

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CYPHER ENTERPRISES, LLC,                    §
                                            §
            Plaintiff,                      §
                                            §
                                            §
v.                                          §      Civil Action No. 4:14-cv-00243-A
                                            §
HASHFAST TECHNOLOGIES LLC and               §
HASHFAST LLC,                               §
                                            §
            Defendants.                     §
                                            §

**PERTINENT HIGHLIGHTED CASE LAW IN SUPPORT OF DEFENDANTS
HASHFAST TECHNOLOGIES LLC
AND HASHFAST LLC'S BRIEF IN SUPPORT OF
<u>MOTION TO DISMISS PURSUANT TO 12(b)(1), 12(b)(2), 12(b)(3) AND 12(b)(6)</u>**

Pursuant to the Paragraph C of the Court's Order of April 22, 2014 [Docket No. 8],

Defendants Hashfast Technologies LLC ("Hashfast Technologies") and Hashfast LLC

("Hashfast") (collectively "Defendants") submit the following pertinent, highlighted cases in

support of their Motion and Brief in Support of Motion to Dismiss Pursuant to Rule 12(b)(1),

12(b)(2), 12(b)(3) and 12(b)(6):

| Tab No. | Name |
|---------|------|
| A | *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) |
| B | *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2000) |

Dated: May 6, 2014

Respectfully submitted,

John D. Penn
Texas Bar No. 15752300
JPenn@perkinscoie.com
Kelly D. Hine
Texas Bar No. 24002290
KHine@perkinscoie.com
Erin E. Leu
Texas Bar No. 24070138
ELeu@perkinscoie.com

Perkins Coie LLP
500 N. Akard Street, Suite 3300
Dallas, Texas 75201
214.965.7700 – Office
214.965.7799 – Facsimile

**Attorneys for Defendants Hashfast
Technologies LLC and Hashfast LLC**

## CERTIFICATE OF SERVICE

On the 6th day of May, 2014, a true and correct copy of the above was sent via certified mail return receipt requested and electronic mail to the following:

Robert J. Bogdanowicz III
325 N. Saint Paul Street, Suite 1500
Dallas, Texas 75201
(214) 736-7861 – Office
(214) 965-8505 – Facsimile
rob@deanslyons.com

Counsel for Defendants





▷

Supreme Court of the United States
Manuel LUJAN, Jr., Secretary of the Interior, Petitioner
v.
DEFENDERS OF WILDLIFE, et al.

No. 90–1424.
Argued Dec. 3, 1991.
Decided June 12, 1992.

Environmental groups brought action challenging regulation of the Secretary of the Interior which required other agencies to confer with him under the Endangered Species Act only with respect to federally funded projects in the United States and on the high seas. The United States District Court for the District of Minnesota, Donald D. Alsop, Chief Judge, dismissed for lack of standing, 658 F.Supp. 43. The Court of Appeals for the Eighth Circuit reversed, 851 F.2d 1035. The District Court entered judgment in favor of environmental groups, 707 F.Supp. 1082, and the Court of Appeals affirmed, 911 F.2d 117. On certiorari, the Supreme Court, Justice Scalia, held that: (1) plaintiffs did not assert sufficiently imminent injury to have standing, and (2) plaintiffs' claimed injury was not redressable.

Reversed and remanded.

Justice Kennedy filed an opinion concurring in part and concurring in the judgment in which Justice Souter joined.

Justice Stevens filed an opinion concurring in the judgment.

Justice Blackmun dissented and filed an opinion in which Justice O'Connor joined.

West Headnotes

[1] Constitutional Law 92 ⚖2330

92 Constitutional Law
    92XX Separation of Powers
        92XX(A) In General
            92k2330 k. In general. Most Cited Cases
(Formerly 92k50)

Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. U.S.C.A. Const. Art. 1, § 1; Art. 2, § 1, cl. 1; Art. 3, § 1 et seq.

[2] Federal Civil Procedure 170A ⚖103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing in General
                170Ak103.2 k. In general; injury or interest. Most Cited Cases
(Formerly 170Ak103.1)

Though some of its elements express merely prudential considerations that are part of judicial self-government, core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III. U.S.C.A. Const. Art. 3, § 1 et seq.

[3] Federal Civil Procedure 170A ⚖103.2

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130

Page 2

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing in General
            170Ak103.2 k. In general; injury or
interest. Most Cited Cases

**Federal Civil Procedure 170A** 🗝103.3

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing in General
            170Ak103.3 k. Causation; redressability. Most Cited Cases

**Federal Civil Procedure 170A** 🗝103.4

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
          170Ak103.1 Standing in General
            170Ak103.4 k. Rights of third parties or
public. Most Cited Cases

Irreducible constitutional minimum of standing requires that plaintiff have suffered an injury in fact, which is an invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical; that there be a causal connection between the injury and conduct complained of so that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court; and that it be likely, as opposed to merely speculative, that injury will be redressed by a favorable decision.

**[4] Federal Civil Procedure 170A** 🗝103.2

170A Federal Civil Procedure
   170AII Parties

170AII(A) In General
   170Ak103.1 Standing in General
      170Ak103.2 k. In general; injury or
interest. Most Cited Cases

In order for injury to be "particularized," it must affect the plaintiff in a personal and individual way.

**[5] Federal Civil Procedure 170A** 🗝103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing in General
            170Ak103.2 k. In general; injury or
interest. Most Cited Cases
         (Formerly 170Bk247)

Party invoking federal jurisdiction bears the burden of establishing elements of standing.

**[6] Federal Civil Procedure 170A** 🗝103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing in General
            170Ak103.2 k. In general; injury or
interest. Most Cited Cases

**Federal Civil Procedure 170A** 🗝103.5

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing in General
            170Ak103.5 k. Pleading. Most Cited
Cases

Elements of standing are not merely pleading requirements but, rather, are an indispensable part of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                    Page 3

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

the plaintiff's case, and each element must be sup-
ported in the same way as any other matter on which
the plaintiff bears the burden of proof, with the man-
ner and degree of evidence required at successive
stages of litigation.

**[7] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing in General
                170Ak103.2 k. In general; injury or
interest. Most Cited Cases

**Federal Civil Procedure 170A ☞2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of proof. Most
Cited Cases

At the pleading stage, general factual allegations
of injury resulting from defendant's conduct may
suffice to establish standing; in response to summary
judgment motion, plaintiff can no longer rest on mere
allegations but must set forth by affidavit or other
evidence the specific facts which will be taken as true
for purposes of summary judgment; at the final stage,
those facts, if controverted, must be supported ade-
quately by the evidence adduced at trial. Fed.Rules
Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞103.3**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing in General

170Ak103.3 k. Causation; redressabil-
ity. Most Cited Cases

When plaintiff's asserted injury arises from the
government's allegedly unlawful regulation or lack of
regulation of someone else, causation and redressa-
bility required for standing hinge on response of the
regulated or regulable third party to the government
action or inaction and on the response of others as
well.

**[9] Environmental Law 149E ☞651**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek
Review; Standing
            149Ek651 k. Cognizable interests and inju-
ries, in general. Most Cited Cases
        (Formerly 187k3.5, 187k31/2)

Desire to use or observe animal species, even for
purely aesthetic purposes, is a cognizable interest for
standing purposes.

**[10] Federal Civil Procedure 170A ☞2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of proof. Most
Cited Cases

To survive summary judgment motion for dis-
missal of suit under Endangered Species Act for lack
of standing, environmental groups had to submit af-
fidavits or other evidence showing, through specific
facts, not only that listed species were in fact being
threatened by funded activities abroad but, also that
one or more of the groups' members would thereby be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

directly affected, apart from their special interest in the subject. Endangered Species Act of 1973, § 11(g), as amended, 16 U.S.C.A. § 1540(g).

**[11] Environmental Law 149E ⚷652**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek652 k. Organizations, associations, and other groups. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Affidavits in which members of organizations stated that they had previously traveled to places in the world where projects being funded by the Agency for International Development (AID) were taking place and that they hoped to be able to return and observe endangered species in those locations did not show that damage to species from the projects would produce imminent injury to them, and organizations thus did not have standing to challenge regulation of the Secretary of the Interior requiring that other agencies consult under the Endangered Species Act only with respect to actions in the United States or on the high seas. Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[12] Federal Civil Procedure 170A ⚷103.2**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing in General
170Ak103.2 k. In general; injury or interest. Most Cited Cases

Imminence of injury is demanded for standing even when the alleged harm does not depend upon affirmative actions of third parties which are beyond the plaintiff's control.

**[13] Environmental Law 149E ⚷651**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek651 k. Cognizable interests and injuries, in general. Most Cited Cases
(Formerly 199k25.15(4.1), 199k25.15(4) Health and Environment)

"Ecosystem nexus," under which a person who uses any part of a continuous ecosystem may be considered adversely affected by activity, does not provide basis for standing to challenge the activity.

**[14] Environmental Law 149E ⚷656**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek656 k. Other particular parties. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Persons seeking to challenge regulation of the Secretary of the Interior which required other agencies to consult under the Endangered Species Act only with respect to federally funded projects in the United States and on the high seas, and not in other countries, could not obtain standing under a "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing, or under a "vocational nexus" approach, under which anyone with a professional interest in the animals can sue. Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[15] Environmental Law 149E ⚷652**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 5
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek
Review; Standing
            149Ek652 k. Organizations, associations,
and other groups. Most Cited Cases
    (Formerly 187k3.5, 187k31/2)

    Harm allegedly suffered by members of environmental groups as result of federal funding of projects in other countries which might threaten endangered species could not be redressed in action against Secretary of the Interior challenging his regulation which required consultation under the Endangered Species Act by other governmental agencies only with respect to funding of projects in the United States and on the high seas, and groups thus lacked standing, as other agencies denied the authority of the Secretary to order consultation and would not be bound by an order and action to which they were not a party. (Per Justice Scalia with the Chief Justice and two Justices concurring and two Justices concurring in part and in the judgment.) Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[16] Federal Civil Procedure 170A ⛝103.3**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing in General
                170Ak103.3 k. Causation; redressability. Most Cited Cases

    Existence of federal jurisdiction ordinarily depends upon facts as they exist when the complaint is filed, and later participation in a suit by those parties necessary for plaintiffs' injury to be redressed will not give plaintiffs standing when their injury was not redressable by any of the parties to the suit at the time that it was filed. (Per Justice Scalia with the Chief

Justice and two Justices concurring and two Justices concurring in part and in the judgment.)

**[17] Environmental Law 149E ⛝656**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek
Review; Standing
            149Ek656 k. Other particular parties. Most Cited Cases
    (Formerly 187k3.5, 187k31/2)

    Members of environmental groups who asserted injury due to lack of opportunity to observe endangered species as a result of projects in other countries partially funded by the Agency for International Development (AID) did not show an injury which would be redressable as a result of challenge to regulation of the Secretary of the Interior which required AID to consult under the Endangered Species Act only with respect to projects in the United States and on the high seas where AID provided less than 10% of the funding for project about which plaintiffs complained and there was nothing to indicate that the project would be suspended or do less harm to endangered species if that funding were eliminated. (Per Justice Scalia with Chief Justice and two Justices concurring and two Justices concurring in part and in judgment.) Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[18] Environmental Law 149E ⛝656**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek
Review; Standing
            149Ek656 k. Other particular parties. Most Cited Cases
    (Formerly 187k3.5, 187k31/2)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                    Page 6

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Persons challenging regulation of the Secretary of the Interior requiring other agencies to consult with him under the Endangered Species Act only with respect to funding of projects in the United States and on the high seas did not have standing on basis of the "citizen-suit" provision of the Endangered Species Act. Endangered Species Act of 1973, §§ 7(a)(2), 11(g), as amended, 16 U.S.C.A. §§ 1536(a)(2), 1540(g).

**[19] Federal Civil Procedure 170A ⟺103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing in General
                170Ak103.4 k. Rights of third parties or public. Most Cited Cases

Plaintiff raising only a generally available grievance about government, and claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large does not state an Article III case or controversy. U.S.C.A. Const. Art. 3, § 1 et seq.

**\*\*2133** *Syllabus* FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Section 7(a)(2) of the Endangered Species Act of 1973 divides responsibilities regarding the protection of endangered species between petitioner Secretary of the Interior and the Secretary of Commerce, and requires each federal agency to consult with the relevant Secretary to ensure that any action funded by the

agency is not likely to jeopardize the continued existence or habitat of any endangered or threatened species. Both Secretaries initially promulgated a joint regulation extending § 7(a)(2)'s coverage to actions taken in foreign nations, but a subsequent joint rule limited the section's geographic scope to the United States and the high seas. Respondents, wildlife conservation and other environmental organizations, filed an action in the District Court, seeking a declaratory judgment that the new regulation erred as to § 7(a)(2)'s geographic scope and an injunction requiring the Secretary of the Interior to promulgate a new rule restoring his initial interpretation. The Court of Appeals reversed the District Court's dismissal of the suit for lack of standing. Upon remand, on cross-motions for summary judgment, the District Court denied the Secretary's motion, which renewed his objection to standing, and granted respondents' motion, ordering the Secretary to publish a new rule. The Court of Appeals affirmed.

**\*\*2134** *Held:* The judgment is reversed, and the case is remanded.

911 F.2d 117, (CA 8 1990), reversed and remanded.

Justice SCALIA delivered the opinion of the Court, except as to Part III–B, concluding that respondents lack standing to seek judicial review of the rule. Pp. 2135–2140, 2142–2146.

(a) As the parties invoking federal jurisdiction, respondents bear the burden of showing standing by establishing, *inter alia,* that they have suffered an injury in fact, *i.e.,* a concrete and particularized, actual or imminent invasion of a legally protected interest. To survive a summary judgment motion, they must set forth by affidavit or other evidence specific facts to support their claim. Standing is particularly difficult to show here, since third parties, rather than respondents, are the object of the Government action or inaction to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                      Page 7
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

which respondents object. Pp. 2135–2137.

**\*556** b) Respondents did not demonstrate that they suffered an injury in fact. Assuming that they established that funded activities abroad threaten certain species, they failed to show that one or more of their members would thereby be directly affected apart from the members' special interest in the subject. See *Sierra Club v. Morton,* 405 U.S. 727, 735, 739, 92 S.Ct. 1361, 1366, 1368, 31 L.Ed.2d 636. Affidavits of members claiming an intent to revisit project sites at some indefinite future time, at which time they will presumably be denied the opportunity to observe endangered animals, do not suffice, for they do not demonstrate an "imminent" injury. Respondents also mistakenly rely on a number of other novel standing theories. Their theory that any person using any part of a contiguous ecosystem adversely affected by a funded activity has standing even if the activity is located far away from the area of their use is inconsistent with this Court's opinion in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695. And they state purely speculative, nonconcrete injuries when they argue that suit can be brought by anyone with an interest in studying or seeing endangered animals anywhere on the globe and anyone with a professional interest in such animals. Pp. 2137–2140.

(c) The Court of Appeals erred in holding that respondents had standing on the ground that the statute's citizen-suit provision confers on all persons the right to file suit to challenge the Secretary's failure to follow the proper consultative procedure, notwithstanding their inability to allege any separate concrete injury flowing from that failure. This Court has consistently held that a plaintiff claiming only a generally available grievance about government, unconnected with a threatened concrete interest of his own, does not state an Article III case or controversy. See, *e.g., Fairchild v. Hughes,* 258 U.S. 126, 129–130, 42 S.Ct. 274, 275, 66 L.Ed. 499. Vindicating the public interest is the function of the Congress and the Chief Execu-

tive. To allow that interest to be converted into an individual right by a statute denominating it as such and permitting all citizens to sue, regardless of whether they suffered any concrete injury, would authorize Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. Pp. 2142–2146.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, in which REHNQUIST, C.J., and WHITE, KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion with respect to Part III–B, in which REHNQUIST, C.J., and WHITE and THOMAS, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER, J., joined, *post,* p. 2146. STEVENS, J., filed an opinion concurring in the judgment, *post,* **\*\*2135 \*557** p. 2147. BLACKMUN, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post,* p. 2151.

*Edwin S. Kneedler* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Robert L. Klarquist, David C. Shilton, Thomas L. Sansonetti,* and *Michael Young.*

*Brian B. O'Neill* argued the cause for respondents. With him on the brief were *Steven C. Schroer* and *Richard A. Duncan.\**

\* *Terence P. Ross, Daniel J. Popeo,* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of Austin et al. by *William A. Butler, Angus E. Crane, Michael J. Bean, Kenneth Oden, James M. McCormack,* and *Wm. Robert Irvin;* for the American Association of Zoological Parks & Aquariums et al. by *Ronald J. Greene* and *W. Hardy Callcott;* for the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                   Page 8
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

American Institute of Biological Sciences by *Richard J. Wertheimer* and *Charles M. Chambers;* and for the Ecotropica Foundation of Brazil et al. by *Durwood J. Zaelke.*

A brief of *amici curiae* was filed for the State of Texas et al. by *Patrick J. Mahoney, Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Nancy N. Lynch, Mary Ruth Holder,* and *Shannon J. Kilgore,* Assistant Attorneys General, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, *Daniel E. Lungren,* Attorney General of California, *Robert A. Butterworth,* Attorney General of Florida, *Michael E. Carpenter,* Attorney General of Maine, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert J. Del Tufo,* Attorney General of New Jersey, *Robert Abrams,* Attorney General of New York, *Lee Fisher,* Attorney General of Ohio, and *Jeffrey L. Amestoy,* Attorney General of Vermont, *Victor A. Kovner, Leonard J. Koerner, Neal M. Janey,* and *Louise H. Renne.*

Justice SCALIA delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, and an opinion with respect to Part III–B, in which THE CHIEF JUSTICE, Justice WHITE, and Justice THOMAS join.

This case involves a challenge to a rule promulgated by the Secretary of the Interior interpreting § 7 of the Endangered *558 Species Act of 1973 (ESA), 87 Stat. 884, 892, as amended, 16 U.S.C. § 1536, in such fashion as to render it applicable only to actions within the United States or on the high seas. The preliminary issue, and the only one we reach, is whether respondents here, plaintiffs below, have standing to seek judicial review of the rule.

I

The ESA, 87 Stat. 884, as amended, 16 U.S.C. § 1531 *et seq.,* seeks to protect species of animals against threats to their continuing existence caused by

man. See generally *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA instructs the Secretary of the Interior to promulgate by regulation a list of those species which are either endangered or threatened under enumerated criteria, and to define the critical habitat of these species. 16 U.S.C. §§ 1533, 1536. Section 7(a)(2) of the Act then provides, in pertinent part:

"Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical." 16 U.S.C. § 1536(a)(2).

In 1978, the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), on behalf of the Secretary of the Interior and the Secretary of Commerce respectively, promulgated a joint regulation stating that the obligations imposed by § 7(a)(2) extend to actions taken in foreign nations. 43 Fed.Reg. 874 (1978). The next year, however, the Interior Department began to reexamine its position. Letter from Leo Kuliz, Solicitor, Department of the Interior, to Assistant Secretary, Fish and Wildlife and Parks, Aug. 8, 1979. A revised joint regulation, reinterpreting*559 § 7(a)(2) to require consultation only for actions taken in the United States or on the high seas, was proposed in 1983, 48 Fed.Reg. 29990, and promulgated in 1986, 51 Fed.Reg. 19926; 50 CFR 402.01 (1991).

Shortly thereafter, respondents, organizations dedicated to wildlife conservation and other environmental causes, filed this action against the Secretary of the Interior, seeking a declaratory judgment that the new regulation is in error as to the geographic scope of § 7(a)(2) and an injunction requiring the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                          Page 9
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Secretary to promulgate a new regulation restoring the initial interpretation. The District Court granted the Secretary's motion to dismiss for lack of standing. *Defenders of Wildlife v. Hodel,* 658 F.Supp. 43, 47–48 (Minn.1987). The Court of Appeals for the Eighth Circuit reversed by a divided vote. *Defenders of Wildlife v. Hodel,* 851 F.2d 1035 (1988). On remand, the Secretary moved for summary judgment on the standing issue, and respondents moved for summary judgment on the merits. The District Court denied the Secretary's motion, on the ground that the Eighth Circuit had already determined the standing question in this case; it granted respondents' merits motion, and ordered the Secretary to publish a revised regulation. *Defenders of Wildlife v. Hodel,* 707 F.Supp. 1082 (Minn.1989). The Eighth Circuit affirmed. 911 F.2d 117 (1990). We granted certiorari, 500 U.S. 915, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).

## II

[1][2] While the Constitution of the United States divides all power conferred upon **\*\*2136** the Federal Government into "legislative Powers," Art. I, § 1, "[t]he executive Power," Art. II, § 1, and "[t]he judicial Power," Art. III, § 1, it does not attempt to define those terms. To be sure, it limits the jurisdiction of federal courts to "Cases" and "Controversies," but an executive inquiry can bear the name "case" (the Hoffa case) and a legislative dispute can bear the name "controversy" (the Smoot–Hawley controversy). Obviously, then, the Constitution's central mechanism of separation of powers depends\*560 largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. In The Federalist No. 48, Madison expressed the view that "[i]t is not infrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," whereas "the executive power [is] restrained within a narrower compass and ... more simple in its nature," and "the judiciary [is] described by landmarks still less uncertain." The Federalist No. 48, p. 256 (Carey and McClellan eds. 1990). One of those

landmarks, setting apart the "Cases" and "Controversies" that are of the justiciable sort referred to in Article III—"serv[ing] to identify those disputes which are appropriately resolved through the judicial process," *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)—is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III. See, *e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

[3][4] Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, see *id.,* at 756, 104 S.Ct., at 3327; *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 1368–1369, n. 16, 31 L.Ed.2d 636 (1972);[FN1] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " *Whitmore, supra,* 495 U.S., at 155, 110 S.Ct., at 1723 (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." \*561*Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct., at 1924, 1926.

FN1. By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                    Page 10
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

[5][6][7] The party invoking federal jurisdiction bears the burden of establishing these elements. See *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990); *Warth, supra,* 422 U.S., at 508, 95 S.Ct., at 2210. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. See *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–889, 110 S.Ct. 3177, 3185–3189, 111 L.Ed.2d 695 (1990); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 114–115, and n. 31, 99 S.Ct. 1601, 1614–1615, and n. 31, 60 L.Ed.2d 66 (1979); **2137*Simon, supra,* 426 U.S., at 45, n. 25, 96 S.Ct., at 1927, and n. 25; *Warth, supra,* 422 U.S., at 527, and n. 6, 95 S.Ct., at 2219, and n. 6 (Brennan, J., dissenting). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *National Wildlife Federation, supra,* 497 U.S., at 889, 110 S.Ct., at 3189. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone, supra,* 441 U.S., at 115, n. 31, 99 S.Ct., at 1616, n. 31.

[8] When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has *562 caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (opinion of KENNEDY, J.); see also *Simon, supra,* 426 U.S., at 41–42, 96 S.Ct., at 1925, 1926; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. *E.g., Warth, supra,* 422 U.S., at 505, 95 S.Ct., at 2208. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Allen, supra,* 468 U.S., at 758, 104 S.Ct., at 3328; *Simon, supra,* 426 U.S., at 44–45, 96 S.Ct., at 1927; *Warth, supra,* 422 U.S., at 505, 95 S.Ct., at 2208.

III

We think the Court of Appeals failed to apply the foregoing principles in denying the Secretary's motion for summary judgment. Respondents had not made the requisite demonstration of (at least) injury and redressability.

A

[9][10] Respondents' claim to injury is that the lack of consultation with respect to certain funded activities abroad "increas[es] the rate of extinction of endangered and threatened species." Complaint ¶ 5,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130

Page 11

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

App. 13. Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of *563 standing. See, *e.g., Sierra Club v. Morton,* 405 U.S., at 734, 92 S.Ct., at 1366. "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.,* at 734–735, 92 S.Ct., at 1366. To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by **2138 funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their " 'special interest' in th[e] subject." *Id.,* at 735, 739, 92 S.Ct., at 1366, 1368. See generally *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

[11][12] With respect to this aspect of the case, the Court of Appeals focused on the affidavits of two Defenders' members—Joyce Kelly and Amy Skilbred. Ms. Kelly stated that she traveled to Egypt in 1986 and "observed the traditional habitat of the endangered nile crocodile there and intend[s] to do so again, and hope[s] to observe the crocodile directly," and that she "will suffer harm in fact as the result of [the] American ... role ... in overseeing the rehabilitation of the Aswan High Dam on the Nile ... and [in] develop [ing] ... Egypt's ... Master Water Plan." App. 101. Ms. Skilbred averred that she traveled to Sri Lanka in 1981 and "observed th[e] habitat" of "endangered species such as the Asian elephant and the leopard" at what is now the site of the Mahaweli project funded by the Agency for International Development (AID), although she "was unable to see any of the endangered species"; "this development project," she continued, "will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited ... [, which] may severely shorten the future of these species"; that threat, she concluded, harmed her because she "intend[s] to return to Sri Lanka in the future

and hope[s] to be more fortunate in spotting at least the endangered elephant and leopard." *Id.,* at 145–146. When Ms. Skilbred was asked *564 at a subsequent deposition if and when she had any plans to return to Sri Lanka, she reiterated that "I intend to go back to Sri Lanka," but confessed that she had no current plans: "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Id.,* at 318.

We shall assume for the sake of argument that these affidavits contain facts showing that certain agency-funded projects threaten listed species—though that is questionable. They plainly contain no facts, however, showing how damage to the species will produce "imminent" injury to Mses. Kelly and Skilbred. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Lyons,* 461 U.S., at 102, 103 S.Ct., at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require. See *supra,* at 2136.[FN2]

> FN2. The dissent acknowledges the settled requirement that the injury complained of be, if not actual, then at least *imminent,* but it contends that respondents could get past summary judgment because "a reasonable finder of fact could conclude ... that ... Kelly or Skilbred will soon return to the project

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 12
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

sites." *Post,* at 2152. This analysis suffers either from a factual or from a legal defect, depending on what the "soon" is supposed to mean. If "soon" refers to the standard mandated by our precedents—that the injury be "imminent," *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)—we are at a loss to see how, as a factual matter, the standard can be met by respondents' mere profession of an intent, some day, to return. But if, as we suspect, "soon" means nothing more than "in this lifetime," then the dissent has undertaken quite a departure from our precedents. Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is " ' "*certainly* impending," ' " *id.,* at 158, 110 S.Ct., at 1725 (emphasis added). It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all. See, *e.g., id.,* at 156–160, 110 S.Ct., at 1723–1726; *Los Angeles v. Lyons,* 461 U.S. 95, 102–106, 103 S.Ct. 1660, 1665–1667, 75 L.Ed.2d 675 (1983).

There is no substance to the dissent's suggestion that imminence is demanded only when the alleged harm depends upon "the affirmative actions of third parties beyond a plaintiff's control," *post,* at 2153. Our cases *mention* third-party-caused contingency, naturally enough; but they also mention the plaintiff's failure to show that he will soon expose *himself* to the injury, see, *e.g., Lyons, supra,* at 105–106, 103 S.Ct., at 1666–1667; *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974); *Ashcroft v. Mattis,* 431 U.S. 171, 172–173, n. 2, 97 S.Ct. 1739, 1740 n. 2, 52 L.Ed.2d 219 (1977) (*per curiam* ). And there is certainly no reason in principle to demand evidence that third persons will take the action exposing the plaintiff to harm, while *presuming* that the plaintiff himself will do so.

Our insistence upon these established requirements of standing does not mean that we would, as the dissent contends, "demand ... detailed descriptions" of damages, such as a "nightly schedule of attempted activities" from plaintiffs alleging loss of consortium. *Post,* at 2153. That case and the others posited by the dissent all involve *actual* harm; the existence of standing is clear, though the precise extent of harm remains to be determined at trial. Where there is no actual harm, however, its imminence (though not its precise extent) must be established.

**2139 [13] *565 Besides relying upon the Kelly and Skilbred affidavits, respondents propose a series of novel standing theories. The first, inelegantly styled "ecosystem nexus," proposes that any person who uses *any part* of a "contiguous ecosystem" adversely affected by a funded activity has standing even if the activity is located a great distance away. This approach, as the Court of Appeals correctly observed, is inconsistent with our opinion in *National Wildlife Federation,* which held that a plaintiff claiming injury from environmental damage*566 must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it. 497 U.S., at 887–889, 110 S.Ct., at 3188–3189; see also *Sierra Club,* 405

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 13

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

U.S., at 735, 92 S.Ct., at 1366. It makes no difference that the general-purpose section of the ESA states that the Act was intended in part "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b). To say that the Act protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question.

[14] Respondents' other theories are called, alas, the "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing; and the "vocational nexus" approach, under which anyone with a professional interest in such animals can sue. Under these theories, anyone who goes to see Asian elephants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing to sue because the Director of the Agency for International Development (AID) did not consult with the Secretary regarding the AID-funded project in Sri Lanka. This is beyond all reason. Standing is not "an ingenious academic exercise in the conceivable," *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm. It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible—though it goes to the outermost limit of plausibility—to think that a person who observes or works with animals **2140 of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that *567 might have been the subject of his interest will no longer exist, see *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2866,

n. 4, 92 L.Ed.2d 166 (1986). It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.[FN3]

> FN3. The dissent embraces each of respondents' "nexus" theories, rejecting this portion of our analysis because it is "unable to see how the distant location of the destruction *necessarily* (for purposes of ruling at summary judgment) mitigates the harm" to the plaintiff. *Post,* at 2154. But summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Respondents had to adduce facts, therefore, on the basis of which it could reasonably be found that concrete injury to their members was, as our cases require, "certainly impending." The dissent may be correct that the geographic remoteness of those members (here in the United States) from Sri Lanka and Aswan does not "*necessarily* " prevent such a finding—but it assuredly does so when no further facts have been brought forward (and respondents have produced none) showing that the impact upon animals in those distant places will in some fashion be reflected here. The dissent's position to the contrary reduces to the notion that distance *never* prevents harm, a proposition we categorically reject. It cannot be that a person with an interest in an animal automatically has standing to enjoin federal threats to that species of animal, anywhere in the world. Were that the case, the plaintiff in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                 Page 14
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

*Sierra Club,* for example, could have avoided the necessity of establishing anyone's use of Mineral King by merely identifying one of its members interested in an endangered species of flora or fauna at that location. Justice BLACKMAN's accusation that a special rule is being crafted for "environmental claims," *post,* at 2154, is correct, but *he* is the craftsman.

Justice STEVENS, by contrast, would allow standing on an apparent "animal nexus" theory to all plaintiffs whose interest in the animals is "genuine." Such plaintiffs, we are told, do not have to visit the animals because the animals are analogous to family members. *Post,* at 2148–2149, and n. 2. We decline to join Justice STEVENS in this Linnaean leap. It is unclear to us what constitutes a "genuine" interest; how it differs from a "nongenuine" interest (which nonetheless prompted a plaintiff to file suit); and why such an interest in animals should be different from such an interest in anything else that is the subject of a lawsuit.

**\*568 B**

Besides failing to show injury, respondents failed to demonstrate redressability. Instead of attacking the separate decisions to fund particular projects allegedly causing them harm, respondents chose to challenge a more generalized level of Government action (rules regarding consultation), the invalidation of which would affect all overseas projects. This programmatic approach has obvious practical advantages, but also obvious difficulties insofar as proof of causation or redressability is concerned. As we have said in another context, "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations ... [are], even when premised on allegations of several instances of violations of law, ... rarely

if ever appropriate for federal-court adjudication." *Allen,* 468 U.S., at 759–760, 104 S.Ct., at 3329.

[15] The most obvious problem in the present case is redressability. Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question. Whereas in other contexts the ESA is quite explicit as to the Secretary's controlling authority, see, *e.g.,* 16 U.S.C. § 1533(a)(1) ( "The Secretary shall" promulgate regulations determining endangered species); § 1535(d)(1) **\*\*2141** ("The Secretary is authorized to provide financial assistance to any State"), with respect to consultation the initiative, and hence arguably the initial responsibility for determining statutory necessity, lies with **\*569** the agencies, see § 1536(a)(2) ("*Each Federal agency shall,* in consultation with and with the assistance of the Secretary, insure that any" funded action is not likely to jeopardize endangered or threatened species) (emphasis added). When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies, see 51 Fed.Reg. 19928 (1986). The Solicitor General, however, has repudiated that position here, and the agencies themselves apparently deny the Secretary's authority. (During the period when the Secretary took the view that § 7(a)(2) did apply abroad, AID and FWS engaged in a running controversy over whether consultation was required with respect to the Mahaweli project, AID insisting that consultation applied only to domestic actions.)

[16] Respondents assert that this legal uncertainty did not affect redressability (and hence standing) because the District Court itself could resolve the issue of the Secretary's authority as a necessary part of its standing inquiry. Assuming that it is appropriate to resolve an issue of law such as this in connection with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 15
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

a threshold standing inquiry, resolution by the District Court would not have remedied respondents' alleged injury anyway, because it would not have been binding upon the agencies. They were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced.[FN4] The *570 Court of Appeals tried to finesse this problem by simply proclaiming that "[w]e are satisfied that an injunction requiring the Secretary to publish [respondents' desired] regulatio[n] ... would result in consultation." *Defenders of Wildlife,* 851 F.2d, at 1042, 1043–1044. We do not know what would justify that confidence, particularly when the Justice Department (presumably after consultation with the agencies) has taken the **2142 position that the regulation is not binding.[FN5] The *571 short of the matter is that redress of the only injury in fact respondents complain of requires action (termination of funding until consultation) by the individual funding agencies; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action.

> FN4. We need not linger over the dissent's facially impracticable suggestion, *post,* at 2154–2155, that one agency of the Government can acquire the power to direct other agencies by simply claiming that power in its own regulations and in litigation to which the other agencies are not parties. As for the contention that the other agencies will be "collaterally estopped" to challenge our judgment that they are bound by the Secretary of the Interior's views, because of their participation in this suit, *post,* at 2155–2156: Whether or not that is true now, it was assuredly not true when this suit was filed, naming the Secretary alone. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989) (em-

phasis added). It cannot be that, by later participating in the suit, the State Department and AID retroactively created a redressability (and hence a jurisdiction) that did not exist at the outset.

The dissent's rejoinder that redressability *was* clear at the outset because the *Secretary* thought the regulation binding on the agencies, *post,* at 2156, n. 4, continues to miss the point: The *agencies* did not *agree* with the Secretary, nor would they be bound by a district court holding (as to this issue) in the Secretary's favor. There is no support for the dissent's novel contention, *ibid,* that Rule 19 of the Federal Rules of Civil Procedure, governing joinder of indispensable parties, somehow alters our longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed. The redressability element of the Article III standing requirement and the "*complete relief*" referred to by Rule 19 are not identical. Finally, we reach the dissent's contention, *post,* at 2156, n. 4, that by refusing to waive our settled rule for purposes of this case we have made "federal subject-matter jurisdiction ... a one-way street running the Executive Branch's way." That is so, we are told, because the Executive can dispel jurisdiction where it previously existed (by either conceding the merits or by pointing out that nonparty agencies would not be bound by a ruling), whereas a plaintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct. But *any* defendant, not just the Government, can dispel jurisdiction by conceding the merits (and presumably thereby suffering a judgment) or by demonstrating standing defects. And permitting a defendant to point out a pre-existing standing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                    Page 16

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

defect late in the day is not remotely comparable to permitting a plaintiff to *establish* standing on the basis of the defendant's litigation conduct occurring after standing is erroneously determined.

FN5. Seizing on the fortuity that the case has made its way to *this* Court, Justice STEVENS protests that no agency would ignore "an authoritative construction of the [ESA] by this Court." *Post,* at 2149. In that he is probably correct; in concluding from it that plaintiffs have demonstrated redressability, he is not. Since, as we have pointed out above, standing is to be determined as of the commencement of suit; since at that point it could certainly not be known that the suit would reach this Court; and since it is not likely that an agency would feel compelled to accede to the legal view of a district court expressed in a case to which it was not a party; redressability clearly did not exist.

[17] A further impediment to redressability is the fact that the agencies generally supply only a fraction of the funding for a foreign project. AID, for example, has provided less than 10% of the funding for the Mahaweli project. Respondents have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated. As in *Simon,* 426 U.S., at 43–44, 96 S.Ct., at 1926–1927, it is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.[FN6] There is no standing.

FN6. The dissent criticizes us for "overlook[ing]" memoranda indicating that the Sri Lankan Government solicited and required AID's assistance to mitigate the effects of the Mahaweli project on endangered species, and that the Bureau of Reclamation was advising the Aswan project. *Post,* at 2157–2158. The

memoranda, however, contain no indication whatever that the projects will cease or be less harmful to listed species in the absence of AID funding. In fact, the Sri Lanka memorandum suggests just the opposite: It states that AID's role will be to *mitigate* the " 'negative impacts to the wildlife,' " *post,* at 2157, which means that the termination of AID funding would *exacerbate* respondents' claimed injury.

IV

[18] The Court of Appeals found that respondents had standing for an additional reason: because they had suffered a "procedural injury." The so-called "citizen-suit" provision of the ESA provides, in pertinent part, that "any person may commence**572 a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter." 16 U.S.C. § 1540(g). The court held that, because § 7(a)(2) requires interagency consultation, the citizen-suit provision creates a "procedural righ[t]" to consultation in all "persons"—so that *anyone* can file suit in federal court to challenge the Secretary's (or presumably any other official's) failure to follow the assertedly correct consultative procedure, notwithstanding his or her inability to allege any discrete injury flowing from that failure. 911 F.2d, at 121–122. To understand the remarkable nature of this holding one must be clear about what it does *not* rest upon: This is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e.g.,* the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them).[FN7] Nor is it simply a case where concrete injury has been **2143 suffered by many persons, as in mass fraud or mass tort situations. Nor, finally, is it the *573 unusual case in which Congress has created a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Page 17

concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff. Rather, the court held that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, non-instrumental "right" to have the Executive observe the procedures required by law. We reject this view.[FN8]

> FN7. There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the Government's argument that, *even if* the other agencies were obliged to consult with the Secretary, they might not have followed his advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

> FN8. The dissent's discussion of this aspect of the case, *post*, at 2157–2160, distorts our opinion. We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing. The dissent, however,

asserts that there exist "classes of procedural duties ... so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty." *Post*, at 2159. If we understand this correctly, it means that the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree. The dissent is unable to cite a single case in which we actually found standing solely on the basis of a "procedural right" unconnected to the plaintiff's own concrete harm. Its suggestion that we did so in *Japan Whaling Assn. v. American Cetacean Soc.*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), *post*, at 2158–2159, is not supported by the facts. In the former case, we found that the environmental organizations had standing because the "whale watching and studying of their members w [ould] be adversely affected by continued whale harvesting," see 478 U.S., at 230–231, n. 4, 106 S.Ct., at 2866, n. 4; and in the latter we did not so much as mention standing, for the very good reason that the plaintiff was a citizens' council for the area in which the challenged construction was to occur, so that its members would obviously be concretely affected, see *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 812–813 (CA9 1987).

[19] We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every

112 S.Ct. 2130                                                                                Page 18

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

citizen's interest in proper application of the Constitution and laws, and seeking relief that *574 no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy. For example, in *Fairchild v. Hughes,* 258 U.S. 126, 129–130, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922), we dismissed a suit challenging the propriety of the process by which the Nineteenth Amendment was ratified. Justice Brandeis wrote for the Court:

> "[This is] not a case within the meaning of ... Article III.... Plaintiff has [asserted] only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted. Obviously this general right does not entitle a private citizen to institute in the federal courts a suit...." *Ibid.*

In *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), we dismissed for lack of Article III standing a taxpayer suit challenging the propriety of certain federal expenditures. We said:

> "The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.... Here the parties plaintiff have no such case.... [T]heir complaint ... is merely that officials of the executive department of the government are executing and will execute **2144 an act of Congress asserted to be unconstitutional; and this we are asked to prevent. To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id.,* at 488–489, 43 S.Ct., at 601.

In *Ex parte Lévitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), we dismissed a suit contending that Justice Black's appointment to this Court violated the Ineligibility Clause, Art. I, § 6, cl. 2. *575 "It is an established principle," we said, "that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." 302 U.S., at 634, 58 S.Ct., at 1. See also *Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429, 433–434, 72 S.Ct. 394, 396–397, 96 L.Ed. 475 (1952) (dismissing taxpayer action on the basis of *Mellon*).

More recent cases are to the same effect. In *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), we dismissed for lack of standing a taxpayer suit challenging the Government's failure to disclose the expenditures of the Central Intelligence Agency, in alleged violation of the constitutional requirement, Art. I, § 9, cl. 7, that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." We held that such a suit rested upon an impermissible "generalized grievance," and was inconsistent with "the framework of Article III" because "the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.' " *Richardson, supra,* at 171, 176–177, 94 S.Ct., at 2944, 2946. And in *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), we dismissed for the same reasons a citizen-taxpayer suit contending that it was a violation of the Incompatibility Clause, Art. I, § 6, cl. 2, for Members of Congress to hold commissions in the military Reserves. We said that the challenged action, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance.... We reaffirm *Levitt* in holding that standing to sue may not be predicated upon an interest of th[is] kind...." *Schlesinger, supra,* at 217, 220, 94 S.Ct., at 2930, 2932. Since *Schlesinger* we have on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

two occasions held that an injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable because *576 " 'assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.' " *Allen,* 468 U.S., at 754, 104 S.Ct., at 3326; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 483, 102 S.Ct. 752, 764, 70 L.Ed.2d 700 (1982). And only two Terms ago, we rejected the notion that Article III permits a citizen suit to prevent a condemned criminal's execution on the basis of " 'the public interest protections of the Eighth Amendment' "; once again, "[t]his allegation raise [d] only the 'generalized interest of all citizens in constitutional governance' ... and [was] an inadequate basis on which to grant ... standing." *Whitmore,* 495 U.S., at 160, 110 S.Ct., at 1725.

To be sure, our generalized-grievance cases have typically involved Government violation of procedures assertedly ordained by the Constitution rather than the Congress. But there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right. Whether the courts were to act on their own, or at the invitation of Congress, in ignoring the concrete injury requirement described in our cases, they would be discarding a principle fundamental **2145 to the separate and distinct constitutional role of the Third Branch—one of the essential elements that identifies those "Cases" and "Controversies" that are the business of the courts rather than of the political branches. "The province of the court," as Chief Justice Marshall said in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803), "is, solely, to decide on the rights of individuals." Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive. The question presented here is whether the public interest in proper administration of the laws (specifically, in

agencies' observance of a particular, statutorily prescribed procedure) can be converted into an individual right by a statute that denominates it as such, and *577 that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue. If the concrete injury requirement has the separation-of-powers significance we have always said, the answer must be obvious: To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," *Massachusetts v. Mellon,* 262 U.S., at 489, 43 S.Ct., at 601, and to become " 'virtually continuing monitors of the wisdom and soundness of Executive action.' " *Allen, supra,* 468 U.S., at 760, 104 S.Ct., at 3329 (quoting *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)). We have always rejected that vision of our role:

> "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers.... This is very far from assuming that the courts are charged more than administrators or legislators with the protection of the rights of the people. Congress and the Executive supervise the acts of administrative agents.... But under Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power." *Stark v. Wickard,* 321 U.S. 288, 309–310, 64 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 20

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

559, 571, 88 L.Ed. 733 (1944) (footnote omitted).

*578 "Individual rights," within the meaning of this passage, do not mean public rights that have been legislatively pronounced to belong to each individual who forms part of the public. See also *Sierra Club,* 405 U.S., at 740–741, n. 16, 92 S.Ct., at 1369, n. 16.

Nothing in this contradicts the principle that "[t]he ... injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Warth,* 422 U.S., at 500, 95 S.Ct., at 2206 (quoting *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, n. 3, 93 S.Ct. 1146, 1148, n. 3, 35 L.Ed.2d 536 (1973)). Both of the cases used by *Linda R. S.* as an illustration of that principle involved Congress' elevating to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law (namely, injury to an individual's personal interest in living in a racially integrated community, see *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 208–212, 93 S.Ct. 364, 366–368, 34 L.Ed.2d 415 (1972), and injury to a company's interest in marketing its product free from competition, see *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968)). As we said in *Sierra Club,* "[Statutory] broadening [of] the categories of injury that may be alleged in support **2146 of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." 405 U.S., at 738, 92 S.Ct., at 1368. Whether or not the principle set forth in *Warth* can be extended beyond that distinction, it is clear that in suits against the Government, at least, the concrete injury requirement must remain.

* * *

We hold that respondents lack standing to bring this action and that the Court of Appeals erred in denying the summary judgment motion filed by the United States. The opinion of the Court of Appeals is hereby reversed, and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*

*579 Justice KENNEDY, with whom Justice SOUTER joins, concurring in part and concurring in the judgment.

Although I agree with the essential parts of the Court's analysis, I write separately to make several observations.

I agree with the Court's conclusion in Part III–A that, on the record before us, respondents have failed to demonstrate that they themselves are "among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). This component of the standing inquiry is not satisfied unless

"[p]laintiffs ... demonstrate a 'personal stake in the outcome.' ... Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted).

While it may seem trivial to require that Mses. Kelly and Skilbred acquire airline tickets to the project sites or announce a date certain upon which they will return, see *ante,* at 2138, this is not a case where it is reasonable to assume that the affiants will be using the sites on a regular basis, see *Sierra Club v. Morton, supra,* 405 U.S., at 735, n. 8, 92 S.Ct., at 1366, n. 8, nor do the affiants claim to have visited the sites since the projects commenced. With respect to the Court's discussion of respondents' "ecosystem nexus," "animal nexus," and "vocational nexus" theories, *ante,* at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

2139–2140, I agree that on this record respondents' showing is insufficient to establish standing on any of these bases. I am not willing to foreclose the possibility, however, that in different circumstances a nexus theory similar to those proffered here might support a claim to standing. See *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986) ("[R]espondents ... undoubtedly have alleged a sufficient 'injury in fact' in that *580 the whale watching and studying of their members will be adversely affected by continued whale harvesting").

In light of the conclusion that respondents have not demonstrated a concrete injury here sufficient to support standing under our precedents, I would not reach the issue of redressability that is discussed by the plurality in Part III–B.

I also join Part IV of the Court's opinion with the following observations. As Government programs and policies become more complex and farreaching, we must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition. Modern litigation has progressed far from the paradigm of Marbury suing Madison to get his commission, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), or Ogden seeking an injunction to halt Gibbons' steamboat operations, *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). In my view, Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before,**2147 and I do not read the Court's opinion to suggest a contrary view. See *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *ante,* at 2145–2146. In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit. The citizen-suit provision of the Endangered Species Act does not meet these minimal requirements, because while the statute purports to confer a right on "any person ... to enjoin ...

the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter," it does not of its own force establish that there is an injury in "any person" by virtue of any "violation." 16 U.S.C. § 1540(g)(1)(A).

The Court's holding that there is an outer limit to the power of Congress to confer rights of action is a direct and necessary consequence of the case and controversy limitations found in Article III. I agree that it would exceed those limitations if, at the behest of Congress and in the absence*581 of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way. This requirement is not just an empty formality. It preserves the vitality of the adversarial process by assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome, and that "the legal questions presented ... will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In addition, the requirement of concrete injury confines the Judicial Branch to its proper, limited role in the constitutional framework of Government.

An independent judiciary is held to account through its open proceedings and its reasoned judgments. In this process it is essential for the public to know what persons or groups are invoking the judicial power, the reasons that they have brought suit, and whether their claims are vindicated or denied. The concrete injury requirement helps assure that there can be an answer to these questions; and, as the Court's opinion is careful to show, that is part of the constitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                 Page 22

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

tional design.

With these observations, I concur in Parts I, II, III–A, and IV of the Court's opinion and in the judgment of the Court.

Justice STEVENS, concurring in the judgment.

Because I am not persuaded that Congress intended the consultation requirement in § 7(a)(2) of the Endangered Species Act of 1973 (ESA), 16 U.S.C. § 1536(a)(2), to apply to activities in foreign countries, I concur in the judgment of reversal. I do not, however, agree with the Court's conclusion*582 that respondents lack standing because the threatened injury to their interest in protecting the environment and studying endangered species is not "imminent." Nor do I agree with the plurality's additional conclusion that respondents' injury is not "redressable" in this litigation.

I

In my opinion a person who has visited the critical habitat of an endangered species has a professional interest in preserving the species and its habitat, and intends to revisit them in the future has standing to challenge agency action that threatens their destruction. Congress has found that a wide variety of endangered species of fish, wildlife, and plants are of "aesthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." **214816 U.S.C. § 1531(a)(3). Given that finding, we have no license to demean the importance of the interest that particular individuals may have in observing any species or its habitat, whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species. Indeed, this Court has often held that injuries to such interests are sufficient to confer standing,[FN1] and the Court reiterates that holding today. See *ante*, at 2137.

FN1. See, *e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *United States v. Stu-*

*dents Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686–687, 93 S.Ct. 2405, 2415–2416, 37 L.Ed.2d 254 (1973); *Japan Whaling Assn. v. American Cetacean Society*, 478 U.S. 221, 230–231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986).

The Court nevertheless concludes that respondents have not suffered "injury in fact" because they have not shown that the harm to the endangered species will produce "imminent" injury to them. See *ante,* at 2138. I disagree. An injury to an individual's interest in studying or enjoying a species and its natural habitat occurs when someone (whether it be the Government or a private party) takes action that harms that species and habitat. In my judgment, *583 therefore, the "imminence" of such an injury should be measured by the timing and likelihood of the threatened environmental harm, rather than—as the Court seems to suggest, *ante,* at 2138–2139, and n. 2—by the time that might elapse between the present and the time when the individuals would visit the area if no such injury should occur.

To understand why this approach is correct and consistent with our precedent, it is necessary to consider the purpose of the standing doctrine. Concerned about "the proper—and properly limited—role of the courts in a democratic society," we have long held that "Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin,* 422 U.S. 490, 498–499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The plaintiff must have a "personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). For that reason, "[a]bstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the chal-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                      Page 23
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

lenged statute or official conduct.... The injury or threat of injury must be both 'real and immediate,' not 'conjectural,' or 'hypothetical.' " *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (quoting *Golden v. Zwickler,* 394 U.S. 103, 109–110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969)).

Consequently, we have denied standing to plaintiffs whose likelihood of suffering any concrete adverse effect from the challenged action was speculative. See, *e.g., Whitmore v. Arkansas,* 495 U.S. 149, 158–159, 110 S.Ct. 1717, 1724–1725, 109 L.Ed.2d 135 (1990); *Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *O'Shea,* 414 U.S., at 497, 94 S.Ct., at 676. In this case, however, the likelihood that respondents will be injured by the destruction of the endangered species is not speculative. If respondents are genuinely interested in the preservation of the endangered species and intend to study or observe these animals in the future, their injury will occur as soon as the animals are destroyed. Thus the only potential*584 source of "speculation" in this case is whether respondents' intent to study or observe the animals is genuine.[FN2] In my view, Joyce Kelly and Amy Skilbred have **2149 introduced sufficient evidence to negate petitioner's contention that their claims of injury are "speculative" or "conjectural." As Justice BLACKMUN explains, *post,* at 2152–2153, a reasonable finder of fact could conclude, from their past visits, their professional backgrounds, and their affidavits and deposition testimony, that Ms. Kelly and Ms. Skilbred will return to the project sites and, consequently, will be injured by the destruction of the endangered species and critical habitat.

> FN2. As we recognized in *Sierra Club v. Morton,* 405 U.S., at 735, 92 S.Ct. at 1366, the impact of changes in the esthetics or ecology of a particular area does "not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use [the area,] and for whom the aes-

thetic and recreational values of the area will be lessened...." Thus, respondents would not be injured by the challenged projects if they had not visited the sites or studied the threatened species and habitat. But, as discussed above, respondents did visit the sites; moreover, they have expressed an intent to do so again. This intent to revisit the area is significant evidence tending to confirm the genuine character of respondents' interest, but I am not at all sure that an intent to revisit would be indispensable in every case. The interest that confers standing in a case of this kind is comparable, though by no means equivalent, to the interest in a relationship among family members that can be immediately harmed by the death of an absent member, regardless of when, if ever, a family reunion is planned to occur. Thus, if the facts of this case had shown repeated and regular visits by the respondents, cf. *ante,* at 2146 (opinion of KENNEDY, J.), proof of an intent to revisit might well be superfluous.

The plurality also concludes that respondents' injuries are not redressable in this litigation for two reasons. First, respondents have sought only a declaratory judgment that the Secretary of the Interior's regulation interpreting § 7(a)(2) to require consultation only for agency actions in the United States or on the high seas is invalid and an injunction requiring him to promulgate a new regulation requiring consultation for agency actions abroad as well. But, the plurality opines, even if respondents succeed and a new regulation is *585 promulgated, there is no guarantee that federal agencies that are not parties to this case will actually consult with the Secretary. See *ante,* at 2140–2142. Furthermore, the plurality continues, respondents have not demonstrated that federal agencies can influence the behavior of the foreign governments where the affected projects are located. Thus, even if the agencies consult with the Secretary and terminate funding for foreign projects, the foreign

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                    Page 24
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

governments might nonetheless pursue the projects and jeopardize the endangered species. See *ante,* at 2142. Neither of these reasons is persuasive.

We must presume that if this Court holds that § 7(a)(2) requires consultation, all affected agencies would abide by that interpretation and engage in the requisite consultations. Certainly the Executive Branch cannot be heard to argue that an authoritative construction of the governing statute by this Court may simply be ignored by any agency head. Moreover, if Congress has required consultation between agencies, we must presume that such consultation will have a serious purpose that is likely to produce tangible results. As Justice BLACKMUN explains, *post,* at 2156–2157, it is not mere speculation to think that foreign governments, when faced with the threatened withdrawal of United States assistance, will modify their projects to mitigate the harm to endangered species.

## II

Although I believe that respondents have standing, I nevertheless concur in the judgment of reversal because I am persuaded that the Government is correct in its submission that § 7(a)(2) does not apply to activities in foreign countries. As with all questions of statutory construction, the question whether a statute applies extraterritorially is one of congressional intent. *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 284–285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). We normally assume that "Congress is primarily concerned with domestic conditions," *id.,* at 285, 69 S.Ct., at 577, and therefore presume that " 'legislation of Congress, unless a *586 contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States,' " **2150*EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227,1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros.,* 336 U.S., at 285, 69 S.Ct., at 577).

Section 7(a)(2) provides, in relevant part:

"Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce, as appropriate[FN3]], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section...." 16 U.S.C. § 1536(a)(2).

> FN3. The ESA defines "Secretary" to mean "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970." 16 U.S.C. § 1532(15). As a general matter, "marine species are under the jurisdiction of the Secretary of Commerce and all other species are under the jurisdiction of the Secretary of the Interior." 51 Fed.Reg. 19926 (1986) (preamble to final regulations governing interagency consultation promulgated by the Fish and Wildlife Service and the National Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce).

Nothing in this text indicates that the section applies in foreign countries.[FN4] Indeed, the only geographic reference in *587 the section is in the "critical habitat" clause,[FN5] which mentions "affected States." The Secretary of the Interior and the Secretary of Commerce have consistently taken the position that they need not designate critical habitat in foreign countries. See 42 Fed.Reg. 4869 (1977) (initial regulations of the Fish and Wildlife Service and the Na-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

tional Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce).
Consequently, neither Secretary interprets § 7(a)(2) to
require federal agencies to engage in consultations to
ensure that their actions in foreign countries will not
adversely affect the critical habitat of endangered or
threatened species.

> FN4. Respondents point out that the duties in
> § 7(a)(2) are phrased in broad, inclusive
> language: "Each Federal agency" shall con
> sult with the Secretary and ensure that "any
> action" does not jeopardize "any endangered
> or threatened species" or destroy or adversely
> modify the "habitat of such species." See
> Brief for Respondents 36; 16 U.S.C. §
> 1536(a)(2). The Court of Appeals correctly
> recognized, however, that such inclusive
> language, by itself, is not sufficient to over
> come the presumption against the extraterri
> torial application of statutes. 911 F.2d 117,
> 122 (CA8 1990); see also *Foley Bros., Inc. v.
> Filardo,* 336 U.S. 281, 282, 287–288, 69
> S.Ct. 575, 578–579, 93 L.Ed. 680 (1949)
> (statute requiring an 8–hour day provision in
> " '[e]very contract made to which the United
> States ... is a party' " is inapplicable to con
> tracts for work performed in foreign coun
> tries).

> FN5. Section 7(a)(2) has two clauses which
> require federal agencies to consult with the
> Secretary to ensure that their actions (1) do
> not jeopardize threatened or endangered
> species (the "endangered species clause"),
> and (2) are not likely to destroy or adversely
> affect the habitat of such species (the "critical
> habitat clause").

That interpretation is sound, and, in fact, the
Court of Appeals did not question it.[FN6] There is,
moreover, no indication that Congress intended to
give a different geographic scope to the two clauses in

§ 7(a)(2). To the contrary, Congress recognized that
one of the "major causes" of extinction of *588 endangered species is the "destruction of **2151 natural
habitat." S.Rep. No. 93–307, p. 2 (1973); see also
H.Rep. No. 93–412, p. 2 (1973), U.S.Code Cong. &
Admin.News 1973, pp. 2989, 2990; *TVA v. Hill,* 437
U.S. 153, 179, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117
(1978). It would thus be illogical to conclude that
Congress required federal agencies to avoid jeopardy
to endangered species abroad, but not destruction of
critical habitat abroad.

> FN6. Instead, the Court of Appeals con
> cluded that the endangered species clause
> and the critical habitat clause are "severable,"
> at least with respect to their "geographical
> scope," so that the former clause applies ex
> traterritorially even if the latter does not. 911
> F.2d, at 125. Under this interpretation, fed
> eral agencies must consult with the Secretary
> to ensure that their actions in foreign coun
> tries are not likely to threaten any endangered
> species, but they need not consult to ensure
> that their actions are not likely to destroy the
> critical habitats of these species. I cannot
> subscribe to the Court of Appeals' strained
> interpretation, for there is no indication that
> Congress intended to give such vastly dif
> ferent scope to the two clauses in § 7(a)(2).

The lack of an express indication that the consultation requirement applies extraterritorially is particularly significant because other sections of the ESA
expressly deal with the problem of protecting endangered species abroad. Section 8, for example, authorizes the President to provide assistance to "any foreign
country (with its consent) ... in the development and
management of programs in that country which [are]
... necessary or useful for the conservation of any
endangered species or threatened species listed by the
Secretary pursuant to section 1533 of this title." 16
U.S.C. § 1537(a). It also directs the Secretary of the
Interior, "through the Secretary of State," to "en

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                        Page 26
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

courage" foreign countries to conserve fish and wild-life and to enter into bilateral or multilateral agreements. § 1537(b). Section 9 makes it unlawful to import endangered species into (or export them from) the United States or to otherwise traffic in endangered species "in interstate or foreign commerce." §§ 1538(a)(1)(A), (E), (F). Congress thus obviously thought about endangered species abroad and devised specific sections of the ESA to protect them. In this context, the absence of any explicit statement that the consultation requirement is applicable to agency actions in foreign countries suggests that Congress did not intend that § 7(a)(2) apply extraterritorially.

Finally, the general purpose of the ESA does not evince a congressional intent that the consultation requirement be applicable to federal agency actions abroad. The congressional findings explaining the need for the ESA emphasize that "various species of fish, wildlife, and plants *in the United States* have been rendered extinct as a consequence *589 of economic growth and development untempered by adequate concern and conservation," and that these species "are of aesthetic, ecological, educational, historical, recreational, and scientific value to the *Nation and its people.*" §§ 1531(1), (3) (emphasis added). The lack of similar findings about the harm caused by development in other countries suggests that Congress was primarily concerned with balancing development and conservation goals in this country.[FN7]

> FN7. Of course, Congress also found that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to [several international agreements]," and that "encouraging the States ... to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments...." 16 U.S.C. §§ 1531(4), (5). The Court of

Appeals read these findings as indicative of a congressional intent to make § 7(a)(2)'s consultation requirement applicable to agency action abroad. See 911 F.2d, at 122–123. I am not persuaded, however, that such a broad congressional intent can be gleaned from these findings. Instead, I think the findings indicate a more narrow congressional intent that the United States abide by its international commitments.

In short, a reading of the entire statute persuades me that Congress did not intend the consultation requirement in § 7(a)(2) to apply to activities in foreign countries. Accordingly, notwithstanding my disagreement with the Court's disposition of the standing question, I concur in its judgment.

Justice BLACKMUN, with whom Justice O'CONNOR joins, dissenting.

I part company with the Court in this case in two respects. First, I believe that respondents have raised genuine issues of fact—sufficient to survive summary judgment—both as to injury and as to redressability. Second, I question the Court's breadth of language in rejecting standing for "procedural" injuries. I fear the Court seeks to impose fresh limitations on the constitutional **2152 authority of Congress to allow *590 citizen suits in the federal courts for injuries deemed "procedural" in nature. I dissent.

### I

Article III of the Constitution confines the federal courts to adjudication of actual "Cases" and "Controversies." To ensure the presence of a "case" or "controversy," this Court has held that Article III requires, as an irreducible minimum, that a plaintiff allege (1) an injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and that is (3) "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                              Page 27

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

A

To survive petitioner's motion for summary judgment on standing, respondents need not prove that they are actually or imminently harmed. They need show only a "genuine issue" of material fact as to standing. Fed.Rule Civ.Proc. 56(c). This is not a heavy burden. A "genuine issue" exists so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party [respondents]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This Court's "function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.,* at 249, 106 S.Ct., at 2511.

The Court never mentions the "genuine issue" standard. Rather, the Court refers to the type of evidence it feels respondents failed to produce, namely, "affidavits or other evidence showing, through specific facts" the existence of injury. *Ante,* at 2137. The Court thereby confuses respondents' evidentiary burden (*i.e.,* affidavits asserting "specific facts") in withstanding a summary judgment motion under Rule 56(e) with the standard of proof (*i.e.,* the existence of a "genuine issue" of "material fact") under Rule 56(c).

***591 I**

Were the Court to apply the proper standard for summary judgment, I believe it would conclude that the sworn affidavits and deposition testimony of Joyce Kelly and Amy Skilbred advance sufficient facts to create a genuine issue for trial concerning whether one or both would be imminently harmed by the Aswan and Mahaweli projects. In the first instance, as the Court itself concedes, the affidavits contained facts making it at least "questionable" (and therefore within the province of the factfinder) that certain agency-funded projects threaten listed species.[FN1] *Ante,* at 2138. The only remaining issue, then, is whether Kelly and Skilbred have shown that they personally would suffer imminent harm.

FN1. The record is replete with genuine issues of fact about the harm to endangered species from the Aswan and Mahaweli projects. For example, according to an internal memorandum of the Fish and Wildlife Service, no fewer than eight listed species are found in the Mahaweli project area (Indian elephant, leopard, purple-faced langur, toque macaque, red face malkoha, Bengal monitor, mugger crocodile, and python). App. 78. The memorandum recounts that the Sri Lankan Government has specifically requested assistance from the Agency for International Development (AID) in "mitigating the negative impacts to the wildlife involved." *Ibid.* In addition, a letter from the Director of the Fish and Wildlife Service to AID warns: "The magnitude of the Accelerated Mahaweli Development Program could have massive environmental impacts on such an insular ecosystem as the Mahaweli River system." *Id.,* at 215. It adds: "The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife." *Id.,* at 216. Finally, in an affidavit submitted by petitioner for purposes of this litigation, an AID official states that an AID environmental assessment "showed that the [Mahaweli] project could affect several endangered species." *Id.,* at 159.

I think a reasonable finder of fact could conclude from the information in the affidavits and deposition testimony that either Kelly or Skilbred will soon return to the project sites, thereby satisfying the "actual or imminent" injury standard. The Court dismisses ****2153** Kelly's and Skilbred's general statements***592** that they intended to revisit the project sites as "simply not enough." *Ibid.* But those statements did not stand alone. A reasonable finder of fact could conclude, based not only upon their statements of intent to re-

112 S.Ct. 2130                                                                              Page 28

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

turn, but upon their past visits to the project sites, as well as their professional backgrounds, that it was likely that Kelly and Skilbred would make a return trip to the project areas. Contrary to the Court's contention that Kelly's and Skilbred's past visits "prov[e] nothing," *ibid.,* the fact of their past visits could demonstrate to a reasonable factfinder that Kelly and Skilbred have the requisite resources and personal interest in the preservation of the species endangered by the Aswan and Mahaweli projects to make good on their intention to return again. Cf. *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) ("Past wrongs were evidence bearing on whether there is a real and immediate threat of repeated injury") (internal quotation marks omitted). Similarly, Kelly's and Skilbred's professional backgrounds in wildlife preservation, see App. 100, 144, 309–310, also make it likely—at least far more likely than for the average citizen—that they would choose to visit these areas of the world where species are vanishing.

By requiring a "description of concrete plans" or "specification of *when* the some day [for a return visit] will be," *ante,* at 8, the Court, in my view, demands what is likely an empty formality. No substantial barriers prevent Kelly or Skilbred from simply purchasing plane tickets to return to the Aswan and Mahaweli projects. This case differs from other cases in which the imminence of harm turned largely on the affirmative actions of third parties beyond a plaintiff's control. See *Whitmore v. Arkansas,* 495 U.S. 149, 155–156, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (harm to plaintiff death-row inmate from fellow inmate's execution depended on the court's one day reversing plaintiff's conviction or sentence and considering comparable sentences at resentencing); *Los Angeles v. Lyons,* 461 U.S., at 105, 103 S.Ct., at 1667 (harm dependent on police's arresting plaintiff again *593 and subjecting him to chokehold); *Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976) (harm rested upon "what one of a small, unnamed minority of policemen might do to

them in the future because of that unknown policeman's perception of departmental disciplinary procedures"); *O'Shea v. Littleton,* 414 U.S. 488, 495–498, 94 S.Ct. 669, 675–677, 38 L.Ed.2d 674 (1974) (harm from discriminatory conduct of county magistrate and judge dependent on plaintiffs' being arrested, tried, convicted, and sentenced); *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (harm to plaintiff dependent on a former Congressman's (then serving a 14–year term as a judge) running again for Congress). To be sure, a plaintiff's unilateral control over his or her exposure to harm does not *necessarily* render the harm nonspeculative. Nevertheless, it suggests that a finder of fact would be far more likely to conclude the harm is actual or imminent, especially if given an opportunity to hear testimony and determine credibility.

I fear the Court's demand for detailed descriptions of future conduct will do little to weed out those who are genuinely harmed from those who are not. More likely, it will resurrect a code-pleading formalism in federal court summary judgment practice, as federal courts, newly doubting their jurisdiction, will demand more and more particularized showings of future harm. Just to survive summary judgment, for example, a property owner claiming a decline in the value of his property from governmental action might have to specify the exact date he intends to sell his property and show that there is a market for the property, lest it be surmised he might not sell again. A nurse turned down for a job on grounds of her race had better be prepared to show on what date she was prepared to start work, that she had arranged daycare for her child, and that she **2154 would not have accepted work at another hospital instead. And a Federal Tort Claims Act plaintiff alleging loss of consortium should make sure to furnish this Court with a "description of concrete plans" for her nightly schedule of attempted activities.

*594 2

The Court also concludes that injury is lacking,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

because respondents' allegations of "ecosystem nexus" failed to demonstrate sufficient proximity to the site of the environmental harm. *Ante,* at 2139. To support that conclusion, the Court mischaracterizes our decision in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), as establishing a general rule that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity." *Ante,* at 2139. In *National Wildlife Federation,* the Court required specific geographical proximity because of the particular type of harm alleged in that case: harm to the plaintiff's visual enjoyment of nature from mining activities. 497 U.S., at 888, 110 S.Ct., at 3188. One cannot suffer from the sight of a ruined landscape without being close enough to see the sites actually being mined. Many environmental injuries, however, cause harm distant from the area immediately affected by the challenged action. Environmental destruction may affect animals traveling over vast geographical ranges, see, *e.g., Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (harm to American whale watchers from Japanese whaling activities), or rivers running long geographical courses, see, *e.g., Arkansas v. Oklahoma,* 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (harm to Oklahoma residents from wastewater treatment plant 39 miles from border). It cannot seriously be contended that a litigant's failure to use the precise or exact site where animals are slaughtered or where toxic waste is dumped into a river means he or she cannot show injury.

The Court also rejects respondents' claim of vocational or professional injury. The Court says that it is "beyond all reason" that a zoo "keeper" of Asian elephants would have standing to contest his Government's participation in the eradication of all the Asian elephants in another part of the world. *Ante,* at 2139. I am unable to see how the distant location of the destruction *necessarily* (for purposes of ruling *595 at summary judgment) mitigates the harm to the elephant keeper. If there is no more access to a future

supply of the animal that sustains a keeper's livelihood, surely there is harm.

I have difficulty imagining this Court applying its rigid principles of geographic formalism anywhere outside the context of environmental claims. As I understand it, environmental plaintiffs are under no special constitutional standing disabilities. Like other plaintiffs, they need show only that the action they challenge has injured them, without necessarily showing they happened to be physically near the location of the alleged wrong. The Court's decision today should not be interpreted "to foreclose the possibility ... that in different circumstances a nexus theory similar to those proffered here might support a claim to standing." *Ante,* at 2146 (KENNEDY, J., concurring in part and concurring in judgment).

**B**

A plurality of the Court suggests that respondents have not demonstrated redressability: a likelihood that a court ruling in their favor would remedy their injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74–75, and n. 20, 98 S.Ct. 2620, 2630–2631, and n. 20, 57 L.Ed.2d 595 (1978) (plaintiff must show "substantial likelihood" that relief requested will redress the injury). The plurality identifies two obstacles. The first is that the "action agencies" (*e.g.,* AID) cannot be required to undertake consultation with petitioner Secretary, because they are not directly bound as parties to the suit and are otherwise not indirectly**2155 bound by being subject to petitioner Secretary's regulation. Petitioner, however, officially and publicly has taken the position that his regulations regarding consultation under § 7 of the Act are binding on action agencies. 50 CFR § 402.14(a) (1991).[FN2] And he has previously *596 taken the same position in this very litigation, having stated in his answer to the complaint that petitioner "admits the Fish and Wildlife Service (FWS) was designated the lead agency for the formulation of regulations concerning section 7 of the [Endangered Species Act]." App. 246. I cannot agree with the plu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                  Page 30

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

rality that the Secretary (or the Solicitor General) is now free, for the convenience of this appeal, to disavow his prior public and litigation positions. More generally, I cannot agree that the Government is free to play "Three–Card Monte" with its description of agencies' authority to defeat standing against the agency given the lead in administering a statutory scheme.

FN2. This section provides in part:

"(a) *Requirement for formal consultation.* Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required...."

The Secretary's intent to make the regulations binding upon other agencies is even clearer from the discussion accompanying promulgation of the consultation rules. See 51 Fed.Reg. 19928 (1986) ("Several commenters stated that Congress did not intend that the Service interpret or implement section 7, and believed that the Service should recast the regulations as 'nonbinding guidelines' that would govern only the Service's role in consultation.... The Service is satisfied that it has ample authority and legislative mandate to issue this rule, and believes that uniform consultation standards and procedures are necessary to meet its obligations under section 7").

Emphasizing that none of the action agencies are parties to this suit (and having rejected the possibility of their being indirectly bound by petitioner's regulation), the plurality concludes that "there is no reason they should be obliged to honor an incidental legal

determination the suit produced." *Ante,* at 2141. I am not as willing as the plurality is to assume that agencies at least will not try to follow the law. Moreover, I wonder if the plurality has not overlooked the extensive involvement from the inception of this litigation by the Department of State and AID.[FN3] Under *597 principles of collateral estoppel, these agencies are precluded from subsequently relitigating the issues decided in this suit.

FN3. For example, petitioner's motion before the District Court to dismiss the complaint identified four attorneys from the Department of State and AID (an agency of the Department of State) as "counsel" to the attorneys from the Justice Department in this action. One AID lawyer actually entered a formal appearance before the District Court on behalf of AID. On at least one occasion petitioner requested an extension of time to file a brief, representing that " '[a]n extension is necessary for the Department of Justice to consult with ... the Department of State [on] the brief.' " See Brief for Respondents 31, n. 8. In addition, AID officials have offered testimony in this action.

"[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly to the knowledge of the opposing party, is as much bound by the judgment and as fully entitled to avail himself of it as an estoppel against an adverse party, as he would be if he had been a party to the record." *Soufront v. Compagnie des Sucreries de Puerto Rico,* 217 U.S. 475, 487, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910).

This principle applies even to the Federal Government. In *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), this Court held that the Government was estopped from relitigating in federal court the constitutionality of Montana's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 31
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

gross receipts tax, because that issue previously had been litigated in state court by an individual contractor whose litigation had been financed and controlled by the Federal Government. "Thus, although not a party, the United States plainly had a sufficient 'laboring**2156 oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Id.,* at 155, 99 S.Ct., at 974. See also *United States v. Mendoza,* 464 U.S. 154, 164, n. 9, 104 S.Ct. 568, 574, n. 9, 78 L.Ed.2d 379 (1984) (Federal Government estopped where it "constituted a 'party' in all but a technical sense"). In my view, the action agencies have had sufficient "laboring oars" in this litigation since its inception to be bound from subsequent *598 relitigation of the extraterritorial scope of the § 7 consultation requirement.[FN4] As a result, I believe respondents' injury would likely be redressed by a favorable decision.

> FN4. The plurality now suggests that collateral-estoppel principles can have no application here, because the participation of other agencies in this litigation arose *after* its inception. Borrowing a principle from this Court's statutory diversity jurisdiction cases and transferring it to the constitutional standing context, the Court observes: " 'The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*' ". *Ante,* at 2141, n. 4 (quoting *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989) ). See also *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824) (Marshall, C.J.). The plurality proclaims that "[i]t cannot be" that later participation of other agencies in this suit retroactively created a jurisdictional issue that did not exist at the outset. *Ante,* at 2141, n. 4.

> The plurality, however, overlooks at least three difficulties with this explanation. In

the first place, assuming that the plurality were correct that events as of the initiation of the lawsuit are the only proper jurisdictional reference point, were the Court to follow this rule in this case there would be no question as to the compliance of other agencies, because, as stated at an earlier point in the opinion: "When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies." *Ante,* at 2141. This suit was commenced in October 1986, just three months after the regulation took effect. App. 21; 51 Fed.Reg. 19926 (1986). As the plurality further admits, questions about compliance of other agencies with the Secretary's regulation arose only by later participation of the Solicitor General and other agencies in the suit. *Ante,* at 2141. Thus, it was, to borrow the plurality's own words, "assuredly not true when this suit was filed, naming the Secretary alone," *ante,* at 2141, n. 4, that there was any question before the District Court about other agencies being bound.

Second, were the plurality correct that, for purposes of determining redressability, a court may look only to facts as they exist when the complaint is filed, then the Court by implication would render a nullity part of Rule 19 of the Federal Rules of Civil Procedure. Rule 19 provides in part for the joinder of persons if "in the person's absence complete relief cannot be accorded among those already parties." This presupposes nonredressability at the outset of the litigation. Under the plurality's rationale, a district court would have no authority to join indispensable parties, because it would, as an initial matter, have no jurisdiction for lack of the power to provide redress at the outset of the litigation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                   Page 32

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Third, the rule articulated in *New-man–Green* is that the existence of federal jurisdiction *"ordinarily"* depends on the facts at the initiation of the lawsuit. This is no ironclad *per se* rule without exceptions. Had the Solicitor General, for example, taken a position during this appeal that the § 7 consultation requirement does in fact apply extraterritorially, the controversy would be moot, and this Court would be without jurisdiction.

In the plurality's view, federal subject-matter jurisdiction appears to be a one-way street running the Executive Branch's way. When the Executive Branch wants to dispel jurisdiction over an action against an agency, it is free to raise at any point in the litigation that other nonparty agencies might not be bound by any determinations of the one agency defendant. When a plaintiff, however, seeks to preserve jurisdiction in the face of a claim of nonredressability, the plaintiff is not free to point to the involvement of nonparty agencies in subsequent parts of the litigation. The plurality does not explain why the street runs only one way—why some actions of the Executive Branch subsequent to initiation of a lawsuit are cognizable for jurisdictional purposes but others simply are not.

More troubling still is the distance this one-way street carries the plurality from the underlying purpose of the standing doctrine. The purpose of the standing doctrine is to ensure that courts do not render advisory opinions rather than resolve genuine controversies between adverse parties. Under the plurality's analysis, the federal courts are to ignore their

*present* ability to resolve a concrete controversy if at some distant point in the past it could be said that redress could not have been provided. The plurality perverts the standing inquiry.

*599 The second redressability obstacle relied on by the plurality is that "the [action] agencies generally supply only a fraction of the funding for a foreign project." *Ante,* at 2142. What this Court might "generally" take to be true does not eliminate the existence of a genuine issue of fact to withstand **2157 summary judgment. Even if the action agencies supply only a fraction of the funding for a particular foreign project, it remains at least a question for the finder of fact whether threatened withdrawal of that fraction would affect foreign government conduct sufficiently to avoid harm to listed species.

The plurality states that "AID, for example, has provided less than 10% of the funding for the Mahaweli project." *Ibid.* The plurality neglects to mention that this "fraction" amounts to $170 million, see App. 159, not so paltry a sum for a country of only 16 million people with a gross national product of less than $6 billion in 1986 when respondents filed *600 the complaint in this action. Federal Research Division, Library of Congress, Sri Lanka: A Country Study (Area Handbook Series) xvi-xvii (1990).

The plurality flatly states: "Respondents have produced nothing to indicate that the projects they have named will ... do less harm to listed species, if that fraction is eliminated." *Ante,* at 2142. As an initial matter, the relevant inquiry is not, as the plurality suggests, what will happen if AID or other agencies stop funding projects, but what will happen if AID or other agencies comply with the consultation requirement for projects abroad. Respondents filed suit to require consultation, not a termination of funding. Respondents have raised at least a genuine issue of fact that the projects harm endangered species and that the actions of AID and other United States agencies

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                      Page 33
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

can mitigate that harm.

The plurality overlooks an Interior Department memorandum listing eight endangered or threatened species in the Mahaweli project area and recounting that "[t]he Sri Lankan government has requested the assistance of AID in mitigating the negative impacts to the wildlife involved." App. 78. Further, a letter from the Director of the Fish and Wildlife Service to AID states:

> "The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife. The donor nations and agencies that are financing the [Mahaweli project] will be the key as to how successfully the wildlife is preserved. If wildlife problems receive the same level of attention as the engineering project, then the negative impacts to the environment can be alleviated. This means that there has to be long-term funding in sufficient amounts to stem the negative impacts of this project." *Id.,* at 216.

**\*601** I do not share the plurality's astonishing confidence that, on the record here, a factfinder could only conclude that AID was powerless to ensure the protection of listed species at the Mahaweli project.

As for the Aswan project, the record again rebuts the plurality's assumption that donor agencies are without any authority to protect listed species. Kelly asserted in her affidavit—and it has not been disputed—that the Bureau of Reclamation was "overseeing" the rehabilitation of the Aswan project. *Id.,* at 101. See also *id.,* at 65 (Bureau of Reclamation publication stating: "In 1982, the Egyptian government ... requested that Reclamation serve as its engineering advisor for the nine-year [Aswan] rehabilitation project").

I find myself unable to agree with the plurality's

analysis of redressability, based as it is on its invitation of executive lawlessness, ignorance of principles of collateral estoppel, unfounded assumptions about causation, and erroneous conclusions about what the record does not say. In my view, respondents have satisfactorily shown a genuine issue of fact as to whether their injury would likely be redressed by a decision in their favor.

### II

The Court concludes that any "procedural injury" suffered by respondents is insufficient to confer standing. It rejects the view that the "injury-in-fact requirement [is] satisfied by congressional conferral upon *all* persons of an abstract, self-contained, non-instrumental**\*2158** 'right' to have the Executive observe the procedures required by law." *Ante,* at 2143. Whatever the Court might mean with that very broad language, it cannot be saying that "procedural injuries" *as a class* are necessarily insufficient for purposes of Article III standing.

Most governmental conduct can be classified as "procedural." Many injuries caused by governmental conduct, therefore, are categorizable at some level of generality as **\*602** "procedural" injuries. Yet, these injuries are not categorically beyond the pale of redress by the federal courts. When the Government, for example, "procedurally" issues a pollution permit, those affected by the permittee's pollutants are not without standing to sue. Only later cases will tell just what the Court means by its intimation that "procedural" injuries are not constitutionally cognizable injuries. In the meantime, I have the greatest of sympathy for the courts across the country that will struggle to understand the Court's standardless exposition of this concept today.

The Court expresses concern that allowing judicial enforcement of "agencies' observance of a particular, statutorily prescribed procedure" would "transfer from the President to the courts the Chief Executive's most important constitutional duty, to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

'take Care that the Laws be faithfully executed,' Art. II, § 3." *Ante,* at 2145. In fact, the principal effect of foreclosing judicial enforcement of such procedures is to transfer power into the hands of the Executive at the expense—not of the courts—but of Congress, from which that power originates and emanates.

Under the Court's anachronistically formal view of the separation of powers, Congress legislates pure, substantive mandates and has no business structuring the procedural manner in which the Executive implements these mandates. To be sure, in the ordinary course, Congress does legislate in black-and-white terms of affirmative commands or negative prohibitions on the conduct of officers of the Executive Branch. In complex regulatory areas, however, Congress often legislates, as it were, in procedural shades of gray. That is, it sets forth substantive policy goals and provides for their attainment by requiring Executive Branch officials to follow certain procedures, for example, in the form of reporting, consultation, and certification requirements.

The Court recently has considered two such procedurally oriented statutes. In *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), the Court examined a *603 statute requiring the Secretary of Commerce to certify to the President that foreign nations were not conducting fishing operations or trading which "dimins[h] the effectiveness" of an international whaling convention. *Id.,* at 226, 106 S.Ct., at 2864. The Court expressly found standing to sue. *Id.,* at 230–231, n. 4, 106 S.Ct., at 2865–2866, n. 4. In *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989), this Court considered injury from violation of the "action-forcing" procedures of the National Environmental Policy Act (NEPA), in particular the requirements for issuance of environmental impact statements.

The consultation requirement of § 7 of the Endangered Species Act is a similar, action-forcing statute. Consultation is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species. Once consultation is initiated, the Secretary is under a duty to provide to the action agency "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). The Secretary is also obligated to suggest "reasonable and prudent alternatives" to prevent jeopardy to listed species. *Ibid.* The action agency must undertake as well its own "biological**2159 assessment for the purpose of identifying any endangered species or threatened species" likely to be affected by agency action. § 1536(c)(1). After the initiation of consultation, the action agency "shall not make any irreversible or irretrievable commitment of resources" which would foreclose the "formulation or implementation of any reasonable and prudent alternative measures" to avoid jeopardizing listed species. § 1536(d). These action-forcing procedures are "designed to protect some threatened concrete interest," *ante,* at 2143, n. 8, of persons who observe and work with endangered or threatened species. That is why I am mystified by the Court's unsupported conclusion that "[t]his is not a case where plaintiffs *604 are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Ante,* at 2142.

Congress legislates in procedural shades of gray not to aggrandize its own power but to allow maximum Executive discretion in the attainment of Congress' legislative goals. Congress could simply impose a substantive prohibition on Executive conduct; it could say that no agency action shall result in the loss of more than 5% of any listed species. Instead, Congress sets forth substantive guidelines and allows the Executive, within certain procedural constraints, to decide how best to effectuate the ultimate goal. See *American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). The

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                 Page 35
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Court never has questioned Congress' authority to impose such procedural constraints on Executive power. Just as Congress does not violate separation of powers by structuring the procedural manner in which the Executive shall carry out the laws, surely the federal courts do not violate separation of powers when, at the very instruction and command of Congress, they enforce these procedures.

To prevent Congress from conferring standing for "procedural injuries" is another way of saying that Congress may not delegate to the courts authority deemed "executive" in nature. *Ante,* at 2145 (Congress may not "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3"). Here Congress seeks not to delegate "executive" power but only to strengthen the procedures it has legislatively mandated. "We have long recognized that the nondelegation doctrine does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches." *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 1756, 114 L.Ed.2d 219 (1991). "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive *or judicial actors.*" *Ibid.* (emphasis added).

**\*605** Ironically, this Court has previously justified a relaxed review of congressional delegation to the Executive on grounds that Congress, in turn, has subjected the exercise of that power to judicial review. *INS v. Chadha,* 462 U.S. 919, 953–954, n. 16, 103 S.Ct. 2764, 2785–2786, n. 16, 77 L.Ed.2d 317 (1983); *American Power & Light Co. v. SEC,* 329 U.S., at 105–106, 67 S.Ct. at 142–143. The Court's intimation today that procedural injuries are not constitutionally cognizable threatens this understanding upon which Congress has undoubtedly relied. In no sense is the Court's suggestion compelled by our "common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Ante,* at 2136. In my view, it reflects an unseemly solicitude for an

expansion of power of the Executive Branch.

It is to be hoped that over time the Court will acknowledge that some classes of procedural duties are so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty. For example, in the context of the NEPA requirement of environmental-impact statements,**\*\*2160** this Court has acknowledged "it is now well settled that NEPA itself does not mandate particular results [and] simply prescribes the necessary process," but "*these procedures are almost certain to affect the agency's substantive decision.*" *Robertson v. Methow Valley Citizens Council,* 490 U.S., at 350, 109 S.Ct., at 1846 (emphasis added). See also *Andrus v. Sierra Club,* 442 U.S. 347, 350–351, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the 'action-forcing' characteristics of [the environmental-impact statement requirement] would be lost"). This acknowledgment of an inextricable link between procedural and substantive harm does not reflect improper appellate factfinding. It reflects nothing more than the proper deference owed to the judgment of a coordinate branch—Congress—that certain procedures are directly tied to protection against a substantive harm.

**\*606** In short, determining "injury" for Article III standing purposes is a fact-specific inquiry. "Typically ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S., at 752, 104 S.Ct., at 3325. There may be factual circumstances in which a congressionally imposed procedural requirement is so insubstantially connected to the prevention of a substantive harm that it cannot be said to work any conceivable injury to an individual litigant. But, as a general matter, the courts owe substantial deference to Congress'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                  Page 36

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

substantive purpose in imposing a certain procedural requirement. In all events, "[o]ur separation-of-powers analysis does not turn on the labeling of an activity as 'substantive' as opposed to 'procedural.' " *Mistretta v. United States,* 488 U.S. 361, 393, 109 S.Ct. 647, 665, 102 L.Ed.2d 714 (1989). There is no room for a *per se* rule or presumption excluding injuries labeled "procedural" in nature.

### III

In conclusion, I cannot join the Court on what amounts to a slash-and-burn expedition through the law of environmental standing. In my view, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison,* 1 Cranch 137, 163, 2 L.Ed. 60 (1803).

I dissent.

U.S.Minn.,1992.
Lujan v. Defenders of Wildlife
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.





317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

United States Court of Appeals,
Fifth Circuit.
Oliver "Buck" REVELL, Plaintiff–Appellant,
v.
Hart G.W. LIDOV, an individual; Board of Trustees
of Columbia University in the City of New York, a
foreign corporation (Columbia University); Columbia
University School of Journalism, an agency and/or
Department of Columbia University in the City of
New York, Defendants–Appellees.

No. 01–10521.
Dec. 31, 2002.

Former associate director of FBI, a Texas resident, sued nonresidents, an assistant professor and a university, for defamation arising out of professor's authorship of article that he posted on internet bulletin board hosted by university. The United States District Court for the Northern District of Texas, Jerry L. Buchmeyer, Chief Judge, 2001 WL 285253, dismissed claims for lack of personal jurisdiction, and director appealed. The Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that: (1) university's maintenance of website did not constitute substantial contacts with Texas, so as to support exercise of general personal jurisdiction over university in Texas under due process clause of the Fourteenth Amendment, and (2) university and professor did not have sufficient "minimum contacts" with Texas to support exercise of specific personal jurisdiction over them under the due process clause of the Fourteenth Amendment.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⚖3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-residents in general.
Most Cited Cases
    (Formerly 92k305(5))

**Federal Courts 170B ⚖2721**

170B Federal Courts
    170BX Personal Jurisdiction
        170BX(B) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction
            170Bk2721 k. In general. Most Cited Cases
    (Formerly 170Bk76.1, 170Bk76)

Federal district court sitting in diversity may exercise personal jurisdiction over foreign defendant if (1) long-arm statute of forum state creates personal jurisdiction over defendant, and (2) exercise of personal jurisdiction is consistent with due process guarantees of the United States Constitution. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[2] Constitutional Law 92 ⚖3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-residents in general.
Most Cited Cases
    (Formerly 92k305(5))

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

Because Texas's long-arm statute reaches to constitutional limits, Court of Appeals, in determining whether personal jurisdiction exists over foreign defendant in Texas, asks if exercising personal jurisdiction over defendant would offend due process under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 ☞3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-residents in general.
Most Cited Cases
    (Formerly 92k305(5))

The Due Process Clause of the Fourteenth Amendment permits court to exercise personal jurisdiction over foreign defendant when (1) that defendant has purposefully availed himself of benefits and protections of forum state by establishing "minimum contacts" with forum state, and (2) exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

**[4] Constitutional Law 92 ☞3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-residents in general.
Most Cited Cases
    (Formerly 92k305(5))

Sufficient minimum contacts with forum state will give rise to either specific or general jurisdiction over foreign defendant under due process clause of the Fourteenth Amendment; "general jurisdiction" exists when defendant's contacts with forum state are unrelated to cause of action but are continuous and systematic, whereas "specific jurisdiction" arises when defendant's contacts with forum arise from, or are directly related to, the cause of action. U.S.C.A. Const.Amend. 14.

**[5] Constitutional Law 92 ☞3965(9)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3965 Particular Parties or Circumstances
                92k3965(9) k. Non-profit, charitable, and educational organizations. Most Cited Cases
    (Formerly 92k305(5))

**Federal Courts 170B ☞2728**

170B Federal Courts
    170BX Personal Jurisdiction
        170BX(B) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction
            170Bk2722 Factors Considered in General
                170Bk2728 k. Internet use. Most Cited Cases
    (Formerly 170Bk76.5)

Non-resident university's maintenance of website, which allowed users to subscribe to university's journalism review, purchase advertising on website or in journal and submit electronic applications for admission, did not constitute substantial contacts with Texas, so as to support exercise of general personal jurisdiction over university in Texas under due process clause of the Fourteenth Amendment; university, since it began keeping records, never received more than twenty internet subscriptions to journal from Texas residents. U.S.C.A. Const.Amend. 14.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

**[6] Constitutional Law 92 ⟜3965(1)**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(E) Civil Actions and Proceedings
     92k3961 Jurisdiction and Venue
       92k3965 Particular Parties or Circumstances
        92k3965(1) k. In general. Most Cited Cases
   (Formerly 92k305(5))

    Maintenance of "passive" internet website, i.e., one that merely allows owner to post information on internet, does not constitute sufficient minimum contacts with forum state to establish personal jurisdiction over foreign defendant under due process clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[7] Constitutional Law 92 ⟜3965(1)**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(E) Civil Actions and Proceedings
     92k3961 Jurisdiction and Venue
       92k3965 Particular Parties or Circumstances
        92k3965(1) k. In general. Most Cited Cases
   (Formerly 170Bk76.5, 92k305(5))

    Sliding scale approach, as used to measure internet site's connections to forum state in analyzing whether exercise of personal jurisdiction over foreign defendant is appropriate under due process clause of the Fourteenth Amendment, is not well adapted to general jurisdiction inquiry, because even repeated contacts with forum residents by foreign defendant may not constitute requisite substantial, continuous and systematic contacts required for finding of general jurisdiction. U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law 92 ⟜3965(9)**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(E) Civil Actions and Proceedings
     92k3961 Jurisdiction and Venue
       92k3965 Particular Parties or Circumstances
        92k3965(9) k. Non-profit, charitable, and educational organizations. Most Cited Cases
   (Formerly 92k305(5))

**Constitutional Law 92 ⟜3965(10)**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(E) Civil Actions and Proceedings
     92k3961 Jurisdiction and Venue
       92k3965 Particular Parties or Circumstances
        92k3965(10) k. Representatives of organizations; officers, agents, and employees. Most Cited Cases
   (Formerly 92k305(5))

**Federal Courts 170B ⟜2744**

170B Federal Courts
   170BX Personal Jurisdiction
     170BX(B) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction
     170Bk2737 Particular Contexts and Causes of Action
       170Bk2744 k. Defamation. Most Cited Cases
   (Formerly 170Bk76.25)

    Non-residents, a university and an assistant professor, who posted an article on internet bulletin board that was maintained by university, did not have sufficient "minimum contacts" with Texas to support ex-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

ercise of specific personal jurisdiction over them in Texas under due process clause of the Fourteenth Amendment, in defamation action by former associate director of FBI, who was criticized in article; article contained no reference to Texas, article was not specifically directed at Texas readers, and professor did not know director was resident of Texas. U.S.C.A. Const.Amend. 14.

**\*468** Joe C. Tooley (argued), Rockwall, TX, for Revell.

Paul Christopher Watler (argued), Robert Brooks Gilbreath, John T. Gerhart, Jenkens & Gilchrist, Dallas, TX, for Lidov.

Charles L. Babcock (argued), David T. Moran, Kimberly Chastain Van Amburg, Jackson Walker, Dallas, TX, for Bd. of Trustees of Columbia University and Columbia University School of Journalism.

Appeal from the United States District Court for the Northern District of Texas.

Before HIGGINBOTHAM, WIENER, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Oliver "Buck" Revell sued Hart G.W. Lidov and Columbia University for defamation arising out of Lidov's authorship of an article that he posted on an internet bulletin board hosted by Columbia. The district court dismissed Revell's claims for lack of personal jurisdiction over both Lidov and Columbia. We affirm.

### \*469 I

Hart G.W. Lidov, an Assistant Professor of Pathology and Neurology at the Harvard Medical School and Children's Hospital, wrote a lengthy article on the subject of the terrorist bombing of Pan Am Flight 103, which exploded over Lockerbie, Scotland in 1988.

The article alleges that a broad politically motivated conspiracy among senior members of the Reagan Administration lay behind their wilful failure to stop the bombing despite clear advance warnings. Further, Lidov charged that the government proceeded to cover up its receipt of advance warning and repeatedly misled the public about the facts. Specifically, the article singles out Oliver "Buck" Revell, then Associate Deputy Director of the FBI, for severe criticism, accusing him of complicity in the conspiracy and cover-up. The article further charges that Revell, knowing about the imminent terrorist attack, made certain his son, previously booked on Pan Am 103, took a different flight. At the time he wrote the article, Lidov had never been to Texas, except possibly to change planes, or conducted business there, and was apparently unaware that Revell then resided in Texas.

Lidov has also never been a student or faculty member of Columbia University, but he posted his article on a website maintained by its School of Journalism. In a bulletin board section of the website, users could post their own works and read the works of others. As a result, the article could be viewed by members of the public over the internet.

Revell, a resident of Texas, sued the Board of Trustees of Columbia University, whose principal offices are in New York City, and Lidov, who is a Massachusetts resident, in the Northern District of Texas. Revell claimed damage to his professional reputation in Texas and emotional distress arising out of the alleged defamation of the defendants, and sought several million dollars in damages. Both defendants moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The district court granted the defendants' motions, and Revell now appeals.

### II
### A

Our question is whether the district court could properly exercise personal jurisdiction over Hart Li-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

dov and Columbia University, an issue of law we review *de novo.*[FN1] The plaintiff bears the burden of establishing jurisdiction, but need only present *prima facie* evidence.[FN2] We must accept the plaintiff's "uncontroverted allegations, and resolve in [his] favor all conflicts between the facts contained in the parties' affidavits and other documentation."[FN3] In considering a motion to dismiss for lack of personal jurisdiction a district court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[FN4]

> FN1. *Felch v. Transportes Lar–Mex SA De CV,* 92 F.3d 320, 324 (5th Cir.1996).

> FN2. *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 854 (5th Cir.2000).

> FN3. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 215 (5th Cir.2000).

> FN4. *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985).

[1][2] A federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution.[FN5] Because Texas's long-arm statute reaches \*470 to the constitutional limits,[FN6] we ask, therefore, if exercising personal jurisdiction over Lidov and Columbia would offend due process.

> FN5. *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999).

> FN6. *Electrosource, Inc. v. Horizon Battery Techs., Ltd.,* 176 F.3d 867, 871 (5th Cir.1999).

[3][4] The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a foreign defendant when (1) "that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'"[FN7] Sufficient minimum contacts will give rise to either specific or general jurisdiction.[FN8] "General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'"[FN9] Specific jurisdiction arises when the defendant's contacts with the forum "arise from, or are directly related to, the cause of action."[FN10]

> FN7. *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336 (5th Cir.1999) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

> FN8. *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994).

> FN9. *Mink,* 190 F.3d at 336.

> FN10. *Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir.2001) (internal quotation marks omitted).

B

[5] Answering the question of personal jurisdiction in this case brings these settled and familiar formulations to a new mode of communication across state lines. Revell first urges that the district court may assert general jurisdiction over Columbia because its website provides internet users the opportunity to subscribe to the *Columbia Journalism Review,* purchase advertising on the website or in the journal, and submit electronic applications for admission.[FN11]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

FN11. The district court did not address Revell's general jurisdiction argument. It was made and we reach the issue. *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

[6] This circuit has drawn upon the approach of *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*[FN12] in determining whether the operation of an internet site can support the minimum contacts necessary for the exercise of personal jurisdiction.[FN13] *Zippo* used a "sliding scale" to measure an internet site's connections to a forum state.[FN14] A "passive" website, one that merely allows the owner to post information on the internet, is at one end of the scale.[FN15] It will not be sufficient to establish personal jurisdiction.[FN16] At the other end are sites whose owners engage in repeated online contacts with forum residents over the internet, and in these cases personal jurisdiction may be proper.[FN17] In between are those sites with some interactive elements, through which a site allows for bilateral information exchange with its visitors. Here, we find more familiar terrain, requiring that we examine the extent of the interactivity and nature of the forum contacts.[FN18]

FN12. 952 F.Supp. 1119 (W.D.Pa.1997).

FN13. *Mink,* 190 F.3d at 336.

FN14. *Zippo,* 952 F.Supp. at 1124.

FN15. *Id.*

FN16. *Id.*

FN17. *Id.*

FN18. *Id.*

**\*471** [7] While we deployed this sliding scale in

*Mink v. AAAA Development LLC,* it is not well adapted to the general jurisdiction inquiry, because even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction—in other words, while it may be doing business *with* Texas, it is not doing business *in* Texas.[FN19]

FN19. *Access Telecom, Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 717 (5th Cir.1999); *see also Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) ("[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders.").

Irrespective of the sliding scale, the question of general jurisdiction is not difficult here. Though the maintenance of a website is, in a sense, a continuous presence everywhere in the world, the cited contacts of Columbia with Texas are not in any way "substantial."[FN20]

FN20. *See Wilson v. Belin,* 20 F.3d 644, 650–51 (5th Cir.1994) (finding no personal jurisdiction over individual defamation defendants where the defendants did not conduct regular business in Texas and did not make a substantial part of their business decisions in Texas).

Columbia's contacts with Texas are in stark contrast to the facts of the Supreme Court's seminal case on general jurisdiction, *Perkins v. Benguet Consolidated Mining Co.*[FN21] In *Perkins,* a Philippine corporation temporarily relocated to Ohio.[FN22] The corporation's president resided in Ohio, the records of the corporation were kept in Ohio, director's meetings were held in Ohio, accounts were held in Ohio banks,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

and all key business decisions were made there.[FN23] Columbia's internet presence in Texas quite obviously falls far short of this standard.

FN21. 342 U.S. 437, 438, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

FN22. *Id.* at 447–48, 72 S.Ct. 413.

FN23. *Id.*

Our conclusion also comports with the recent decision in *Bird v. Parsons,* [FN24] where the Sixth Circuit found Ohio courts lacked general jurisdiction over a non-resident business that registered domain names despite the fact that: (1) the defendant maintained a website open for commerce with Ohio residents and (2) over 4000 Ohio residents had in fact registered domain names with the defendant.[FN25] By contrast, Columbia, since it began keeping records, never received more than twenty internet subscriptions to the *Columbia Journalism Review* from Texas residents.[FN26]

FN24. 289 F.3d 865 (6th Cir.2002).

FN25. *Id.* at 873–74.

FN26. More precisely, there were 17 subscriptions by Texas residents in 2000 and 18 for the first two issues in 2001. R. at 305.

## C

[8] Turning to the issue of specific jurisdiction, the question is whether Revell has made out his *prima facie* case with respect to the defendants' contacts with Texas. *Zippo* 's scale does more work with specific jurisdiction—the context in which it was originally conceived.[FN27]

FN27. *Zippo Mfg. Co. v. Zippo Dot Com,*

*Inc.,* 952 F.Supp. 1119, 1122 (W.D.Pa.1997) (noting that the plaintiff conceded that only specific jurisdiction was at issue in the case).

Revell urges that, given the uniqueness of defamation claims and their inherent ability to inflict injury in far-flung jurisdictions, we should abandon the imagery of *Zippo.* It is a bold but ultimately unpersuasive argument. Defamation has its unique features, but shares relevant characteristics with various business torts.[FN28] Nor is the *Zippo* scale, as has been suggested,**472** in tension with the "effects" test of *Calder v. Jones* [FN29] for intentional torts,[FN30] which we address in Part II.D.

FN28. *See Indianapolis Colts v. Metro. Balt. Football Club Ltd. P'ship,* 34 F.3d 410, 411–12 (7th Cir.1994).

FN29. 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

FN30. We need not decide today whether or not a "*Zippo*-passive" site could still give rise to personal jurisdiction under *Calder,* and reserve this difficult question for another time.

For specific jurisdiction we look only to the contact out of which the cause of action arises [FN31]—in this case the maintenance of the internet bulletin board. Since this defamation action does not arise out of the solicitation of subscriptions or applications by Columbia, those portions of the website need not be considered.

FN31. *Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir.2001).

The district court concluded that the bulletin board was "*Zippo*-passive" and therefore could not create specific jurisdiction. The defendants insist that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

Columbia's bulletin board is indistinguishable from the website in *Mink.* In that case, we found the website would not support a finding of minimum contacts because it only solicited customers, provided a toll-free number to call, and an e-mail address.[FN32] It did not allow visitors to place orders online.[FN33] But in this case, any user of the internet can post material to the bulletin board. This means that individuals *send* information to be posted, and *receive* information that others have posted. In *Mink* and *Zippo,* a visitor was limited to expressing an interest in a commercial product. Here the visitor may participate in an open forum hosted by the website.[FN34] Columbia's bulletin board is thus interactive, and we must evaluate the extent of this interactivity as well as Revell's arguments with respect to *Calder.*

> FN32. *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336–37 (5th Cir.1999).

> FN33. *Id.* at 337.

> FN34. *See, e.g., Barrett v. Catacombs Press,* 44 F.Supp.2d 717, 728 (E.D.Pa.1999) (finding interactive internet newsgroups where defendant posted messages in common cyberspace accessible to all but ultimately holding personal jurisdiction could not be obtained).

D
1

In *Calder,* an editor and a writer for the *National Enquirer,* both residents of Florida, were sued in California for libel arising out of an article published in the *Enquirer* about Shirley Jones, an actress.[FN35] The Supreme Court upheld the exercise of personal jurisdiction over the two defendants because they had "expressly aimed" their conduct towards California.[FN36]

> FN35. *Calder,* 465 U.S. at 784–85, 104 S.Ct.

1482.

> FN36. *Id.* at 789, 104 S.Ct. 1482.

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. *In sum, California is the focal point both of the story and of the harm suffered.*[FN37]

> FN37. *Id.* at 788–89, 104 S.Ct. 1482 (emphasis added).

The Court also relied upon the fact that the *Enquirer* had its largest circulation—over 600,000 copies—in California, indicating that the defendants knew the harm of their allegedly tortious activity would be felt there.[FN38]

> FN38. *Id.* at 789–90, 104 S.Ct. 1482 ("And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation.").

*473 2

Revell urges that, measured by the "effects" test of *Calder,* he has presented his *prima facie* case for the defendants' minimum contacts with Texas. At the outset we emphasize that the "effects" test is but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum.[FN39]

> FN39. *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 253 F.3d 865, 869 (5th Cir.2001).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

We find several distinctions between this case and *Calder*—insurmountable hurdles to the exercise of personal jurisdiction by Texas courts. First, the article written by Lidov about Revell contains no reference to Texas, nor does it refer to the Texas activities of Revell, and it was not directed at Texas readers as distinguished from readers in other states. Texas was not the focal point of the article or the harm suffered, unlike *Calder,* in which the article contained descriptions of the California activities of the plaintiff, drew upon California sources, and found its largest audience in California. [FN40] This conclusion fits well with our decisions in other intentional tort cases where the plaintiff relied upon *Calder.* In those cases we stated that the plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder.*[FN41] We also find instructive the defamation decisions of the Sixth, Third, and Fourth Circuits in *Reynolds v. International Amateur Athletic Federation,* [FN42] *Remick v. Manfredy,*[FN43] and *Young v. New Haven Advocate,* [FN44] respectively.

> FN40. *Calder,* 465 U.S. at 788, 104 S.Ct. 1482; *see also Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 777, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (noting that the harm of a libelous publication is felt where it is distributed).

> FN41. *See Panda Brandywine,* 253 F.3d at 870 ("If we were to accept Appellants' arguments, a nonresident defendant would be subject to jurisdiction in Texas for an intentional tort simply because the plaintiff's complaint alleged injury in Texas to Texas residents regardless of the defendant's contacts...."); *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772–73 (5th Cir.1988) (rejecting application of *Calder* and describing the plaintiff's decision to maintain its principal place of business in the forum state as "a mere fortuity" that could not support

personal jurisdiction). *But see Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1202 (7th Cir.1997) (finding personal jurisdiction over a California business proper under *Calder* on the basis that the defendant's alleged threatening of one of the plaintiff's customers in New Jersey injured the plaintiff, an Illinois business, in Illinois); *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 263–65 (3d Cir.1998) (recognizing circuit split between *Janmark* and views of the First, Fourth, Fifth, Eighth, Ninth and Tenth Circuits and adopting the majority view). We do not suggest that the analysis for defamation claims under *Calder* should differ from that utilized in our other cases, but merely provide further explication because this case is factually more similar to *Calder.*

> FN42. 23 F.3d 1110 (6th Cir.1994).

> FN43. 238 F.3d 248 (3d Cir.2001).

> FN44. 315 F.3d 256, 258 (4th Cir.2002).

In *Reynolds* a London-based association published a press release regarding the plaintiff's disqualification from international track competition for two years following his failure of a drug test.[FN45] The plaintiff, an Ohio resident, claimed that the alleged defamation had cost him endorsement contracts in Ohio and cited *Calder* in support of his argument that personal jurisdiction over the defendant in Ohio was proper.[FN46] The court found *Calder* inapposite because, *inter alia,* the allegedly defamatory press release dealt with the plaintiff's activities in Monaco, not Ohio; the source of the report was a urine sample*474 taken in Monaco and analyzed in Paris; and the "focal point" of the release was not Ohio.[FN47] We agree with the *Reynolds* court that the sources relied upon and activities described in an allegedly defamatory publication should in some way connect with the forum if *Calder* is to be invoked.[FN48] Lidov's article, insofar as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

it relates to Revell, deals exclusively with his actions as Associate Deputy Director of the FBI—just as the offending press release in *Reynolds* dealt only with a failed drug test in Monaco. It signifies that there is no reference to Texas in the article or any reliance on Texas sources. These facts weigh heavily against finding the requisite minimum contacts in this case.

FN45. 23 F.3d at 1112.

FN46. *Id.* at 1119–20.

FN47. *Id.* at 1120. The court also cited two distinctions arguably not present in this case: that the plaintiff's professional reputation was not centered in Ohio, and that the defendant did not itself publish or circulate the report in Ohio. *Id.* However, the defendant in *Reynolds* clearly knew that the plaintiff was an Ohio resident, unlike Lidov. *See* Part II.D.3.

FN48. The Tenth Circuit has suggested that this is not a requirement of *Calder.* In *Burt v. Board of Regents of University of Nebraska,* 757 F.2d 242 (10th Cir.1985), *vacated as moot, Connolly v. Burt,* 475 U.S. 1063, 106 S.Ct. 1372, 89 L.Ed.2d 599 (1986), the court upheld the application of *Calder* to support personal jurisdiction in Colorado where a University of Nebraska doctor had written unflattering and allegedly defamatory letters about the plaintiff in response to requests from Colorado hospitals, despite the fact that the content of the letters focused on the plaintiff's activities in Nebraska, not Colorado. *Id.* at 244–45. We find more persuasive the view of Judge Seth, who remarked, in dissent, that this represented "but half a *Calder,*" which requires both the harm to be felt in the forum *and* that the forum be the focal point of the publication. *Id.* at 245–47

(Seth, J., dissenting).

In *Remick* the plaintiff, a Pennsylvania lawyer, sued several individuals for defamation arising out of two letters sent to the plaintiff in Pennsylvania containing oblique charges of incompetence and accusations that the plaintiff was engaged in extortion of the defendants.[FN49] The letters concerned the termination of the plaintiff's representation of one of the defendants, a professional boxer.[FN50] One of the two letters was read by individuals other than the plaintiff when it was faxed to the plaintiff's Philadelphia office.[FN51] The court held, however, that since there was nothing in the letter to indicate that it was targeted at Pennsylvania residents other than the plaintiff, personal jurisdiction could not be obtained under *Calder.*[FN52] Furthermore, the court noted that allegations that the charges in the letter had been distributed throughout the "boxing community" were insufficient, because there was no assertion that Pennsylvania had a "unique relationship with the boxing industry, as distinguished from the relationship in *Calder* between California and the motion picture industry, with which the *Calder* plaintiff was associated."[FN53]

FN49. *Remick,* 238 F.3d at 257–58.

FN50. *Id.*

FN51. *Id.* at 257.

FN52. *Id.* at 259.

FN53. *Id.; see also ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 625 (4th Cir.1997) (finding *Calder* inapplicable where allegedly tortious business activity was focused "more generally on customers located throughout the United States and Canada without focusing on and targeting South Carolina"); *Pavlovich v. Superior Court,* 29 Cal.4th 262, 265–66, 127 Cal.Rptr.2d 329,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

58 P.3d 2 (2002) (rejecting the personal jurisdiction of California courts in a trade secret infringement case over a Texan who posted the offending computer code on a website).

Similarly, in *Young v. New Haven Advocate*,[FN54] two newspapers in Connecticut posted on the internet articles about the **\*475** housing of Connecticut prisoners in Virginia that allegedly defamed a Virginia prison warden. The Fourth Circuit held that Virginia could not exercise personal jurisdiction over the Connecticut defendants because "they did not manifest an intent to aim their websites or the posted articles at a Virginia audience." [FN55] Following its decision in *ALS Scan, Inc. v. Digital Service Consultants*,[FN56] it reasoned that "application of *Calder* in the Internet context requires proof that the out-of-state defendant's Internet activity is expressly directed at or directed to the forum state." [FN57] It observed that more than simply making the news article accessible to Virginians by defendants' posting of the article on their internet sites was needed for assertion of jurisdiction: "The newspapers must, through the Internet postings, manifest an intent to *target* and *focus* on Virginia readers." [FN58]

FN54. 315 F.3d 256, 258 (4th Cir.2002).

FN55. *Id.*

FN56. 293 F.3d 707 (4th Cir.2002).

FN57. *Young,* 315 F.3d at 262 (citing *ALS,* 293 F.3d at 714).

FN58. *Id.*

As with *Remick* and *Young,* the post to the bulletin board here was presumably directed at the entire world, or perhaps just concerned U.S. citizens. But certainly it was not directed specifically at Texas,

which has no especial relationship to the Pan Am 103 incident. Furthermore, here there is nothing to compare to the targeting of California readers represented by approximately 600,000 copies of the *Enquirer* the *Calder* defendants knew would be distributed in California, the *Enquirer* 's largest market.[FN59]

FN59. *Calder v. Jones,* 465 U.S. 783, 785 n. 2, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

3

As these cases aptly demonstrate, one cannot purposefully avail oneself of "some forum someplace"; rather, as the Supreme Court has stated, due process requires that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." [FN60] Lidov's affidavit, uncontroverted by the record, states that he did not even know that Revell was a resident of Texas when he posted his article. Knowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm forms an essential part of the *Calder* test. [FN61] The defendant must be chargeable with knowledge of the forum at which his conduct is directed in order to reasonably anticipate being haled into court in that forum, as *Calder* itself [FN62] and numerous cases from other circuits applying *Calder* confirm.[FN63] Demanding knowledge**\*476** of a particular forum to which conduct is directed, in defamation cases, is not altogether distinct from the requirement that the forum be the focal point of the tortious activity because satisfaction of the latter will ofttimes provide sufficient evidence of the former.

FN60. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

FN61. Further evidence that the *Calder* defendants knew that the harm of their conduct would be felt in California came from their

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

knowledge that the *Enquirer* enjoyed its largest circulation there. *Id.* at 789, 104 S.Ct. 1482.

FN62. *Calder,* 465 U.S. at 790, 104 S.Ct. 1482 ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, *knowingly cause the injury in California.*" (emphasis added)).

FN63. *See, e.g., Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000) (stating that *Calder* requires that "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant *knows to be a resident of the forum state* " (emphasis added)); *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 266 (3d Cir.1998) ("[T]he plaintiff must show that the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct *in the forum,* and point to specific activity indicating that the defendant expressly aimed its tortious conduct *at the forum.*" (emphasis added)).

Lidov must have known that the harm of the article would hit home wherever Revell resided. But that is the case with virtually any defamation. A more direct aim is required than we have here. In short, this was not about Texas. If the article had a geographic focus it was Washington, D.C.

### III

Our ultimate inquiry is rooted in the limits imposed on states by the Due Process Clause of the Fourteenth Amendment. It is fairness judged by the reasonableness of Texas exercising its power over residents of Massachusetts and New York. This inquiry into fairness captures the reasonableness of hauling a defendant from his home state before the court of a sister state; in the main a pragmatic account of reasonable expectations—if you are going to pick a fight in Texas, it is reasonable to expect that it be settled there. It is not fairness calibrated by the likelihood of success on the merits or relative fault. Rather, we look to the geographic focus of the article, not the bite of the defamation, the blackness of the calumny, or who provoked the fight.

Revell also makes various evidentiary objections to the affidavits introduced by the defendants to support their motions to dismiss. We conclude that all of these lack merit, and the district court did not abuse its discretion in rejecting them.[FN64] Alternatively, Revell asks that we remand for further discovery, but given the uncontroverted facts of the operation of Columbia's website, and lack of purposeful availment, we must decline to do so.[FN65]

FN64. *Coury v. Prot,* 85 F.3d 244, 249 (5th Cir.1996).

FN65. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 221 (5th Cir.2000) (affirming denial of discovery that "could not have added any significant facts" (internal quotation marks omitted)).

### IV

In sum, Revell has failed to make out a *prima facie* case of personal jurisdiction over either defendant. General jurisdiction cannot be obtained over Columbia. Considering both the "effects" test of *Calder* and the low-level of interactivity of the internet bulletin board, we find the contacts with Texas insufficient to establish the jurisdiction of its courts, and hence the federal district court in Texas, over Columbia and Lidov. We AFFIRM the dismissal for lack of personal jurisdiction as to both defendants.

AFFIRMED.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L. Rep. 1521
**(Cite as: 317 F.3d 467)**

C.A.5 (Tex.),2002.
Revell v. Lidov
317 F.3d 467, 173 Ed. Law Rep. 403, 31 Media L.
Rep. 1521

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.