FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
NORTH DIVISION

2014 MAY -6  PM 3: 11

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| CYPHER ENTERPRISES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:14-cv-00243-A |
| | § | |
| HASHFAST TECHNOLOGIES LLC and | § | |
| HASHFAST LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PERTINENT HIGHLIGHTED CASE LAW IN SUPPORT OF DEFENDANTS
## HASHFAST TECHNOLOGIES LLC
## AND HASHFAST LLC'S BRIEF IN SUPPORT OF
## MOTION TO DISMISS PURSUANT TO 12(b)(1), 12(b)(2), 12(b)(3) AND 12(b)(6)

Pursuant to the Paragraph C of the Court's Order of April 22, 2014 [Docket No. 8], Defendants Hashfast Technologies LLC ("Hashfast Technologies") and Hashfast LLC ("Hashfast") (collectively "Defendants") submit the following pertinent, highlighted cases in support of their Motion and Brief in Support of Motion to Dismiss Pursuant to Rule 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6):

| TAB NO. | NAME |
|---|---|
| C | *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. Partnership*, 146 S.W.3d 79 (Tex. 2004) |

Dated:  May 6, 2014                          Respectfully submitted,


                                             _____
                                             John D. Penn
                                             Texas Bar No. 15752300
                                             JPenn@perkinscoie.com
                                             Kelly D. Hine
                                             Texas Bar No. 24002290
                                             KHine@perkinscoie.com
                                             Erin E. Leu
                                             Texas Bar No. 24070138
                                             ELeu@perkinscoie.com

                                             Perkins Coie LLP
                                             500 N. Akard Street, Suite 3300
                                             Dallas, Texas  75201
                                             214.965.7700 – Office
                                             214.965.7799 – Facsimile

                                             **Attorneys for Defendants Hashfast
                                             Technologies LLC and Hashfast LLC**


## CERTIFICATE OF SERVICE

On the 6th day of May, 2014, a true and correct copy of the above was sent via certified mail return receipt requested and electronic mail to the following:

Robert J. Bogdanowicz III
325 N. Saint Paul Street, Suite 1500
Dallas, Texas 75201
(214) 736-7861 – Office
(214) 965-8505 – Facsimile
rob@deanslyons.com


                                             _____
                                             Counsel for Defendants


**Pertinent Highlighted Case Law in Support of Defendants' Motion to Dismiss–Page 2**

Westlaw

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

▷

Supreme Court of Texas.
PPG INDUSTRIES, INC., Petitioner,
v.
JMB/HOUSTON CENTERS PARTNERS LIMITED
PARTNERSHIP, Respondent.

No. 01–0346.
Argued Nov. 20, 2002.
Decided July 9, 2004.
Rehearing Denied Nov. 5, 2004.

**Background:** Purchaser of office building brought action against window manufacturer, alleging breach of warranty and violation of Deceptive Trade Practices–Consumer Protection Act (DTPA). The 127th District Court, Harris County, entered judgment on jury verdict in favor of purchaser. Manufacturer appealed. The Houston Court of Appeals, 14th District, 41 S.W.3d 270, affirmed. Review was granted.

**Holdings:** The Supreme Court, Brister, J., held that:
(1) any DTPA claims that original owner of building had, against window manufacturer, could not be assigned to building purchaser;
(2) discovery rule applied to breach of warranty claims under Uniform Commercial Code (UCC);
(3) breach of warranty claims should have been discovered when manufacturer replaced one-fourth of the windows, in response to complaint about deterioration of reflective coating; and
(4) whether statements, in manufacturer's advertisement in trade publication often relied on by architects, regarding 20–year limited warranty was part of the bargain between seller and building owner was fact question for jury.

Reversed and remanded.

O'Neill, J., filed an opinion concurring in part and dissenting in part, in which Schneider and Smith, JJ., joined.

West Headnotes

**[1] Sales 343 ⚷10**

343 Sales
343I Requisites and Validity of Contract
343k9 Personal Property Which May Be Subject of Sale
343k10 k. Nature of property. Most Cited Cases

Sale of exterior windows, for use in construction of skyscraper, constituted sale of "goods," within meaning of Uniform Commercial Code's (UCC) warranty provisions for sales of goods. V.T.C.A., Bus. & C. §§ 2.102, 2.105(a).

**[2] Statutes 361 ⚷1377**

361 Statutes
361III Construction
361III(M) Presumptions and Inferences as to Construction
361k1372 Statute as a Whole; Relation of Parts to Whole and to One Another
361k1377 k. Express mention and implied exclusion; expressio unius est exclusio alterius. Most Cited Cases
(Formerly 361k195)

When the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended, and if so,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

the court must honor that difference.

**[3] Antitrust and Trade Regulation 29T ☞290**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
        29TIII(E)1 In General
            29Tk287 Persons Entitled to Sue or Seek
Remedy
              29Tk290 k. Private entities or indi-
viduals. Most Cited Cases
    (Formerly 92Hk33 Consumer Protection)

While the Deceptive Trade Practices–Consumer
Protection Act (DTPA) allows the Attorney General to
bring consumer protection actions, one of the statute's
primary purposes is to encourage consumers them-
selves to file their own complaints. V.T.C.A., Bus. &
C. §§ 17.44(a), 17.46(a), 17.47.

**[4] Assignments 38 ☞22**

38 Assignments
    38I Property, Estates, and Rights Assignable
        38k21 Rights of Action
        38k22 k. In general. Most Cited Cases

The assignability, under the common law, of most
claims does not mean all are assignable; exceptions
may be required, due to equity and public policy.

**[5] Antitrust and Trade Regulation 29T ☞393**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
        29TIII(E)7 Relief
            29Tk387 Monetary Relief; Damages

            29Tk393 k. Enhanced damages;
double or treble damages. Most Cited Cases
    (Formerly 92Hk40 Consumer Protection)

Statutory treble damages under the Deceptive
Trade Practices–Consumer Protection Act (DTPA)
are punitive damages, rather than remedial damages.
V.T.C.A., Bus. & C. § 17.50.

**[6] Antitrust and Trade Regulation 29T ☞958**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
        29Tk958 k. In general. Most Cited Cases
    (Formerly 265k28(1.2))

There was no remedy at common law for being
driven out of business by a monopolist.

**[7] Assignments 38 ☞26**

38 Assignments
    38I Property, Estates, and Rights Assignable
        38k21 Rights of Action
        38k26 k. Founded on statute. Most Cited
Cases

Claims that could be brought in the absence of the
Deceptive Trade Practices–Consumer Protection Act
(DTPA) generally cannot be assigned by an aggrieved
consumer to someone else. V.T.C.A., Bus. & C. §
17.41 et seq.

**[8] Assignments 38 ☞26**

38 Assignments
    38I Property, Estates, and Rights Assignable
        38k21 Rights of Action
        38k26 k. Founded on statute. Most Cited

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

Cases

Any claims that original owner of skyscraper had, under Deceptive Trade Practices–Consumer Protection Act (DTPA), against seller of defective exterior windows used in construction of skyscraper, for breach of warranty, were not assignable from original owner to subsequent purchaser of skyscraper. V.T.C.A., Bus. & C. § 17.50(a).

**[9] Limitation of Actions 241 ⚖95(9)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(9) k. Contracts; warranties. Most Cited Cases

Four-year limitations period, under Uniform Commercial Code (UCC), for breach of warranty claims against seller of exterior windows used in construction of skyscraper, began to run when a reasonable buyer should have discovered any defects, up until the end of the five-year warranty period, rather than being subject to UCC's absolute limitations period requiring suit for breach of warranty within four years of delivery; seller, by warranting that windows would be free of defects for five years, explicitly guaranteed future performance. V.T.C.A., Bus. & C. § 2.725(a, b).

**[10] Limitation of Actions 241 ⚖95(9)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(9) k. Contracts; warranties. Most Cited Cases

Under discovery rule which tolls the limitations period for breach of warranty claim under Uniform Commercial Code (UCC), which applies when warranty explicitly extends to future performance of goods, owner of skyscraper learned of its wrongful injury with respect to skyscraper's exterior windows, and therefore should have discovered its claim for breach of warranty through defective design of all windows, when seller of windows replaced one-fourth of the windows, in response to complaint about deterioration of reflective coating. V.T.C.A., Bus. & C. § 2.725(b).

**[11] Limitation of Actions 241 ⚖95(9)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(9) k. Contracts; warranties. Most Cited Cases

The discovery rule which tolls the limitations period for breach of warranty claim under Uniform Commercial Code (UCC), which applies when warranty explicitly extends to future performance of goods, does not linger until a claimant learns of actual causes and possible cures; instead, it tolls limitations only until a claimant learns of a wrongful injury, and thereafter, the limitations clock is running, even if the claimant does not yet know the specific cause of the injury, the party responsible for it, the full extent of it, or the chances of avoiding it. V.T.C.A., Bus. & C. § 2.725(b).

**[12] Limitation of Actions 241 ⚖199(1)**

241 Limitation of Actions
    241V Pleading, Evidence, Trial, and Review
        241k199 Questions for Jury

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

241k199(1) k. In general. Most Cited Cases

The end of the discovery rule period is normally a fact question for the jury, for purposes of discovery rule which tolls the limitations period for breach of warranty claim under Uniform Commercial Code (UCC), which applies when warranty explicitly extends to future performance of goods. V.T.C.A., Bus. & C. § 2.725(b).

**[13] Limitation of Actions 241 ⟾47(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k47 Covenants and Conditions
                241k47(1) k. In general. Most Cited Cases

Efforts by seller of exterior windows used in construction of skyscraper, to repair windows with deteriorating reflective coating, did not extend the limitations period for a breach of warranty claim, under the Uniform Commercial Code (UCC), for defective design of all windows. V.T.C.A., Bus. & C. § 2.725(b).

**[14] Evidence 157 ⟾207(1)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k206 Judicial Admissions
            157k207 In General
                157k207(1) k. In general. Most Cited Cases

Failure of seller of exterior windows used in construction of skyscraper, to object to jury instruction that building owner's breach of warranty claim under Uniform Commercial Code (UCC), with respect to design defects in all windows, could not have been discovered, for limitations purposes, until seller refused to repair or replace any more windows with deteriorating reflective coating, was not a "judicial admission," because it was not a clear, deliberate, and unequivocal statement. V.T.C.A., Bus. & C. § 2.725(b).

**[15] Appeal and Error 30 ⟾179(3)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(A) Issues and Questions in Lower Court
            30k179 Sufficiency of Presentation of Questions
                30k179(3) k. Matters not submitted to jury and failure to ask instructions. Most Cited Cases

Seller of exterior windows used in construction of skyscraper did not waive its appellate claim that, as matter of law, building owner's breach of warranty claim was untimely under the discovery rule tolling Uniform Commercial Code's (UCC) limitations period, though seller failed to object in trial court to jury instruction that owner's UCC breach of warranty claim, with respect to design defects in all windows, could not have been discovered, for limitations purposes, until seller refused to repair or replace any more windows with deteriorating reflective coating, where seller asserted in trial court that its limitations defense had been established as matter of law, so that no instruction should have been submitted, even if it was in proper form. V.T.C.A., Bus. & C. § 2.725(b).

**[16] Sales 343 ⟾3.1**

343 Sales
    343I Requisites and Validity of Contract
        343k3 Sale Distinguished from Other Transactions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

343k3.1 k. In general. Most Cited Cases

A warranty to make repairs is a warranty for services, not of goods, and thus falls outside the Uniform Commercial Code (UCC) article governing sale of goods. V.T.C.A., Bus. & C. § 2.101 et seq.

**[17] Limitation of Actions 241 ☞13**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(A) Nature, Validity, and Construction in General
            241k13 k. Estoppel to rely on limitation. Most Cited Cases

Even assuming false assurances, by a seller, could toll the limitations period for a breach of warranty claim under the Uniform Commercial Code (UCC), evidence that owner of skyscraper asked seller of exterior windows used in construction of skyscraper for assurances that problem with windows had been remedied, assumed it would get such assurances, was satisfied it had gotten such assurances, and assumed or believed the problem had been fixed or could have reasonably believed the problem was fixed, and evidence that seller stated it thought it could solve the problem by replacing defective windows, and that seller knew more than it was telling anyone about windows' defects, did not establish that seller falsely assured owner the problem had been fixed. V.T.C.A., Bus. & C. § 2.725(b).

**[18] Sales 343 ☞445(2)**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k443 Trial
                343k445 Questions for Jury
                    343k445(2) k. Making and requisites

of express warranty. Most Cited Cases

Whether statements, in window seller's advertisement in trade publication often relied on by architects, regarding 20–year limited warranty on the windows was part of the bargain between seller and skyscraper owner was fact question for jury, in owner's action against seller for breach of express warranty under Uniform Commercial Code (UCC). V.T.C.A., Bus. & C. § 2.313(a).

**[19] Limitation of Actions 241 ☞95(9)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(9) k. Contracts; warranties. Most Cited Cases

**Sales 343 ☞431**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k431 k. Time to sue and limitations. Most Cited Cases

There was no breach of warranty with respect to a particular window, and therefore no requirement of bringing a claim under 20–year limited warranty "against failure of the hermetic seal," provided by seller of exterior windows used in construction of skyscraper, until, during the 20–year period, the particular window failed or the failure should have been discovered by building owner; thus, despite Uniform Commercial Code's (UCC) general four-year limitations period for breach of warranty claims, which could be tolled pursuant to discovery rule applicable to warranty of future performance, owner was not re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

quired to bring breach of warranty claims for all windows within four years of owner's discovery of extensive defects. V.T.C.A., Bus. & C. § 2.725(a, b).

**\*82** Charles R. Dunn, W. Frances Moore, Dunn Kacal Adams, Helen A. Cassidy, Storey Moore & McCally, P.C., David M. Gunn, Beck, Redden & Secrest, L.L.P., David W. Holman, Holman Keeling & York, P.C., Houston, for Petitioner.

Richard M. Alderman, David Crump, Alene Ross Levy, Lynne Liberato, Haynes & Boone, H. Bruce Golden, Golden & Owens, L.L.P., Houston, for Respondent.

Justice BRISTER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN and Justice WAINWRIGHT joined.

JMB/Houston Centers Partners obtained a judgment of more than $17 million for deceptive acts and warranty breaches that a jury found had been committed by PPG Industries, Inc. But as the two corporations had no direct business dealings, none of the claims stemmed from transactions between them. Instead, JMB's suit relied on warranty and DTPA claims received by assignment from its predecessor in interest.

The court of appeals affirmed the judgment, joining several other courts that have held or assumed DTPA claims are assignable;[FN1] a few other opinions suggest they are not.[FN2] We granted the petition in this case to decide the matter.

> FN1. 41 S.W.3d 270, 276–77; *see also Gregorcyk v. Al Hogan Builder, Inc.,* 884 S.W.2d 523, 525–26 (Tex.App.-Corpus Christi 1994, writ denied) (holding homeowners' assignment of "all claims" to their insurer included DTPA claims against builder); *Luker v. Arnold,* 843 S.W.2d 108, 120 (Tex.App.-Fort Worth 1992, no writ)

(holding assignment of DTPA claims valid despite absence of acknowledgment, delivery after assignees' bankruptcy, and limitations); *Nat'l Bugmobiles, Inc. v. Jobi Props.,* 773 S.W.2d 616, 622 (Tex.App.-Corpus Christi 1989, writ denied) (holding subsequent homeowner could bring DTPA claim for breach of termite warranty); *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 610 (Tex.App.-Tyler 1984, writ ref'd n.r.e.) (assignment extended to actions brought under DTPA); *Rosell v. Farmers Tex. County Mut. Ins. Co.,* 642 S.W.2d 278, 279 (Tex.App.-Texarkana 1982, no writ) (plaintiff-assignee denied DTPA recovery because assignor was not DTPA consumer).

> FN2. *See City of Garland v. Booth,* 971 S.W.2d 631, 634 (Tex.App.-Dallas 1998, pet. denied) (holding DTPA claims unassignable when based on legal malpractice); *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 396 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.) (same); *see also Trimble v. Itz,* 898 S.W.2d 370, 372 (Tex.App.-San Antonio 1995) (holding insurer could not bring DTPA claims in insured's name), *writ denied,* 906 S.W.2d 481 (Tex.1995) (per curiam); *Hart v. First Fed. Sav. & Loan Ass'n,* 727 S.W.2d 723, 725 (Tex.App.-Austin 1987, no writ) (reserving question whether DTPA claims were assignable). We have reserved the related but distinct question whether DTPA claims survive a consumer's death. *Shell Oil Co. v. Chapman,* 682 S.W.2d 257, 259 (Tex.1984).

We hold that assigning DTPA claims would defeat the primary purpose of the statute—to encourage individual consumers to bring such claims themselves. Additionally, we find the personal and punitive aspects of DTPA claims cannot be squared with a rule allowing them to be assigned as if they were mere

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

property.

We also conclude the trial court erred in holding that JMB's five-year-warranty claim was not barred by limitations, and that its twenty-year-warranty claim was a *83 basis of the parties' bargain as a matter of law. Accordingly, we reverse the judgment, and remand for a new trial of the latter claim alone.

### I. Background

One Houston Center, a forty-six-story skyscraper in downtown Houston, was completed in April 1978 and originally owned by Houston Center Corporation (HCC). The exterior included more than 12,000 Twindows, a dual-pane glass window unit manufactured and installed by PPG. Twindows were chosen for their insulating ability and color, which blended with other buildings in the Houston Center complex.

By July of 1982, a large number of the Twindows showed fogging and discoloration. At HCC's request, PPG manufactured and installed replacements for one-fourth of the building's windows pursuant to a contractual warranty. The replacement project took more than two years.

Several years later, HCC entered negotiations to sell One Houston Center to JMB. During its due diligence, JMB learned of the earlier window problems, and that to a limited extent they continued. When JMB inquired whether any warranties still applied, PPG replied that all had expired.

JMB bought the building "as is" in December 1989 as part of a $375 million purchase. HCC assigned to JMB all warranties relating to the building, and JMB waived all DTPA claims against HCC.

When extensive Twindows problems appeared in 1991, JMB sued PPG for violating the DTPA and breaching warranties issued to HCC. A jury found for JMB on all claims, assessing the cost to replace every Twindow in the building with comparable but non-defective window units at $4,745,037. The trial court trebled the award under the mandatory provisions of the 1973 DTPA,[FN3] and after a bench trial awarded another $1,716,181 in attorney fees.

> FN3. Act of May 21, 1973, 63rd Leg., R.S. ch. 143, § 1, 1973 Tex. Gen. Laws 322, 327 (amended 1977, 1979, 1989, and 1995) (current version at TEX. BUS. & COM.CODE § 17.50).

### II. Assignment of DTPA Claims
#### A

PPG first attacks the DTPA award, asserting that DTPA claims cannot be assigned. To determine whether DTPA claims are assignable, we look first to the words of the statute.

[1] The sale of Twindows was a sale of goods, and thus subject to the warranty provisions of Chapter 2 of the Texas Business and Commerce Code (the UCC).[FN4] Chapter 17 of the same Code (the DTPA) allows consumers to bring breach of warranty claims under that chapter as well.[FN5] Thus, a consumer may choose to bring warranty claims under either chapter, or both as JMB did here.

> FN4. See Tex. Bus. & Com.Code § 2.102 (providing chapter applies to transactions in goods); *id.* § 2.105(a) (defining "goods" as "all things ... which are movable at the time of identification to the contract for sale"); *Crest Ridge Constr. Group, Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir.1996) (holding wall panels were "goods" under Texas law as they were movable at time of sale); *see also Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 803 (Tex.1991) (concluding fabricated materials sold to general contractor for use in construction project were "goods").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

FN5. *See* TEX. BUS. & COM.CODE § 17.50(a) (providing consumers "may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: ... (2) breach of an express or implied warranty").

**\*84** The purposes and provisions of the UCC and the DTPA are, of course, not the same; otherwise, there would have been no need for both. The primary difference relevant here is that the UCC expressly provides that warranty claims are assignable,[FN6] while the DTPA says nothing about assignment.

FN6. *See id.* § 2.210(b) ("Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise.").

[2] A statute's silence can be significant.[FN7] When the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended.[FN8] If so, we must honor that difference.[FN9]

FN7. *See, e.g., Quick v. City of Austin,* 7 S.W.3d 109, 122 (Tex.1998) ( "[T]he statute is silent as to whether the program is effective pending approval. We find this silence significant because, in other Water Code sections, the Legislature has specifically stated that an act was not effective until the

Commission approved it.").

FN8. *Id.* at 122–23.

FN9. *See* 1 AM.JUR.2D*Abatement, Survival, & Revival* § 62 (1994) (stating a statutory cause of action generally "does not survive unless its survival is specifically provided for in the statute itself or in another statute").

Of course, legislatures do not always mean to say something by silence. Legislative silence may be due to mistake, oversight, lack of consensus, implied delegation to courts or agencies, or an intent to avoid unnecessary repetition. But we must at least begin our analysis by noting that the Legislature clearly knew how to indicate that warranty claims were assignable, but did not do so in the DTPA.

**B**

In some cases of statutory silence, we have looked to the statute's purpose for guidance.[FN10] Accordingly, we next look to the purposes of the DTPA to determine whether assignment of claims is consistent with its goals.

FN10. *See, e.g., Hines v. Hash,* 843 S.W.2d 464, 468 (Tex.1992) ( "When the statute is silent, we have looked to its purpose for guidance."); *Moore v. Lumbermen's Reciprocal Ass'n,* 258 S.W. 1051, 1053 (Tex. Comm'n App.1924, judgm't adopted) (looking to object and purpose of statute that was silent regarding whether compensation benefits survived to heirs).

The DTPA's primary goal was to protect consumers by encouraging them to bring consumer complaints:

This subchapter shall be liberally construed and applied to promote its underlying purposes, which

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.[FN11]

> FN11. *See* TEX. BUS. & COM.CODE § 17.44(a).

[3] While the DTPA allows the attorney general to bring consumer protection actions,[FN12] one of the statute's primary purposes is to encourage *consumers themselves* to file their *own* complaints:

> FN12. *Id.* §§ 17.46(a), 17.47.

[The Legislature] provided for the recovery of attorney's fees under the Deceptive Trade Practices Act, as encouragement to *those abused* by certain proscribed conduct to avail *themselves* *85 of the remedies of the Act.*[FN13]

> FN13. *First City Bank–Farmers Branch, Tex. v. Guex,* 677 S.W.2d 25, 30 (Tex.1984) (emphasis added).

* * *

[O]ne purpose of the DTPA's treble damages provisions is to encourage *privately initiated* consumer litigation, reducing the need for public enforcement.[FN14]

> FN14. *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980) (emphasis added).

* * *

[T]he legislative intent [was] to encourage *aggrieved consumers* to seek redress and to deter unscrupulous sellers who engage in deceptive trade practices.[FN15]

> FN15. *Woods v. Littleton,* 554 S.W.2d 662, 669 (Tex.1977) (emphasis added) (quoting *McDaniel v. Dulworth,* 550 S.W.2d 395, 396 (Tex.Civ.App.-Dallas 1977, no writ)).

Making DTPA claims assignable would have just the opposite effect: instead of swindled consumers bringing their own DTPA claims, they will be brought by someone else.

The Legislature did not intend the DTPA for everybody. It limited DTPA complaints to "consumers,"[FN16] and excluded a number of parties and transactions from the DTPA, including claims by businesses with more than $25 million in assets,[FN17] and certain claims in which consumers were represented by legal counsel.[FN18] If DTPA claims can be assigned, a party excluded by the statute (such as JMB here) could nevertheless assert DTPA claims by stepping into the shoes of a qualifying assignor. This would frustrate the clear intent of the Legislature.

> FN16. TEX. BUS. & COM.CODE § 17.45(4) (defining "consumer" as one "who seeks or acquires by purchase or lease, any goods or services"); *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 815 (Tex.1997) (holding "consumer" includes intended beneficiary of goods or services).

> FN17. TEX. BUS. & COM.CODE § 17.45(4).

> FN18. *Id.* § 17.49(f).

The court of appeals reasoned that assignment would accord with one of the DTPA's other purposes—discouraging consumer fraud.[FN19] But this proves too much; commercial trading in almost any kind of claim would likely encourage its proliferation, but

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

raises a host of other concerns.[FN20]

> FN19. 41 S.W.3d at 277; *Thomes,* 761 S.W.2d at 595; *see also Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex.1996) ("The purpose of the DTPA is ..., in part, ... to deter the conduct the DTPA forbids.").

> FN20. *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 316 (Tex.App.-San Antonio 1994, writ ref'd) ("We do not relish the thought of entrepreneurs purchasing the legal rights of clients against their attorneys as an ordinary business transaction in pursuit of profit."); *see also Mallios v. Baker,* 11 S.W.3d 157, 165 (Tex.2000) (Hecht, J., concurring) (noting that one reason most American courts prohibit voluntary assignments of legal malpractice claims is "commercial marketing of claims and increased litigation, resulting in increased costs of malpractice insurance and increased costs in legal services") (footnotes omitted).

First, the DTPA's treble-damage provisions were intended to motivate affected consumers; [FN21] they may provide a different motivation for those who might traffic in such claims. It is one thing to place the power of treble damages in the hands of aggrieved parties or the attorney general; it is quite another to place it in the hands of those considering litigation for commercial profit.

> FN21. *Pennington,* 606 S.W.2d at 690.

Second, appraising the value of a chose in action is never easy, due to the absence *86 of objective measures or markets.[FN22] Consumers are likely to be at a severe negotiating disadvantage with the kinds of entrepreneurs willing to buy DTPA claims cheap and settle them dear. The result of making DTPA claims

assignable is likely to be that some consumers will be deceived twice.

> FN22. *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 713 (Tex.1996).

Third, in many cases consumers may not even know they have DTPA claims when they sign a general assignment included in contractual boilerplate.[FN23] If such assignments are valid, the claims meant to protect consumers will quite literally be gone before they know it. In this case for example, both JMB and HCC were wealthy and sophisticated corporations, yet both denied any knowledge of a potential DTPA claim against PPG at the time of the 1989 building sale.[FN24] There was no assignment of claims generally, and no mention specifically of DTPA claims against PPG; instead, JMB relies solely on a general assignment of the building's warranties.[FN25] If this is enough, then HCC assigned away its DTPA rights against PPG without knowing it and without receiving anything for it; the $10 million in incentive damages left over after every Twindow is replaced will serve as a pure windfall for JMB. Every conceivable purpose of the statute is defeated if consumers may lose their claims by accident.

> FN23. *Cf. Kelley v. Bluff Creek Oil Co.,* 158 Tex. 180, 309 S.W.2d 208, 212 (1958) (noting general rule that after assignment, only assignee may bring claim).

> FN24. Indeed, JMB's discovery rule defense to limitations required proof that neither it nor HCC knew or should have known of any potential claim against PPG at the time the sale of One Houston Center was being negotiated.

> FN25. In addition to assigning to JMB all tangible property, service contracts, permits, trade names, and leases, HCC assigned to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

JMB all "intangible personal property of every kind and character" and "[t]he benefit of all assignable warranties, guaranties, representations or covenants given to or made in favor of [HCC]."

JMB makes no attempt to defend commercial marketing of DTPA claims, arguing only for assignment in cases like this—in which it bought the underlying building and will bear the costs of repairing it. But allowing DTPA claims by those who purchase defective goods from a consumer shifts the focus of the DTPA from deceptive *practices* to defective *products*.[FN26] If DTPA claims may be assigned to subsequent buyers like JMB, treble damages will often go to wealthy entrepreneurs rather than the consumers who were actually defrauded.

> FN26. *Amstadt,* 919 S.W.2d at 650 ("We find no authority for shifting the focus of a DTPA claim from whether the defendant committed a deceptive act to whether a product that was sold caused an injury.").

Moreover, JMB's only claim here is based on the written assignment. JMB acquired no DTPA claims merely by becoming a subsequent owner of One Houston Center,[FN27] and asserts none in its own right. As JMB's only basis for DTPA claims is the written assignment, it is hard *87 to see how its claims are different from those that might be obtained by arbitrageurs.

> FN27. *Id.* at 649–50 ("[W]e are not persuaded that the Legislature intended the DTPA to reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer.... [T]he defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed *in connection with* the plaintiff's transaction in goods or services.") (emphasis

in original). While *Amstadt* involved only DTPA laundry-list and unconscionability claims, our holding leaves no basis for distinguishing breach-of-warranty DTPA claims. Accordingly, *Amstadt* appears to overrule *Gupta v. Ritter Homes, Inc.,* in which we held an implied warranty asserted under the DTPA could be brought by a subsequent purchaser. 646 S.W.2d 168, 169 (Tex.1983).

In sum, allowing assignment of DTPA claims would ensure that aggrieved consumers do not file them, that some consumers receive nothing in compensation, and others are deceived a second time. All would defeat the very purposes for which the DTPA was enacted.

### C

[4] In some cases of statutory silence, we have also looked to related common-law principles.[FN28] With respect to the assignment of claims, we have recognized the collapse of the common-law rule that generally prohibited such assignments.[FN29] But the assignability of *most* claims does not mean *all* are assignable;[FN30] exceptions may be required due to equity and public policy.[FN31]

> FN28. *See, e.g., Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 927 (Tex.1998) ("Because the statute is silent on which party has the burden to prove the settlement amount, we refer to the common law."); *Jackson v. Thweatt,* 883 S.W.2d 171, 175 (Tex.1994) ("As the statute at hand is silent as to the rights of assignees, we turn to the common law to fill the gap.") (quoting *FDIC v. Bledsoe,* 989 F.2d 805, 810 (5th Cir.1993)).

> FN29. *Gandy,* 925 S.W.2d at 706.

> FN30. *Mallios,* 11 S.W.3d at 169 (Hecht, J.,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

concurring) ("[T]he assignability of some choses in action does not require that all choses be assignable.").

FN31. *See, e.g., Gandy,* 925 S.W.2d at 707 (prohibiting assignment of insured's claims against insurer); *Zuniga,* 878 S.W.2d at 313 (prohibiting assignment of legal malpractice claims); *Elbaor v. Smith,* 845 S.W.2d 240, 241 (Tex.1992) (prohibiting Mary Carter agreements, in which defendant receives assignment of part of plaintiff's claim and both remain parties at trial); *Int'l Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988) (prohibiting assignment of plaintiff's claims against one tortfeasor to another tortfeasor); *Trevino v. Turcotte,* 564 S.W.2d 682, 690 (Tex.1978) (prohibiting assignment of right to challenge will to one who had taken under will). Equitable exceptions to the general rule exist because assignment of choses in action "has its roots in equity, not law." *Gandy,* 925 S.W.2d at 705.

Courts addressing assignability have often distinguished between claims that are property-based and remedial and claims that are personal and punitive, holding that the former are assignable and the latter are not.[FN32] The DTPA claims here (unlike the warranty claims under the UCC) clearly fall in the latter category.

FN32. *See, e.g., Mallios,* 11 S.W.3d at 164 (Hecht, J., concurring) (noting the reason most American courts prohibit voluntary assignments of legal malpractice claims is "the personal nature of both legal services and the attorney-client relationship"); *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 940 n. 1 (Tex.1988) ("[O]ne cannot bring a cause of action for the defamation of a person already dead."); *Johnson v. Rolls,* 97 Tex. 453, 79 S.W. 513, 514 (1904) ("If the sum sued for is

a penalty, there can be no controversy that at common law the cause of action died with the wrongdoer."); *G.H. & S.A. Ry. v. Freeman,* 57 Tex. 156, 158 (1882) ( "Mere personal torts die with the party and are not assignable. 'Such are actions of slander, libel, assault and battery, false imprisonment, [adultery], seduction, etc.' "); *Bay Ridge Util. Dist. v. 4M Laundry,* 717 S.W.2d 92, 96 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) ("[A] statutory cause of action is not assignable if it is personal to the one who holds it and would not survive his death."); *see also Hart Conversions, Inc. v. Pyramid Seating Co.,* 658 N.E.2d 129, 131 (Ind.Ct.App.1995) ("The general rule is that the right to collect a penalty is a personal right which is not assignable."); *Investors Title Ins. Co. v. Herzig,* 330 N.C. 681, 413 S.E.2d 268, 271 (1992) (holding unfair practices claim for treble damages was personal right that could not be assigned); 1 AM.JUR.2D *Abatement, Survival, & Revival* § 65 (1994) ( "[A] cause of action to enforce a penalty generally does not survive the death of either party if it is penal or personal rather than contractual in nature.").

***88** Unlike most other states, Texas adopted the UCC without choosing any of its three options concerning who may sue on warranties;[FN33] instead, the Legislature expressly delegated that choice to the courts.[FN34] Pursuant to that mandate, in *Nobility Homes of Texas, Inc. v. Shivers,* we held a downstream purchaser of a mobile home could bring implied warranty claims directly against a remote manufacturer, even though there was no privity of contract between them.[FN35] While it appears we have never addressed the same issue regarding express warranties, several lower courts have applied the same rule in that context—express warranties pass with the goods.
[FN36]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
(Cite as: 146 S.W.3d 79)

FN33. The three alternatives provide that a seller's express or implied warranties extend to (A) any family member or household guest of the buyer, (B) any person who may reasonably be expected to use, consume, or be affected by the goods and suffers a personal injury, or (C) any person who may reasonably be expected to use, consume, or be affected by the goods and who suffers any type of injury. UCC § 2–318 (1966); *see Garcia v. Tex. Instruments, Inc.,* 610 S.W.2d 456, 464–65 (Tex.1980) (noting three alternatives).

FN34. TEX. BUS. & COM.CODE § 2.318 ("This chapter does not provide whether anyone other than a buyer may take advantage of an express or implied warranty of quality made to the buyer or whether the buyer or anyone entitled to take advantage of a warranty made to the buyer may sue a third party other than the immediate seller for deficiencies in the quality of the goods. These matters are left to the courts for their determination."); *see Garcia,* 610 S.W.2d at 464 (noting uniqueness of this provision).

FN35. 557 S.W.2d 77, 81 (Tex.1977). This presumes no valid disclaimer or modification. *See* TEX. BUS. & COM.CODE § 2.316.

FN36. *See, e.g., DaimlerChrysler Corp. v. Inman,* 121 S.W.3d 862, 881 (Tex.App.-Corpus Christi 2003, pet. filed); *U.S. Tire–Tech, Inc. v. Boeran, B.V.,* 110 S.W.3d 194, 198 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *Edwards v. Schuh,* 5 S.W.3d 829, 833 (Tex.App.-Austin 1999, no pet.); *Indust–Ri–Chem Lab., Inc. v. Par–Pak Co.,* 602 S.W.2d 282, 287–88 (Tex.Civ.App.-Dallas 1980, no writ). *But see Tex. Processed Plastics, Inc. v. Gray Enters.,*

*Inc.,* 592 S.W.2d 412, 415 (Tex.Civ.App.-Tyler 1979, no writ). *See also D. Brit Nelson, Comment, Is Privity Still Required in a Breach of Express Warranty Cause of Action for Personal Injury Damages?,* 43 Baylor L.Rev. 551, 571–74 (1991) (arguing for retention of privity limits).

But in *Amstadt v. U.S. Brass Corp.,* we held downstream purchasers of non-mobile homes could *not* bring DTPA claims against remote manufacturers and suppliers of a defective plumbing system, because the deceptive acts alleged were not committed against or communicated to them in connection with their own purchases.[FN37] Recognizing the similarity to this case, JMB asserted no DTPA claims in its own right, as it had no connection with PPG's original Twindows sale, and never saw any PPG advertisements or warranties before it bought the building.[FN38]

FN37. *Amstadt,* 919 S.W.2d at 649–50 ("[W]e are not persuaded that the Legislature intended the DTPA to reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer.... [T]he defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed *in connection with* the plaintiff's transaction in goods or services.") (emphasis in original). While Amstadt involved only DTPA laundry-list and unconscionability claims, our holding leaves no basis for distinguishing breach-of-warranty DTPA claims. Accordingly, *Amstadt* appears to overrule *Gupta v. Ritter Homes, Inc.,* in which we held an implied warranty asserted under the DTPA could be brought by a subsequent purchaser. 646 S.W.2d 168, 169 (Tex.1983).

FN38. A former property manager removed all the original materials when it left the property several years before JMB became

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

the owner. JMB did ask PPG whether the Twindows were still under warranty; PPG replied in the negative. As a matter of law and logic, if the price JMB paid for Houston Center was based on the belief that no warranties existed, it would be benefited rather than harmed if the facts proved otherwise.

**\*89** Thus, we have established a clear distinction between DTPA and warranty claims: a downstream buyer *can* sue a remote seller for breach of an implied warranty, but *cannot* sue under the DTPA. Clearly, if warranty claims are assignable because they are "property-based," DTPA claims must be something else; there must be a "personal" aspect in being "duped" that does not pass to subsequent buyers the way a warranty does.

DTPA claims generally are also punitive rather than remedial. In this respect, it is important to remember that the DTPA overlaps many common-law causes of action, including breach of contract, warranty, fraud, misrepresentation, and negligence.[FN39] Frequently, the DTPA is pleaded not because it is the *only* remedy, but because it is the most *favorable* remedy. In this case, for example, JMB pleaded one set of factual allegations that was then incorporated wholesale into claims for breach of contract, warranty, and the DTPA. The contract and warranty claims offered a remedy, but only the DTPA offered treble damages.

> FN39. *Amstadt,* 919 S.W.2d at 649 (noting "broad, overlapping prohibitions" in the DTPA).

In such cases, the most important role of the DTPA is the remedies it *adds,* not the ones it *duplicates.*[FN40] Economic damages and attorney's fees are certainly remedial, but they were recoverable in contract and warranty long before the DTPA was passed. The DTPA adds mental anguish and punitive damages

[FN41] —damages that could hardly be more personal.

> FN40. *See* TEX. BUS. & COM.CODE § 17.43 ("The provisions of this subchapter are not exclusive. The remedies provided in this subchapter are in addition to any other procedures or remedies provided for in any other law.").

> FN41. *See id.* § 17.50(b)(1).

JMB never asserted a claim for mental anguish, but many DTPA claimants do and will. If consumers can assign their DTPA claims, they may still have to testify at trial about the nature, duration, and severity of their mental anguish,[FN42] but someone else will keep the money.

> FN42. *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995).

[5] JMB argues the DTPA's treble damages are remedial rather than punitive because they address individual rather than public injuries. Our dissenting colleagues would also find DTPA damages remedial, but overlook the fact that twenty years ago we held exactly the opposite. In *Pace v. State,* we held a DTPA treble-damage award could not be recovered from the Real Estate Recovery Fund (a fund set up for "*reimbursing* aggrieved persons") because "treble damages under the DTPA are punitive damages."[FN43]

> FN43. 650 S.W.2d 64, 65 (Tex.1983) (emphasis in original); *see also* TEX. BUS. & COM.CODE § 17.43 ("[N]o recovery shall be permitted under both this subchapter and another law of both damages and penalties for the same act or practice."). JMB also argues the treble damages here are "less personal" because they were mandatory. *See Woods,* 554 S.W.2d at 669. But as treble damages have not been mandatory for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

twenty-five years, *see Jim Walter Homes, Inc. v. Valencia,* 690 S.W.2d 239, 241 (Tex.1985), it is unclear why we should make DTPA claims assignable now.

[6] JMB also points to cases in which federal statutory penalties have been held assignable. Statutes that create a remedy where none previously existed may be remedial; for example, there was no remedy at common law for being driven out of *90 business by a monopolist.[FN44] But that cannot be said of JMB's warranty claims here.

> FN44. *See, e.g., Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 949–50 (5th Cir.1975).

Of course, if manufacturers make representations or warranties directly to consumers, the latter may sue directly (despite the absence of privity) for breach of express warranty [FN45] or violation of the DTPA.[FN46] But JMB neither alleged nor proved that was the case here. As DTPA claims are too "personal" and "punitive" to pass with goods from one owner to the next, it is hard to see why they should pass with the same goods by assignment.[FN47]

> FN45. *See U.S. Pipe & Foundry Co. v. City of Waco,* 130 Tex. 126, 108 S.W.2d 432, 434–35 (1937).

> FN46. *See Amstadt,* 919 S.W.2d at 652.

> FN47. *Cf. Trevino,* 564 S.W.2d at 689 (holding that beneficiary who accepted bequest under will and was estopped from contesting it could not avoid that estoppel by acquiring assignment of third party's interest in will).

**D**

Finally, we must consider whether assignment of

DTPA claims may increase or distort litigation. "We have never upheld assignments in the face of those concerns." [FN48] We have prohibited assignments that may skew the trial process, confuse or mislead the jury, promote collusion among nominal adversaries, or misdirect damages from more culpable to less culpable defendants.[FN49]

> FN48. *Gandy,* 925 S.W.2d at 711.

> FN49. *Elbaor,* 845 S.W.2d at 250.

First, as noted above, DTPA claims are unlike most contract-related claims in providing for mental anguish and punitive damages. Jurors are bound to experience some confusion in assessing mental anguish of a consumer, or punitive damages based on "the situation and sensibilities of the parties," [FN50] when the affected consumer is not a party. The Legislature intended DTPA lawsuits to be "efficient and economical"; [FN51] assessing personal and punitive damages in these circumstances is likely to make that goal difficult.

> FN50. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 35 (Tex.1994).

> FN51. TEX. BUS. & COM.CODE § 17.44(a).

But more important, there is a serious risk here of skewing the adversarial process. When A sells goods to B who sells them to C, if the goods prove defective and there were no dealings between A and C (as is often the case in the stream of commerce), C will naturally look to B for a breach-of-contract remedy. But if DTPA claims are assignable, B and C both have a strong incentive to direct the suit elsewhere for relief. If B settles with C for a small amount and assigns any DTPA claims it may have against A, C now has a case with potential punitive damages, and B has avoided potential liability. Thus the litigation will

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

continue with the parties in different roles—precisely the results that have led us to prohibit assignments in other contexts.

In this case JMB made no complaints against HCC, even though the window problems JMB discovered were very similar to the ones HCC encountered a few years before.[FN52] Further, to avoid any discovery rule problems, HCC joined JMB in downplaying the earlier problems that must have seemed disastrous to HCC at *91 the time. We cast no aspersions on the litigants here; we only note that assignability of DTPA claims may encourage some buyers to cooperate—if not collude—with a seller who may have been the one that actually misled them.

> FN52. *See Int'l Proteins Corp.,* 744 S.W.2d at 934 (noting that generally "a cause of action may be assigned, but it is contrary to public policy to permit a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed").

**E**

[7][8] The DTPA is primarily concerned with people—both the deceivers and the deceived.[FN53] This gives the entire act a personal aspect that cannot be squared with a rule that allows assignment of DTPA claims as if they were merely another piece of property.

> FN53. *See* TEX. BUS. & COM.CODE § 17.44(a).

Our dissenting colleagues assert we should skip over the question of DTPA assignability (which they proceed to address in detail) to address the "threshold" question whether HCC had a valid DTPA claim to assign. In reviewing this DTPA judgment in favor of an assignee, an appellate court could first ask whether the assignment, if proper, concerned a valid DTPA

claim (as our colleagues do), or whether the DTPA claim, if proper, could be assigned (as do we). Clearly, the more important question to the jurisprudence of the state [FN54] is whether DTPA claims can be transferred (a matter of conflict in the courts of appeals), not whether pre–1983 DTPA claims survived the 1983 amendments (a matter as to which there has been neither case nor conflict in the twenty years since).

> FN54. TEX. GOV'T CODE § 22.001(a)(6).

Our dissenting colleagues suggest in a hypothetical that under our decision today, if A tampers with a car's odometer before selling it to B who sells it to C, C has no DTPA remedy against A. Of course, that is already the case under *Amstadt* if there is no assignment. Moreover, C can also sue B under the DTPA (perhaps for representing the car had lower mileage than it really had),[FN55] and B can bring an indemnity and contribution claim under the DTPA against A.[FN56] If we assume (as their hypothetical does) that A did the tampering, the effect is likely to be the same—A pays DTPA damages, and C receives them. *But if B did the tampering* (and given the severe federal penalties,[FN57] no one is likely to admit it), the assignment of DTPA claims skews the normal litigation process by encouraging C to combine with B against A.

> FN55. *See, e.g.,* TEX. BUS. & COM.CODE § 17.46(b)(6) (providing DTPA claim for misrepresenting characteristics of goods).

> FN56. *Id.* § 17.555. C could also sue A directly under federal law, *see* 49 U.S.C. § 32710, though we concede the gist of our colleagues' hypothetical that such will not be the case for every claim in the DTPA's laundry list.

> FN57. *See* 49 U.S.C. § 32709 (providing for civil penalties of $2,000 per violation, and criminal penalties up to three years impris-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

onment).

Because only an assignment is before us, we do not decide whether DTPA claims survive to a consumer's heirs, a related but sometimes distinct inquiry. [FN58] For the same reason, we also reserve for another day the assignment of claims that were created within and could not be brought without the DTPA, such as false going-out-of-business sales [FN59] or price-gouging during *92 a disaster. [FN60] Finally, our holding does not prohibit equitable assignments, such as a contingent-fee interest assigned to a consumer's attorney.[FN61]

> FN58. *See Gandy,* 925 S.W.2d at 706 (noting that "[c]auses of action ex delicto for personal torts did not survive the plaintiff's death and could not be assigned"); *Dearborn Stove Co. v. Caples,* 149 Tex. 563, 236 S.W.2d 486, 490 (1951) ("Rights of actions of this type which do not survive death ... are considered nonassignable."); *see also Lumbermen's Reciprocal Ass'n,* 258 S.W. at 1056 (holding right to receive compensation benefits could survive even though it was not assignable).

> FN59. TEX. BUS. & COM.CODE § 17.46(b)(17).

> FN60. *Id.* § 17.46(b)(27).

> FN61. *See, e.g., Levine v. Bayne, Snell & Krause, Ltd.,* 92 S.W.3d 1, 4–5 (Tex.App.-San Antonio 1999), *rev'd on other grounds,* 40 S.W.3d 92 (Tex.2001).

But because of the statutory differences between the UCC and the DTPA, the personal litigation by consumers that was the DTPA's primary purpose, the personal and punitive nature of both DTPA claims and DTPA damages, and the risks to the adversarial process, we hold that DTPA claims generally cannot be assigned by an aggrieved consumer to someone else.

### III. The Five–Year Warranty

Although JMB cannot recover treble damages under the DTPA (by assignment or otherwise), the jury's answers to two warranty questions would support JMB's recovery of actual damages and attorney's fees. JMB can assert breach of warranty claims against PPG because, unlike DTPA claims, warranty claims pass with the underlying goods [FN62] and are assignable to a subsequent purchaser.[FN63]

> FN62. *See supra* text accompanying notes 35–36.

> FN63. *See* TEX. BUS. COM.CODE § 2.210(b).

One Houston Center was substantially completed April 1, 1978. Upon completion, PPG issued a five-year limited warranty of its materials and work:

> PPG Industries, Inc. warrants all material furnished and work performed is in accordance with plans and specifications as amended by changes thereto by the owner or his authorized representative, and further warrants material furnished and labor performed to be free of defects and watertight for five years from April 1, 1978. Should such a defect occur within this warranty, PPG Industries, Inc. shall, upon receipt of written notice, repair and/or replace the defective product.

The jury found PPG breached this five-year warranty; [FN64] PPG asserts the claim is barred by limitations.

> FN64. PPG also agreed to be responsible beyond five years for "continuing corrections" to any units as to which repairs were undertaken but unsuccessful. The court of appeals correctly held this extended the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

five-year warranty only as to Twindows that were replaced. 41 S.W.3d at 282. As Houston Center never requested a jury finding or damage issue related to these Twindows alone, any claim for recovery on such a theory has been waived. *See Brown v. Bank of Galveston Nat'l Ass'n,* 963 S.W.2d 511, 515 (Tex.1998) (holding if resolution of a factual issue is required to establish a theory of recovery or defense, the failure to request a jury instruction on that issue waives the claim on appeal).

**A**

The UCC generally requires suit on breach of warranty claims within four years of delivery, regardless of when the buyer discovers defects in the goods. [FN65] This absolute limitation period was intended to provide a uniform date of accrual beyond which sellers need not worry about stale warranty claims, or retain records to defend against them.[FN66] Under that provision, limitations on PPG's warranty would have run on April 1, 1982.

> FN65. *See* TEX. BUS. & COM.CODE § 2.725(a), (b).

> FN66. *See id.* UCC cmt.; *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 546 (Tex.1986).

[9] But accrual is extended for warranties that explicitly guarantee future performance:

> A breach of warranty occurs when tender of delivery is made, *except that* **\*93** where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.[FN67]

> FN67. TEX. BUS. & COM.CODE §

2.725(b) (emphasis added).

Because PPG explicitly warranted the Twindows would be free of defects for five years, it falls within this exception.[FN68] Thus, warranty claims against PPG accrued not upon initial delivery, but when a reasonable buyer should have discovered any defects, up until the end of the five-year warranty period (when "the time of such performance" expired).

> FN68. *See Safeway,* 710 S.W.2d at 548 (indicating express warranty would extend to future performance if construed to mean roof would last twenty years).

The parties signed a tolling agreement preserving all claims that could have been brought as of September 24, 1993 (a date ten months before JMB actually filed suit on July 21, 1994). In the liability questions, the jurors were instructed not to consider any breach of warranty that should have been discovered before September 25, 1989 (four years before the tolling agreement was signed, and three months before JMB bought the building). PPG asserts the jurors' affirmative answers represent a misunderstanding and misapplication of the discovery rule, as major defects with the Twindows were discovered more than seven years earlier.

**B**

[10] By July 27, 1982, HCC had discovered serious problems with the Twindows, and complained in a letter of "deterioration of the reflective coating." Necessarily, a buyer files a complaint about a product only *after* learning of a defect. Thus, the discovery rule generally ends upon such a complaint, at least with respect to matters asserted therein.[FN69]

> FN69. *See Underkofler v. Vanasek,* 53 S.W.3d 343, 347 (Tex.2001).

After receiving the 1982 complaint, PPG under-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

took a massive remedial effort. Between 1982 and 1985, it replaced more than 3,000 Twindows at Houston Center, a quarter of the total in the forty-six-story skyscraper. These activities could hardly have gone unnoticed. As the court of appeals noted, a "failure rate of 25% might suggest something was amiss." [FN70]

FN70. 41 S.W.3d at 281.

But JMB asserts the discovery rule does not apply because neither HCC nor JMB learned until much later that the problem was a defective design, and thus extended to every window in the building. The court of appeals agreed, pointing to evidence that JMB acted diligently in "attempting to determine the cause of the problem and in attempting to correct it." [FN71]

FN71. *Id.*

[11] But the discovery rule does not linger until a claimant learns of actual causes and possible cures. Instead, it tolls limitations only until a claimant learns of a wrongful injury.[FN72] Thereafter, the limitations clock is running, even if the claimant does not yet know:

FN72. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 749 (Tex.1999); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990).

• the specific cause of the injury; [FN73]

FN73. *KPMG Peat Marwick,* 988 S.W.2d at 749.

• the party responsible for it; [FN74]

FN74. *Childs v. Haussecker,* 974 S.W.2d 31, 40 (Tex.1998); *Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 344 n. 3 (Tex.1992).

*94 • the full extent of it; [FN75] or

FN75. *Childs,* 974 S.W.2d at 42; *see also Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997).

• the chances of avoiding it.[FN76]

FN76. *Murphy v. Campbell,* 964 S.W.2d 265, 272 (Tex.1997).

It is true that not even PPG could spot a defect in every Twindow at this time. But at trial JMB asserted a design defect affecting every Twindow from inception, whether noticeable yet or not; when 3,000 Twindows failed, as a matter of law HCC should have known of this claim.

For the same reason, we must reject the argument that each window unit was a separate product and separately warranted, and thus should be treated separately for discovery rule purposes. If that were the rule, limitations would never begin to run until a defect was discovered in every single window. Texas limitations law is not that patient.

This is not to say either HCC or JMB was required to file suit every time it noticed a scratch. The evidence was undisputed that a few defective window units are inevitable in a construction project of this size; a few isolated defects would not establish discovery as a matter of law. Thus, the federal Eighth Circuit held 23 defective windows on a project involving 2,004 did not establish as a matter of law the buyer should have known the windows were defective.[FN77] Similarly, the court of appeals has repeatedly held in the context of underground leaks that the discovery rule does not end when the first leak is discovered; nor does it continue until all the leaks are known C instead, it ends when an owner knows of enough leaks to indicate the problem is not isolat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

ed.[FN78]

> FN77. *R.W. Murray Co. v. Shatterproof Glass Corp.,* 758 F.2d 266, 273–74 (8th Cir.1985).

> FN78. *See Cornerstones Mun. Util. Dist. v. Monsanto Co.,* 889 S.W.2d 570, 576–77 (Tex.App.-Houston [14th Dist.] 1994, writ denied); *Tenowich v. Sterling Plumbing Co.,* 712 S.W.2d 188, 189–90 (Tex.App.-Houston [14th Dist.] 1986, no writ); *see also Bayou Bend Towers Council of Co–Owners v. Manhattan Constr. Co.,* 866 S.W.2d 740, 742–43 (Tex.App.-Houston [14th Dist.] 1993, writ denied) (holding same with respect to leaking windows and roof).

[12] As a matter of law, the problems here were not isolated, and 3,000 defective windows is not a few. It was undisputed that PPG had never experienced a failure on this scale, either before or since. While the end of the discovery rule is normally a fact question for the jury,[FN79] there can be no difference of opinion under the circumstances presented here. Indeed, if this extraordinary number of failures is not enough to put a claimant on notice that "something is amiss" as a matter of law, then the discovery rule has no boundaries other than those each juror cares to set.

> FN79. *Childs,* 974 S.W.2d at 44.

### C

[13] The court of appeals disregarded what HCC surely knew about defects in the Twindows by pointing to PPG's efforts to repair them. But once HCC discovered widespread defects, PPG's efforts to comply with its warranty obligations, without more, did not "re-start" the discovery rule.

[14][15] JMB begins by asserting PPG admitted the discovery rule tolled limitations on all warranty claims until 1989 when it refused to repair or replace any more Twindows. The trial court instructed the jury that PPG's breach of warranty could not have been discovered until "PPG refused to perform its obligations under the warranty" (*i.e.,* its duty to repair). PPG did not object to this part of the **\*95** charge, though it did assert in motions at the end of JMB's case, at the conclusion of all the evidence, and after the verdict that the discovery rule barred JMB's warranty claims as a matter of law.

We disagree that PPG's failure to object to the jury instruction was an admission. A judicial admission must be a clear, deliberate, and unequivocal *statement;*[FN80] a party's failure to object at trial may constitute waiver, but it is no judicial admission. JMB further implies this was a waiver. But a party asserting that a claim or defense is established as a matter of law does not have to object to the form in which the question is submitted to the jury; a matter-of-law complaint objects to *any* submission, proper form or not.

> FN80. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex.2000).

Next, JMB asserts that even if PPG did not admit the matter, the jury was entitled to find that PPG's repair efforts extended limitations. But almost one hundred years ago, we held a seller's repair efforts do not extend the limitations period for breach of warranty claims.[FN81] Texas courts have been applying that rule ever since,[FN82] as do the courts of most other states.[FN83]

> FN81. *Smith v. Fairbanks, Morse & Co.,* 101 Tex. 24, 102 S.W. 908, 908–09 (1907).

> FN82. *See Equistar Chems., L.P. v. Dresser–Rand Co.,* 123 S.W.3d 584, 590 (Tex.App.-Houston [14th Dist.] 2003, pet. filed); *Pako Corp. v. Thomas,* 855 S.W.2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

215, 219 (Tex.App.-Tyler 1993, no writ); *Lambert v. Wansbrough,* 783 S.W.2d 5, 6 (Tex.App.-Dallas 1989, writ denied); *Muss v. Mercedes–Benz of N. Am., Inc.,* 734 S.W.2d 155, 159–60 (Tex.App.-Dallas 1987, writ refused n.r.e.); *Richker v. United Gas Corp.,* 436 S.W.2d 215, 218–19 (Tex.Civ.App.-Houston 1968, writ ref'd n.r.e.); *Bishop–Babcock–Becker Co. v. Jennings,* 245 S.W. 104, 104–05 (Tex.Civ.App.-Austin 1922, no writ); *see also Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 364–65 (5th Cir.1988) (surveying Texas law on this point). *But see Trunkline LNG Co. v. Trane Thermal Co.,* 722 S.W.2d 722, 725 (Tex.App.-Houston [14th Dist.] 1986, writ refused n.r.e.) (noting in third alternative holding that limitations "may" have been extended by obligation to repair defective goods).

FN83. *See, e.g., Dade County v. Rohr Indus., Inc.,* 826 F.2d 983, 989 (11th Cir.1987) (applying Florida law); *Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 743 (2d Cir.1979) (applying New York law); *Binkley Co. v. Teledyne Mid–Am. Corp.,* 333 F.Supp. 1183, 1187 (E.D.Mo.1971), *aff'd,* 460 F.2d 276 (8th Cir.1972); *Bobo v. Page Eng'g Co.,* 285 F.Supp. 664, 667 (W.D.Pa.1967), *aff'd,* 395 F.2d 991 (3d Cir.1968); *Jim Walter Homes, Inc. v. Kendrick,* 810 So.2d 645, 651 (Ala.2001); *J.R. Simplot Co. v. Chemetics Int'l, Inc.,* 126 Idaho 532, 887 P.2d 1039, 1042 (1994); *Grus v. Patton,* 790 S.W.2d 936, 940 (Mo.Ct.App.1990); *Tomes v. Chrysler Corp.,* 60 Ill.App.3d 707, 18 Ill.Dec. 71, 377 N.E.2d 224, 227 (1978); *Zahler v. Star Steel Supply Co.,* 50 Mich.App. 386, 213 N.W.2d 269, 270 (1973); *Biocraft Labs., Inc. v. USM Corp.,* 163 N.J.Super. 570, 395 A.2d 521, 522 (1978); *Poppenheimer v. Bluff City*

*Motor Homes, Div. of Bluff City Buick Co.,* 658 S.W.2d 106, 111–12 (Tenn.Ct.App.1983); *Gaffney v. Unit Crane & Shovel Corp.,* 117 A.2d 237, 239–40 (Del.Super.Ct.1955).

Serious problems would arise if the rule were otherwise. For example, if the statute of limitations was tolled every time a car needed repairs during a warranty period (and what car does not), the warranty period would become perpetual, and dealers would be loath to make any. We should encourage sellers to attempt repairs; tolling limitations every time they do might discourage them from doing so at all.

And it would give consumers little in return. Faulty repairs or false assurances of repair are already independently actionable under current law—either for breach of the implied warranty applicable to repair services, [FN84] or as DTPA laundry-list *96 violations.[FN85] Accordingly, consumers who discover defects and ask a seller to repair them do not need to toll limitations on the initial warranty claim, as they have a new limitations period relating to the repairs. JMB chose not to assert such claims, but that is not a good reason to extend the limitations period on warranties in all other cases beyond the normal term.

FN84. *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 354–55 (Tex.1987) (creating implied warranty regarding repair services for consumers suing under the DTPA).

FN85. TEX. BUS. & COM.CODE § 17.46(b)(13), (22) (defining "false, misleading, or deceptive acts or practices" to include "knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service," and "representing that work or services have been performed on, or parts replaced in, goods when the work or services were not per-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

formed or the parts replaced").

[16] We did not hold (as JMB asserts) in *Austin Co. v. Vaughn Building Corp.*[FN86] that limitations was tolled until a seller stops making repairs; instead, we held a warranty for repair services was not breached until further repairs were refused.[FN87] A warranty to make repairs is a warranty for services, not of goods, and thus falls outside the UCC.[FN88] We long ago held that limitations accrues upon breach of a repair warranty only if that was the basis of the suit; if instead the basis was a warranty as to the goods themselves, limitations accrues upon delivery.[FN89]

FN86. 643 S.W.2d 113 (Tex.1982).

FN87. *Id.* at 116.

FN88. *See Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 574 (Tex.1991) (holding UCC inapplicable to contract for advertising as it was predominantly a sale of services rather than goods); *see also Muss,* 734 S.W.2d at 158 (holding warranty to repair automobile did not guarantee it to be free of defects, but instead anticipated defects would occur and promised to repair them when they did). The drafters of the UCC have proposed defining a promise to repair or replace goods as a "remedial promise" to make clear that it "is not a warranty at all." UCC § 2–102(35) (Nov. 2000 Draft), preliminary cmt.

FN89. *See Fairbanks, Morse & Co.,* 102 S.W. at 909.

In this case, JMB asserted no claim for breach of a repair warranty. The basis of JMB's complaint was not that PPG refused to supply more Twindows; according to everything pleaded and proved, more Twindows was the last thing JMB wanted. JMB's complaints

arose from defects in the underlying goods, and thus accrued when they failed, not when PPG refused to keep manufacturing and sending replacements with the same problem.

If a defective product is sold and the seller repairs it defectively, a buyer loses nothing by suing on the latter defect instead of the former. More important, if the seller repairs it properly, the buyer has a working product instead of a lawsuit. Accordingly, we reaffirm our long-standing rule that a seller's repair efforts are not alone enough to extend the limitations period for breach of warranty claims.

**D**

[17] The court of appeals also pointed to assurances and misrepresentations PPG allegedly made about its repairs.[FN90] Even if false assurances can toll limitations, neither the court of appeals nor JMB point to a shred of evidence establishing that is what occurred here.

FN90. *See* 41 S.W.3d at 281.

In its brief, JMB assures us PPG affirmatively represented "it had completely remedied any problem," "the problem existed only in certain units," "PPG could and would completely remedy the problem," "the problem was fixed," and "there was no reason for concern." But a careful review of every record reference JMB cites discloses nothing of the kind.

*97 Instead, we are directed to testimony that HCC asked for such assurances,[FN91] tried to get them,[FN92] assumed it would get them, [FN93] and was satisfied it had gotten them.[FN94] There was also evidence that HCC thought the problems were fixed,[FN95] believed they were fixed,[FN96] and could reasonably have believed they were fixed.[FN97] *But nobody swore PPG's agents ever said so.* The only statement placed in the mouths of PPG's agents was that they "thought

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

they could solve" the problem by replacing the defective windows. This is a statement of opinion, not an affirmative representation.

FN91. Q: And did you ask for any assurances from PPG that they would be able to fix the problem using replacement Twindows 435s?

A: Absolutely. We wanted to make sure that whatever course they pursued, that it was going to be a solution to the problem—all the problems would be fixed.

FN92. Q: Now, at the time this meeting occurred, on June 3rd, 1983, were you trying to get answers from PPG about the scope of the problem; how big the problem was?

A: Yes, we were. We wanted to make sure in our discussions that all of the defective units were replaced and we completely solved the problem whenever we were finished.

FN93. Q: Did you assume when PPG asked to have the units pulled from the building and sent to their laboratory for testing to find out what the problem was, did you assume that PPG was going to tell you what the problem was?

A: We sure did.

FN94. Q: Were you satisfied that they told you that they could correct the problem by replacing the defective unit with replacement Twindow 485?

A: Absolutely.

FN95. Q: And was it your understanding that

as of March 18, 1985, every single defective unit in One Houston Center had been replaced by PPG?

A: Yes, it was.

FN96. Q: Mr. Greer, at the time that Mr. McMullen wrote this letter, [o]n behalf of One Houston Center to PPG, did you believe that PPG had completely corrected and fixed the problems at One Houston Center.

A: Yes, we did.

FN97. Q: Do you think it would have been fair and reasonable for the building owner to have believed when you finished your work in 1985 that the problem had been corrected with replacement of those Twindow units?

* * *

A: Yes, sir.

Further, it is undisputed that after all replacements were made, PPG unequivocally quashed any false hopes HCC may have entertained. In an internal memo, the Assistant Property Manager of Houston Center's management company acknowledged that PPG gave no guarantees or assurances about the repairs:

The replacement of defective lites by PPG is now completed. This completion satisfies all surveys and inspections to date. Activities ended approximately March 18, 1985. We finally received a return call from Bill Unrath, a quality control engineer with PPG in Pittsburgh on March 20th. He cited causes for the lites' coating deterioration as follows.... Bill went on to say that there is no way to predict if more lites will become affected. He also said that PPG would continue to stand behind their product, and if

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

we have any more defective lites to please call him.

In my opinion, the above causes cited sound somewhat logical. However, I find it hard to believe that the tolerances of the coating in regard to temperature are so critical. Rather, I suspect that formulation of the coating or application to the glass was substandard. PPG may simply be attempting to provide a scientific explanation when an apology for sloppy workmanship may be more appropriate. In either case, they are picking up the tab.

**\*98** Future action regarding lite replacement may be necessary as more defects are discovered. PPG will be notified should this occur.

If Houston Center's representatives believed just the opposite of what the record shows they were told,[FN98] as a matter of law they should have known better.

> FN98. Q: Now did you, in fact, believe when Mr. Unrath finished his work and when PPG told ... you they had finished their work, did you believe that the problem had been corrected?
>
> A: Absolutely. I mean that's what was reported to us by PPG.

It is true there was evidence PPG knew far more than it was telling anyone about the Twindows' defects. But mere silence is not fraudulent unless there is a duty to disclose;[FN99] no such duty existed between these contracting corporations.[FN100]

> FN99. See Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex.1998).

> FN100. See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 593–95 (Tex.1992).

In sum, PPG's repair efforts may have been futile and its explanations much less than forthcoming, but JMB points to no evidence that either owner was misled by PPG's false assurances rather than its own false hopes. False hopes are not enough to extend limitations. Accordingly, JMB's five-year warranty claims were barred as a matter of law.

### IV. The Twenty–Year Warranty

The jury also found PPG breached a twenty-year limited warranty, which the trial court found was established as a matter of law. PPG argues the trial court erred by refusing to submit this warranty to the jury, and by failing to find it was barred by limitations.

### A

There was no twenty-year warranty in any of the One Houston Center contract documents, even though they included hundreds of pages detailing every aspect of this multi-million-dollar building project. Instead, JMB relies on the following statement appearing in a PPG advertisement in Sweets' Architectural Guide, a trade publication often relied on by architects:

> Twindow units are warranted for twenty (20) years ... from the date of manufacture against failure of the hermetic seal due to faulty manufacturing of the unit by PPG. Pursuant to this limited warranty, PPG will only supply a new unit, and no labor, installation or special or consequential damages are included. This limited warranty is effective only if the unit is properly installed, and is not effective if the unit is installed in sloped glazing. PPG makes no other warranty.

PPG argues this provision does not apply to One Houston Center because (1) it was not included in the contract documents, and (2) it had been shortened before the contract here was signed. The trial court refused PPG's request to submit the question to the jury, finding as a matter of law the statement in Sweets

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

constituted a warranty applicable to Houston Center.

The contract documents—the bid documents, the general contract, and the contract signed by PPG—all contained a number of provisions regarding warranties, but none approaching twenty years:

• the General Documents and Specifications issued for bids (dated March 29, 1976) required (1) a general guarantee regarding the curtain wall for five years from the date the work was accepted, and (2) a specific warranty regarding the glass for five years from completion of the work;

**\*99** • the general contract between Houston Center and Bellows Construction Corporation (dated April 26, 1976) incorporated the contract bid documents and declared them to be "the complete understanding of the parties with reference to the matters herein and therein set forth and there are no understandings nor commitments not expressly stated herein or therein";

• the curtain wall and glass contract between Bellows and Cupples Products Division (dated April 30, 1976) provided for (1) the warranties in the General Contract and (2) a one-year warranty for defects in materials or workmanship;

• the subcontract between Cupples and PPG (dated August 6, 1976 and signed by PPG December 28, 1976) provided for (1) a guarantee of all work for the period required in the general contract and bid specifications, (2) a five-year warranty regarding all defects, and (3) a one-year warranty for breakage from thermal conditions.

[18] The absence of a twenty-year warranty in any of the contract documents does not establish as a matter of law that none existed. The UCC provides that express warranties may arise other than those stated in a contract [FN101] and favors construing over-lapping warranties as cumulative rather than conflicting.[FN102]

> FN101. *See* TEX. BUS. & COM.CODE § 2.313(a)(1) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.").

> FN102. *See id.* § 2.317.

But neither can we hold on these facts as a matter of law, that there *was* a twenty-year warranty. Before any extra-contractual statement becomes a warranty, it must become "part of the basis of the bargain." [FN103] Thus, for example, a statement cannot be a basis of the bargain if one of the parties does not know about it.[FN104]

> FN103. *Id.* § 2.313(a).

> FN104. *See Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 424 (5th Cir.2001); *see also Harris Packaging Corp. v. Baker Concrete Constr. Co.,* 982 S.W.2d 62, 67 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

The court of appeals pointed to a UCC comment explaining that for extraneous statements to become a warranty "no particular reliance on such statements need be shown." [FN105] While "particular" reliance may not be necessary, we have held several times that something rather like it is. The basis-of-the-bargain requirement "loosely reflects the common-law express warranty requirement of reliance," [FN106] and "[r]eliance is also not only relevant to, but an element of proof of, plaintiffs' claims of breach of express warranty (to a certain extent)." [FN107]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

FN105. TEX. BUS. & COM.CODE § 2.313 UCC cmt. 3 ("In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.").

FN106. *Am. Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 436–37 (Tex.1997) (affirming summary judgment on express warranty claim as there was no evidence plaintiff ever saw advertisement containing alleged warranty) (footnote omitted).

FN107. *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 686 (Tex.2003).

Further, the court of appeals' quotation from the comment left off before the comment does, which continues, "Rather, any fact which is to take such affirmations, once made, out of the agreement requires *100 clear affirmative proof. *The issue normally is one of fact.*" [FN108]

FN108. TEX. BUS. & COM.CODE § 2.313 UCC cmt. 3 (emphasis added); *see id.* UCC cmt. 6 (noting "there is no escape from the question of fact").

Here, there was conflicting evidence whether a twenty-year warranty was a basis of the parties' bargain. There was no evidence the contracting parties ever mentioned the Sweets ad in their negotiations, bid documents, or contracts. There is no evidence anyone other than Houston Center's lead architect (who worked for an outside firm) ever saw it. While the architect testified he relied on the Sweets warranty, jurors would not have been required to credit his testimony, as he did not explain why he omitted it when he drew up the bid specifications that included numerous shorter warranties. PPG's witnesses testified the parties' bargain was only what they included in their contract documents, not the unmentioned advertisement.

Further, there was conflicting evidence whether the warranty in Sweets had been withdrawn or amended. It was undisputed that no warranty for Twindows appeared in Sweets in 1977 (when most of them were constructed and installed), and Twindows did not appear at all in the publication in 1978 (when the project was accepted and the five-year warranty issued). As the court of appeals noted, PPG's business records included a 1976 letter addressed to "the trade" and dated before PPG's contract that purported to shorten the warranty to ten years.[FN109] While no PPG witness could affirmatively recall when or if this letter was sent, a jury might attribute some blame for that fact to JMB's failure to file suit until eighteen years later.

FN109. 41 S.W.3d at 283.

A jury might find the parties' bargain here included a twenty-year warranty in an advertisement in a trade magazine, even though they never discussed it and omitted it from the extensive contract documents. But they would not have to; they might also find the parties' bargain was no more than what they stated. As a result, the trial court erred in taking this question from the jury.

**B**

[19] PPG also asserts that, even if there was a twenty-year warranty, it expired along with the five-year warranty on a date four years after extensive defects were discovered.[FN110] We agree with JMB's counter-argument that, unlike the five-year warranty, the twenty-year warranty (assuming it was part of the parties' bargain) did not accrue until the failure of each Twindow seal was or should have been discovered.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

FN110. *See* TEX. BUS. & COM.CODE § 2.725(a), (b).

As with the five-year warranty, the twenty-year warranty explicitly extended to future performance. But breach of the two warranties did not occur at the same time.

The five-year warranty guaranteed the Twindows were "free of defects," and thus was breached upon delivery in 1977 (although it did not *accrue* until discovery within those five years) because the Twindows were not free of defects at that time. But the twenty-year warranty guaranteed them "against failure of the hermetic seal" for twenty years. According to this plain language, even if every Twindow contained a manufacturing defect at delivery, there was no breach of the twenty-year warranty until a hermetic seal failed. Further, there was no breach at all for seals that failed after twenty years.

**\*101** Here again, JMB argues that its warranty claims accrued in September 1989 when PPG refused to replace any more Twindows. We rejected this argument with respect to the five-year warranty because repairs do not toll limitations; we reject it here for a different reason.

JMB confuses a limitation of remedy with a breach of warranty. The UCC specifically allows parties to limit the remedies for breach of a warranty to repair or replacement:

[T]he [parties'] agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price *or to repair and replacement of non-conforming goods or parts....*[FN111]

FN111. *Id.* § 2.719(a) (emphasis added).

In this case, PPG specifically limited all its warranties to replacement of defective Twindows units.

There are consequences connected to a seller's failure to comply with a limited remedy, but changing the accrual date of limitations is not among them. "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [UCC Chapter 2]." [FN112] In other words, when PPG stopped supplying additional Twindows in 1989, JMB's remedies were no longer limited to replacement; all damages provided by the UCC became available. But it neither stopped nor restarted limitations for breach of the underlying warranty.

FN112. *Id.* § 2.719(b).

Assuming the twenty-year warranty was part of the parties' bargain, breach occurred when each hermetic seal failed. As long as PPG supplied replacements, Houston Center's owner could not sue—not because there was no *breach,* but because there was no *damage,* as the only allowable remedy had been provided. Once PPG stopped making replacements, JMB could sue for seal failures that occurred thereafter, and could seek remedies other than replacement.

Here, though HCC discovered defects in the Twindows in the 1980s, there was no evidence all the seals had failed by then. Indeed, PPG's own conduct is some evidence to the contrary, as it inspected all of them but replaced only some. And PPG presented no evidence that JMB should have known every seal would fail before 1998 when the twenty-year warranty expired. The parties' September 24, 1993 tolling agreement thus preserved JMB's breach of warranty claims concerning the twenty-year warranty as to any seals that failed after September 24, 1989, or those failing before which a reasonable owner would not have discovered by that date.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

There was evidence JMB learned of deterioration in Twindows units during its due-diligence investigations several months before it bought Houston Center in December 1989.[FN113] There was also evidence JMB requested a survey in mid–1991 of how many seals had failed, and obtained a bid for replacing every Twindow in the building. But the evidence did not establish as a matter of law that it should have known every seal had failed by either date; accordingly, the trial court *102 correctly submitted the question to the jury.

> FN113. In a schedule attached to the sale agreement, Houston Center's prior owner warranted to JMB that to the best of its knowledge there were no major physical problems with the building other than (among others) "Tint failure of up to 700 plates of glass."

### V. Conclusion

For the foregoing reasons, we reverse the court of appeal's judgment and remand for trial JMB's claim that PPG breached a twenty-year seal warranty that was a part of the basis of their bargain, and any damages related thereto.

Justice O'NEILL filed an opinion concurring in part and dissenting in part, in which Justice SCHNEIDER and Justice SMITH joined.
Justice JEFFERSON did not participate in the decision.
Justice O'NEILL, joined by Justice SCHNEIDER and Justice SMITH, concurring in part and dissenting in part.

S, a car dealer, turns the odometer back on a vehicle that it sells to B, clearly a false and deceptive trade practice that the DTPA was designed to remedy. Unaware that the odometer has been tampered with, B sells the car to C a week later and assigns all warranties associated with it. The car immediately breaks down, and C discovers that the vehicle has 100,000 more miles on it than the odometer represents. After today, C has no remedy against S for deceptive trade practices because the Court indiscriminately outlaws the assignment of all DTPA claims, even those that do not raise the policy concerns the Court fears.

I agree with the Court that DTPA assignments have the potential to raise public policy concerns, and when they do we should address them. But before proceeding to abolish, wholesale, the assignment of all DTPA claims—even those that would further the DTPA's purposes—I would first decide whether HCC had a DTPA claim to assign. The Court skips over this threshold legal question to make a broader policy choice. Addressing the first question, I conclude that HCC was not a consumer under the DTPA and was therefore not entitled to invoke its protections. Having no DTPA claim itself, HCC certainly could not assign one. For this reason, I would reverse and render judgment against JMB on its DTPA claim without reaching the broader assignability question. But if I did reach that question, I would uphold the assignment in this case; it is consistent with the DTPA's purpose and does not violate public policy. The Court's decision today is inconsistent with our own jurisprudence and the legislative intent underlying the DTPA. Accordingly, I concur in the Court's judgment insofar as it relates to JMB's right to recover under the DTPA, although for different reasons. Further, I agree with the Court that limitations does not bar JMB's claim regarding breach of the twenty-year seal warranty, but I disagree that the trial court erred in finding that the warranty applied as a matter of law. For reasons that the court of appeals expressed, 41 S.W.3d 270, 284, I would render judgment in JMB's favor on the breach-of-warranty claim and respectfully dissent from the Court's judgment remanding that claim for a new trial.

### I. Deceptive Trade Practices Act
#### A. Consumer Status

In 1976, PPG contracted with HCC to provide

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

glass and glazing for One Houston Center. As a buyer of PPG's goods and services, HCC qualified as a consumer under the DTPA in effect at the time. In 1983, the Legislature excluded from the DTPA's consumer protections entities like HCC whose assets exceeded $25 million. In 1989, JMB, whose assets also exceeded $25 million, purchased the building and was assigned all warranties and claims associated*103 with it. In 1994, after many windows had fogged or discolored, JMB sued PPG for breach of warranty and DTPA violations.

Assuming that PPG committed deceptive acts or practices in connection with selling and servicing its windows, as the jury found, only a "consumer" has standing to seek recovery against it under the DTPA. *See Knight v. Int'l Harvester Credit Corp.,* 627 S.W.2d 382, 388 (Tex.1982). The 1973 version of the Act that applied when HCC purchased the windows defined "consumer" broadly to include a "corporation who seeks or acquires by purchase or lease, any goods or services." Act of Apr. 10, 1975, 64th Leg., R.S., ch. 62, § 1, 1975 Tex. Gen. Laws 149, 149 (amended 1983) (current version at TEX. BUS. & COM.CODE § 17.45(4)). HCC clearly qualified as a "consumer" under this definition. HCC still owned the building in 1983 when the Legislature amended the statutory definition to exclude business consumers with assets exceeding $25 million. Act of Aug. 29, 1983, 68th Leg., R.S., ch. 883, § 2, 1983 Tex. Gen. Laws 4943, 4943–44 (current version at TEX. BUS. & COM.CODE § 17.45(4)). HCC did not qualify as a consumer under the amended definition. For reasons that follow, I believe that the amended definition became effective immediately and operated to extinguish any DTPA claims that HCC might have had.

The DTPA is a statutory cause of action that the Legislature created to protect consumers damaged by deceptive trade practices. Having created the cause of action, the Legislature is free to repeal or amend it at any time. *See Knight,* 627 S.W.2d at 384. When a party's right or remedy is dependent upon a statute, the

repeal of that statute without a savings clause limiting the repeal's effect operates to immediately deprive the party of all rights that have not become vested or been reduced to final judgment. *Quick v. City of Austin,* 7 S.W.3d 109, 128 (Tex.1999); *see also Knight,* 627 S.W.2d at 384; *Nat'l Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259 (1940). Thus, "suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal." *Quick,* 7 S.W.3d at 128; *see Knight,* 627 S.W.2d at 384 (citing *Dickson,* 139 S.W.2d at 259).

A savings clause may modify this general rule of abatement. *Quick,* 7 S.W.3d at 128–29. Texas's general savings clause is found in section 311.031 of the Government Code, which provides that the repeal or amendment of a statute does not affect the statute's prior operation or any rights previously acquired under it. Tex. Gov't Code § 311.031(a). In this case, the court of appeals applied the general savings clause and held that the 1983 amendments did not immediately apply to alter the consumer status of corporations whose assets exceed the $25 million cap. 41 S.W.3d at 278–79. In doing so, though, the court ignored the 1983 Act's more specific amendatory language. While it may be true that a specific savings clause does not necessarily negate section 311.031's general application, that does not mean the more specific language may be disregarded. If contrary legislative intent can be found in the amendatory language, the general savings clause does not apply. *Quick,* 7 S.W.3d at 130. Accordingly, I begin by analyzing the 1983 Act's amendatory terms.

The 1983 amendments to the DTPA effected three separate changes. First, as *104 already said, the amendments excluded from the Act's consumer protections businesses with assets exceeding $25 million.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

Second, the legislation allowed smaller businesses with assets of $5 million or more to waive the Act's protections by written contract. Finally, the Act added a definition of "business consumer." Act of Aug. 29, 1983, 68th Leg., R.S., ch. 883, §§ 1, 2, 1983 Tex. Gen. Laws 4943, 4943–44 (current version at TEX. BUS. & COM.CODE §§ 17.42, 17.45(4)). Section 4 then contains the following provision:

> This Act applies only to *a contract executed* on or after the effective date of this Act. *A contract executed* before the effective date of this Act is governed by the law in effect when *the contract was executed.*

Act of Aug. 29, 1983, 68th Leg., R.S., ch. 883, § 4, 1983 Tex. Gen. Laws 4943, 4944 (emphasis added). The question, then, is whether this savings provision applies only to the portion of the amending act governing contractual waivers, or if it also preserves the consumer status of corporations with assets exceeding $25 million as to transactions occurring before the amendment's effective date. I conclude that the specific amendatory language indicates the Legislature did not intend to leave the consumer status of corporations exceeding the asset cap intact as to pre-amendment transactions.

Section 4 of the 1983 Act specifically provides that the Act applies only to "contract[s] executed" on or after the amendments' effective date, indicating that it must have intended to preserve from the amendments' immediate effects contracts that were executed before. *Id.* The DTPA's protections, though, extend beyond transactions based upon written contracts. From its inception, the DTPA has defined a "consumer" as anyone "who seeks or acquires" goods or services. Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex. Gen. Laws 322, 323 (current version at TEX. BUS. & COM.CODE § 17.45(4)). Thus, "consumers" do not need a written contract; the Act encompasses those with oral contracts or no contract at all (*i.e.,* mere shoppers). If the Legislature truly

meant the asset cap to apply only to "contracts executed" after 1989, then it has never become operative for oral contracts or shoppers. Such a reading would contravene the Legislature's directive that, in construing statutes, we should presume that "the entire statute is intended to be effective." TEX. GOV'T CODE § 311.021(2).

Moreover, the Legislature knows how to more broadly preserve claims if that is its intent. The Legislature clearly expressed its intent to "save" all claims arising in whole or in part before its 1979 and 1981 DTPA amendments became effective. As to the 1979 amendments, the Legislature stated that "[t]his Act shall be applied prospectively only. Nothing in this Act affects either procedurally or substantively a cause of action that arose either in whole or in part prior to the effective date of this Act." Act of Apr. 10, 1979, 66th Leg., R.S., ch. 603, § 9, 1979 Tex. Gen. Laws 1327, 1332. The 1981 amendatory language is similarly broad: "Nothing in this Act shall affect procedurally or substantively a cause of action arising in whole or in part prior to the effective date of this Act." Act of March 30, 1981, 67th Leg., R.S., ch. 307, § 2, 1981 Tex. Gen. Laws 863, 864. By contrast, the Legislature's 1983 effective-date provision is carefully limited to executed contracts, which can only refer to the contractual waiver provision. As some commentators have noted:

> There is no savings clause in the 1983 amendments to the DTPA which would save a business consumer's pending cause of action. The savings clause of the 1983 amendments is applicable only *105 to contracts executed before the effective date of the amendment (i.e., waivers of DTPA claims in contracts executed before effective date are not valid.)

The Texas legislature clearly distinguishes its express intent regarding the immediate application of the 1979 and 1981 amendments to a pending cause of action from the 1983 amendments. In 1983, the legislature expressly chose to "save" only ex-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

isting contracts (i.e., no valid disclaimer of DTPA rights in contracts executed before effective date) from immediate or retroactive application, and did not intend to "save" the cause of action of a business consumer (with more than $25 million in assets) arising in whole or in part prior to the effective date of such amendment.

Andy A. Tschoepe II, et al., *Aspects of Defending a Texas Deceptive Trade Practices B Consumer Protection Act Claim,* 20 St. Mary's L.J. 527, 555–56 (1989).

Because the specific 1983 amendatory language indicates the Legislature did not intend to preserve a business consumer's claim that arose before the effective date, the general savings clause found in section 311.031(a) has no application. Thus, the 1983 amendment establishing the $25 million asset cap became effective immediately and extinguished HCC's consumer status. As a nonconsumer, then, HCC had no cause of action under the DTPA when it sold the building to JMB in 1989; the only claims JMB acquired in that purchase were potential breach-of-warranty claims. For this reason, I agree that JMB may not recover under the DTPA. But if HCC did qualify as a consumer, I would uphold the assignment of its DTPA claim to JMB when it sold the building.

**B. Assignability**

The Court concludes that DTPA assignments in general, and the one in this case particularly, violate public policy and thwart the Legislature's purpose. While this may be true in some other case, I fail to see it here. JMB owns the defective and allegedly misrepresented "Twindows" and has suffered real economic harm. JMB's DTPA breach-of-warranty claim is, in essence, a property-damage claim, and such claims have long been freely assignable. *See, e.g., G.H. & S.A. R.R. v. Freeman,* 57 Tex. 156, 157 (Tex.1882); *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 610 (Tex.App.-Tyler 1984, writ ref'd n.r.e.);

*Rosell v. Farmers Tex. County Mut. Ins. Co.,* 642 S.W.2d 278, 279 (Tex.App.-Texarkana 1982, no writ); *see also Thomes v. Porter,* 761 S.W.2d 592, 594 (Tex.App.-Fort Worth 1988, no writ) (holding DTPA claim survived owner's death and could be pursued by estate). Moreover, common-law principles support the assignment in this case. *See Thomes,* 761 S.W.2d at 594 (applying common-law rules because the DTPA does not expressly provide for survival of a cause of action).

In *State Farm Fire & Casualty Co. v. Gandy,* we examined the history of assignments and the policy considerations underlying them. 925 S.W.2d 696, 705–11 (Tex.1996). At early common law, a chose in action generally could not be assigned. *Id.* at 705. This aversion to assignments was based in part upon courts' reluctance to increase or distort litigation. *See id.* at 706. Assignments were also disfavored because, under the common law, a chose in action presupposed a personal relationship between the parties which could not be transferred. *See id.; see also* James B. Ames, *The Inalienability of Choses in Action,* in LECTURES IN LEGAL HISTORY 210, 211–212 (1913).

Over time, the demands of commerce eroded the disfavored status of assignments, although certain uniquely personal tort actions which affected their owner's *106 person, personal feelings, or character—such as slander, libel, battery, and false imprisonment—remained unassignable under the common law. *See Gandy,* 925 S.W.2d at 706–07; *Walter W. Cook, The Alienability of Choses in Action,* 29 HARV. L.REV.. 816, 826–29 (1916). The continued nonassignability of such claims was justified by the concern that the factors determining liability and damages were so closely associated with the particular actors involved in the alleged wrongdoing that they could not be fairly assessed when one of the actors was replaced. *See Gandy,* 925 S.W.2d at 706–07; *Freeman,* 57 Tex. at 157; *see also Mallios v. Baker,* 11 S.W.3d 157, 169 (Tex.2000) (Hecht, J., concurring). But "when the injury affect[ed] the estate rather than the person ... the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

right of action could be bought and sold." *Freeman,* 57 Tex. at 157. Thus, assignability of property-damage claims long ago became the general rule. *See, e.g., Graham v. Franco,* 488 S.W.2d 390, 393 (Tex.1972); *Stewart v. H. & T.C. R'y Co.,* 62 Tex. 246, 247 (1884); *Wolff v. Commercial Standard Ins. Co.,* 345 S.W.2d 565, 568 (Tex.Civ.App.-Houston 1961, writ ref'd n.r.e.); *Wichita City Lines, Inc. v. Puckett,* 288 S.W.2d 122, 124 (Tex.Civ.App.-Fort Worth 1956), *aff'd,* 156 Tex. 456, 295 S.W.2d 894 (1956); *see also Johnson v. Rolls,* 97 Tex. 453, 79 S.W. 513, 514 (1904) (noting that at "common law all causes of action for damages die with the person of the party injured, or the person inflicting the injury, except such damages as grow out of acts affecting the property rights of the injured party").

Gradually, assignability of choses in action expanded beyond contract and property-damage claims to include torts and other wrongful acts. *See Gandy,* 925 S.W.2d at 707. On the premise that assignability depended on survivability, the passage of the Texas Survivor Statute meant that personal injury claims became assignable. *See* Act of May 4, 1895, 24th Leg., R.S., ch. 89, § 1, 1895 Tex. Gen. Laws 143 (amended 1985) (current version at TEX. CIV. PRAC. & REM.CODE § 71.021); *Gandy,* 925 S.W.2d at 707 ("On the theory that assignability of a chose in action depended on whether it survived the owner's death, personal injury claims thus became assignable in Texas."); *Beech Aircraft Corp. v. Jinkins III,* 739 S.W.2d 19, 22 (Tex.1987) ("We are mindful of the general rule that a cause of action for damages for personal injuries may be sold or assigned.") (citations omitted). Thus, while some of the common law's reservations still remain, choses in action are now generally considered freely alienable. *See Gandy,* 925 S.W.2d at 707; *Doty v. Caldwell,* 38 S.W. 1025 (Tex.Civ.App. 1897, no writ); *see also Int'l Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988) ("As a general rule a cause of action may be assigned....").

In *Gandy,* which involved an attempted assignment of an insured's DTPA and other claims against his insurer, we decided the claims' assignability based on considerations of equity and public policy. 925 S.W.2d at 696; *see also Int'l Proteins,* 744 S.W.2d at 934 (invalidating assignment of plaintiff's products liability and negligence claims to joint tortfeasor as contrary to public policy). The facts presented in *Gandy* are instructive. There, the plaintiff sued her stepfather, Pearce, for sexual abuse. *Gandy,* 925 S.W.2d at 698. State Farm, which insured the Pearce home, agreed to pay for Pearce's defense and reserved its right to contest coverage. *Id.* at 699–700. Pearce and Gandy settled the case, and, as part of the settlement, Pearce assigned any claims against State Farm to Gandy. *Id.* at 700. Although Pearce had originally denied ever abusing Gandy, after the settlement was negotiated he agreed to a $6 million adverse judgment reciting that he had abused her on 325 *107 occasions. *Id.* at 712. And contrary to the position that Gandy took in her suit against Pearce, she argued in her suit against State Farm as Pearce's assignee that Pearce would not have been liable had State Farm properly handled his defense, while Pearce returned to his original contention that he had never abused Gandy and would have proved his innocence had State Farm provided him with competent counsel. *Id.*

In holding that the assignment in *Gandy* was invalid, our concerns were twofold. First, rather than resolving the suit, the assignment prolonged the litigation. Even after the district court held as a matter of law that Gandy's claims were not covered and that State Farm had no duty to defend Pearce, the settlement practically guaranteed that litigation would continue because, "as Gandy's counsel freely testified, the entire purpose of the arrangement was to find a way to recover against State Farm." *Id.* Second, and more importantly, the assignment distorted the litigation, causing the parties to take "positions that appeared contrary to their natural interests for no other reason than to obtain a judgment against State Farm." *Id.* Thus, we held the claims nonassignable based on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

public policy concerns. *Id.* at 713.

We have also held that Mary Carter agreements, which assign a plaintiff's claims against a nonsettling defendant to a settling defendant, are void as against public policy. *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992). These arrangements "nearly always ensure a trial against the non-settling defendant" and "grant the settling defendant veto power over any proposed settlement between the plaintiff and any remaining defendant." *Id.* at 248. They also confuse the jury by presenting "a sham of adversity" between the plaintiff and settling defendant. *Id.* at 249. We concluded that public policy did not support arrangements "that skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment." *Id.* at 250. Similar concerns that arise when parties purport to assign legal malpractice actions. *See Zuniga, Jr. v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.-San Antonio 1994, writ ref'd) (noting that such assignments would cause "a demeaning reversal of roles" and a "shameless shift of positions").

The assignment of HCC's warranty-based DTPA claims to JMB when it purchased the building does not present the same concerns. The assignment did not spawn litigation that would not likely have occurred otherwise. Instead, the DTPA claims are in the hands of the defective windows' owner, who seeks the same remedy the assignor could have pursued had it not sold the building. Furthermore, the assignment does not require the assignor and assignee to assume positions contrary to their natural interests, nor is the assignment likely to cause jury confusion. Consequently, the distortion of the litigation process that we deplored in *Gandy* and *Elbaor* is simply nonexistent.

The Court additionally premises its holding on the notion that, because the DTPA permits the recovery of enhanced damages, DTPA claims are punitive in nature and thus should not be assignable. Without ques-

tion enhanced damages, by definition, produce an award that exceeds the amount of underlying damage and therefore have a punitive effect. But the DTPA's enhanced-damages provision also has a remedial purpose that the Court entirely ignores. The remedial aspect is expressed in the statutory language, which states that the Act's underlying purpose is "to protect consumers against false, misleading, and deceptive business practices, **\*108** unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex. Gen. Laws 322, 322–23 (amended 1995) (current version at TEX. BUS. & COMM.CODE § 17.44(a)); *see generally* John L. Hill, *Introduction to Consumer Law Symposium,* 8 St. Mary's L.J. 609, 609–12 (1977) (discussing the lack of consumer protections and the inadequacy of remedies for consumer complaints prior to the DTPA). The Legislature has expressed its intent that the DTPA be "liberally construed and applied to promote its underlying purposes...." Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex. Gen. Laws 322 (amended 1995) (current version at Tex. Bus. & Comm.Code § 17.44(a)). We have observed that "one purpose of the DTPA's treble damages provision is to encourage privately initiated consumer litigation, reducing the need for public enforcement." *Pennington v. Singleton, III,* 606 S.W.2d 682, 690 (Tex.1980). The DTPA's enhanced-damages provision also acts as a deterrent in discouraging violations by others. That the damages in this case were mandatorily trebled indicates an intent that they be proportional to the magnitude of the harm caused and not dependent on the degree of the defendant's culpability, making them less personal than ordinary punitive damages and underscoring the trebling provision's remedial purpose. *See* Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex. Gen. Laws 322, 327; *Woods v. Littleton,* 554 S.W.2d 662, 671 (Tex.1977); *Pennington,* 606 S.W.2d at 691 (noting that culpability is an important consideration of section 17.50 as amended in 1979). Our decision in *Pace v. State,* 650 S.W.2d 64 (Tex.1983), does not negate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

the DTPA's remedial effect. There, plaintiffs sought to recover from the Real Estate Recovery Fund, a public fund the Legislature created to reimburse those who suffered monetary loss caused by unscrupulous real estate agents. *Id.* at 65. Relying on the statutory mandate that the fund be used *"for reimbursing ag-grieved persons who suffer monetary damages,"* we noted that treble damages are punitive rather than restitutionary and "[t]herefore the Legislature could not have intended that treble damages be paid from the fund." *Id.* at 65 (emphasis in original). Designed to remedy a public harm with limited funds, the Real Estate Recovery Fund specifically provided a limited remedy. That does not mean, however, that mandatory DTPA trebling is devoid of remedial purpose. The punitive aspect that the Court emphasizes is only one of several purposes that the DTPA serves.[FN1]

> FN1. Many other courts, in assessing the as-signability of enhanced damages under state law, have abandoned the remedial/punitive distinction, focusing instead on the underly-ing claim's assignability. *See, e.g., Cuson v. Md. Cas. Co.,* 735 F.Supp. 966, 971 (D.Haw.1990) (applying Hawaii law and holding that "punitive damages claims which have their genesis in [assignable claims] are assignable as well"); *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.,* 691 F.Supp. 87, 92 (N.D.Ill.1988) (applying Illinois law and holding that punitive damages are assignable if the underlying claim is assignable because "punitive damages are a type of relief which is part and parcel of the underlying cause of action"), *rev'd in part on other grounds,* 877 F.2d 614 (7th Cir.1989); *First Fed. Sav. & Loan Assoc. of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 446–47 (S.D.N.Y.1986) (applying federal and state law and concluding that "once a cause of action is determined to be assigna-ble, a punitive damage claim based upon the cause of action may also be brought by the

assignee"); *Oppel v. Empire Mut. Ins. Co.,* 517 F.Supp. 1305, 1307 (S.D.N.Y.1981) (concluding that because "New York courts permit punitive damages in a bad faith case ... there is no reason why this cause of action also cannot be assigned"); *Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs., Inc.,* 181 Ill.2d 214, 229 Ill.Dec. 496, 692 N.E.2d 269, 273–75 (1998) (holding that punitive dam-ages are a component of relief and are therefore "deemed a part of the underlying action," and assignability favors the public policy goal of deterrence); *Clearwater v. State Farm Mut. Auto. Ins.,* 161 Ariz. 590, 780 P.2d 423, 427 (App.1989), *vacated in part on other grounds,* 164 Ariz. 256, 792 P.2d 719 (1990) (holding that under Arizona law a claim for bad faith was not a personal tort and neither law nor public policy pre-vented the punitive damages aspect of the claim from being assigned); *see also INS Investigations Bureau, Inc. v. Lee,* 709 N.E.2d 736, 742 (Ind.Ct.App.1999) (apply-ing Indiana law); *Allstate Ins. Co. v. Axsom,* 696 N.E.2d 482, 485–86 (Ind.Ct.App.1998) (applying Indiana law and holding bad faith insurance claims assignable); *Kaplan v. Harco, Nat. Ins. Co.,* 716 So.2d 673, 680 (applying Mississippi law and concluding that public policy goal of deterrence is fos-tered by allowing assignment of punitive damages). Under this line of authority, the assignability of DTPA treble damages would depend upon the assignability of JMB's un-derlying warranty claim, which has long been recognized as assignable. This result is consistent with our opinion in *Hofer v. Lav-ender,* 679 S.W.2d 470, 472–75 (Tex.1984), in which we held that punitive damages sur-vive along with an underlying claim for personal injury.

**\*109** The closely analogous Sherman Anti–Trust

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

Act provides a useful comparison. Similar to the version of the DTPA in question here, a violation of the antitrust act gives rise to a claim for mandatory treble damages. 15 U.S.C. § 15(a). As under the DTPA, these damages have a punitive effect, but they were also "designed to deter future antitrust violations" and were "created primarily as a remedy." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *see e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 485, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (noting treble damages function to penalize and deter wrongdoers). And federal law is uniform in holding that an action to recover treble damages under the Sherman Anti–Trust Act "is not an action to recover a penalty" and is assignable. *See Hicks v. Bekins Moving & Storage Co.,* 87 F.2d 583, 585 (9th Cir.1937) (citing *Chattanooga Foundry & Pipe Works v. Atlanta,* 203 U.S. 390, 397, 27 S.Ct. 65, 51 L.Ed. 241 (1906)); *see also, e.g., Sampliner v. Motion Picture Patents Co.,* 254 U.S. 233, 234, 41 S.Ct. 79, 65 L.Ed. 240 (1920); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 431 (3rd Cir.1993); *Chiropractic Coop. Ass'n of Mich. v. Am. Med. Ass'n,* 867 F.2d 270, 272 (6th Cir.1989); *Health Care Equalization Comm. of the Iowa Chiropractic Soc'y v. Iowa Med. Soc'y,* 851 F.2d 1020, 1022 (8th Cir.1988); *Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1283 (9th Cir.1983); *Fazakerly v. E. Kahn's Sons Co.,* 75 F.2d 110, 114 (5th Cir.1935). That anti-trust violations result in injury to the property or business, not the person, of the individuals bringing claims further operates in favor of assignability. *See Moore v. Backus,* 78 F.2d 571, 576 (7th Cir.1935); *United Copper Sec. Co. v. Amalgamated Copper Co.,* 232 F. 574, 577–78 (2d Cir.1916).[FN2]

> FN2. Enhanced-damage awards under other federal statutory schemes have similarly been held to be nonpenal in nature and therefore assignable. These claims include treble-damage patent actions, *see, e.g., Cheramie v. Orgeron,* 434 F.2d 721, 723 (5th

Cir.1970); *Pierce v. Allen B. Du Mont Labs., Inc.,* 297 F.2d 323, 324–25 (3rd Cir.1961); *Armstrong v. Emerson Radio & Phonograph Corp.,* 132 F.Supp. 176, 179 (S.D.N.Y.1955); *Activated Sludge, Inc. v. Sanitary Dist. of Chicago,* 64 F.Supp. 25, 35–36 (N.D.Ill.1946), fifty-percent penalties for civil tax fraud, *see, e.g., Reimer's Estate v. Comm'r of Internal Revenue,* 180 F.2d 159, 160 (6th Cir.1950); *Kahr v. Comm'r of Internal Revenue,* 414 F.2d 621, 626 (2d Cir.1969); *Rau's Estate v. Comm'r of Internal Revenue,* 301 F.2d 51, 55–56 (9th Cir.1962); *Kirk v. Comm'r of Internal Revenue,* 179 F.2d 619, 621–22 (1st Cir.1950), and treble-damage Truth–in–Lending Act claims, *see e.g., Porter v. Household Fin. Corp.,* 46 Ohio Misc. 53, 385 F.Supp. 336, 342 (1974); *Murphy v. Household Fin. Corp.,* 560 F.2d 206, 211 (6th Cir.1977); *but see Johnson v. Household Fin. Corp.,* 453 F.Supp. 1327, 1331 (S.D.Ill.1978) (holding that because "actual damages are not a necessary allegation" of a complaint under the Truth–in–Lending Act, the statutory award is a civil penalty and does not survive). *See also W. Auto Supply Co. v. Gamble–Skogmo, Inc.,* 348 F.2d 736, 740–41 (8th Cir.1965), *Derdiarian v. Futterman Corp.,* 223 F.Supp. 265, 270–71 (S.D.N.Y.1963); *Int'l Ladies' Garment Workers' Union v. Shields & Co.,* 209 F.Supp. 145, 149–50 (S.D.N.Y.1962); *Mills v. Sarjem Corp.,* 133 F.Supp. 753, 761–62 (D.N.J.1955) (all holding that securities fraud claims, which limit recovery to actual damages, are assignable since they are neither penal nor personal).

**\*110** Finally, the Court vastly overstates our holding in *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 647 (Tex.1996). There, we addressed "whether the Legislature intended that upstream suppliers of raw materials and component parts be liable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

under the DTPA *when none of their misrepresentations reached the consumers.*" *Id.* at 652 (emphasis added). Our concern was that the deceptive act or practice touch the consumer transaction: "[the defendants'] actions were not connected with the plaintiffs' transactions, that is, *the sale of the homes,* in a way that justifies liability under the DTPA." *Id.* (emphasis added). There is nothing in our *Amstadt* opinion to suggest that, had the defendants' misrepresentations been directly connected with the homes' sale, subsequent buyers of the homes could not assert DTPA claims by assignment. This is entirely consistent with our decision in *Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168, 169 (Tex.1983), which involved a homeowner's warranty-based DTPA claim against the builder, where we said:

> As between the builder and owner, it matters not whether there has been an intervening owner. The effect of the latent defect on the subsequent owner is just as great as on the original buyer and the builder is no more able to justify his improper work as to a subsequent owner than to the original buyer.

*Id. Amstadt* simply did not concern warranty-based DTPA claims against a product supplier whose representations were made directly to the consumer—in this case HCC.

In sum, none of the theories that have been applied to determine a claim's assignability supports striking down the assignment in this case. Liability is predicated upon a breach-of-warranty property-damage claim, which has long been held assignable at common law. Recognizing the validity of such an assignment is consistent with the DTPA's underlying purposes and does not give rise to the policy concerns that led us to invalidate the assignment in *Gandy.* Just as C should be able to assert a DTPA claim against S for turning back his vehicle's odometer before sale, JMB should be able to step into HCC's shoes and, were HCC a consumer, assert a DTPA claim against PPG.

## II. Breach of Warranty

JMB additionally asserts claims based upon PPG's alleged breach of five- and twenty-year warranties. I agree with the Court that limitations does not bar JMB's claims that are based on the twenty-year seal warranty. PPG contends, though, that JMB cannot recover under that warranty because it failed to obtain jury findings that the warranty formed the "basis of the bargain" and that JMB notified PPG of the defect within a reasonable time. *See* TEX. BUS. & COM.CODE §§ 2.313(a)(1), 2.607(c)(1). The Court agrees, holding that the trial court erred in finding these elements as a matter of law rather than submitting them to the jury. I disagree.

**\*111** An issue that is conclusively established as a matter of law should not be submitted to the jury. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 222–23 (Tex.1992); Tex.R. Civ. P. 278 (requiring the court to submit to the jury only those questions raised by the pleadings and the evidence). Thus, if the trial court correctly found that these elements were conclusively established, it did not err in failing to submit them. *See Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 391–92 (Tex.1997) (holding that trial court properly refused to submit a question unsupported by evidence to jury).

To be actionable, a representation relating to an express warranty must form a "basis of the bargain." *See* TEX. BUS. & COM.CODE § 2.313 cmt. 3; *Sweco, Inc. v. Cont'l Sulfur & Chem.,* 808 S.W.2d 112, 115 (Tex.App.-El Paso 1991, writ denied). PPG argues that the warranty could not have formed a basis of the bargain because there was no evidence PPG relied on it. JMB, on the other hand, relying on a comment to section 2.313, claims no particular reliance need be shown for a representation to become an actionable part of the agreement. Whether or not reliance is an essential element of a breach-of-warranty claim is a question we recently noted in *Compaq v. Lapray* is undecided in Texas. 135 S.W.3d 657, 675

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

(Tex.2004). But we do not need to answer that question here because, whether or not specific reliance is a necessary element, it was shown here. It is undisputed that PPG published the twenty-year warranty in Sweet's Architectural Guide before HCC accepted its bid for the "Twindows" in order to induce customers to purchase its product. Jim Gatton, HCC's lead architect, testified that he depended upon the information that PPG provided in Sweet's Guide:

It was very important to us. It presented the Pittsburgh Plate Glass [PPG], as well as other glass products within the Sweet's Architectural file. We read it very closely. We were dependent upon the information that was printed about the glass in the Sweet's index.

Gatton specifically testified that he relied on the warranty, along with the product specifications provided in Sweet's, in selecting the "Twindows" for One Houston Center. The only evidence that PPG offered to controvert HCC's contention that it selected the "Twindows" based on the twenty-year warranty was Gatton's testimony that the warranty was not the *only* reason "Twindows" were chosen. But it is not necessary to a breach of warranty action to prove that the warranty was the only basis upon which a particular product was chosen. To become a "basis of the bargain," it need only be shown that the affirmation of fact or promise made to the buyer was *part* of the basis of the bargain, not the sole basis. *See* TEX. BUS. & COM.CODE § 2.313(a)(1).

The Court concludes that the trial court erred in determining as a matter of law that the twenty-year warranty was a basis of the bargain, in part, because Gatton "did not explain why he omitted it when he drew up the bid specification that included numerous other shorter warranties." 146 S.W.3d at 100. But Gatton testified repeatedly that the warranty was considered the equivalent of other specifications of the "Twindows," such as U-value and shading coefficient, that also were not expressly stated in the contract. He

explained that the twenty-year warranty was "part of the statement by PPG that they would provide along with the glass, along with the shading coefficient, stated with the U-value with everything else they said about the glass." Gatton had previously testified that HCC chose "Twindows" based upon their shading coefficient, their U-value, and the warranty because these specifications best fit the building's needs.

**\*112** PPG also argues that it had revised the warranty to a ten-year limited warranty before it signed the contract to supply HCC windows, and offered in support a July 1, 1976, a letter from PPG's senior vice president informing the trade that PPG was offering a ten-year warranty, effective September 1, 1976. But PPG presented no evidence that this letter was ever disseminated or published. Moreover, HCC accepted PPG's bid on May 27, 1976, over three months before the purported revised warranty's effective date. The testimony of PPG's lay witnesses that the ten-year warranty was the operative one are conclusory legal opinions not binding on the court. *See Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991). PPG presented no evidence of rescission or modification of the twenty-year warranty. Thus, the trial court did not err in failing to submit the "basis of the bargain" issue to the jury.

PPG also contends that the trial court erred in failing to submit the issue of reasonable notice of breach of warranty to the jury. Again, I disagree. The question of reasonable notice may be decided as a matter of law. *See O'Ferral v. Coolidge,* 149 Tex. 61, 228 S.W.2d 146, 148 (1950). Here, the uncontroverted evidence shows that HCC first notified PPG of a "halo effect" in some units in 1982. PPG inspected the units and saw the problems first-hand. *See Carroll Instrument Co. v. B.W.B. Controls, Inc.,* 677 S.W.2d 654, 657–58 (Tex.App.-Houston [1st Dist.] 1984, no writ) (buyer gave adequate notice by showing defective part to seller). PPG received notification of problems with additional units in July 1989. PPG's notice to JMB in October 1989 that it would no longer replace failed

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822
**(Cite as: 146 S.W.3d 79)**

units also suggests that it had notice of the continuing problems.

In sum, the trial court did not abuse its discretion in refusing to submit the "basis of the bargain" or reasonable notice issues to the jury. Because legally sufficient evidence supports the jury's finding that JMB neither discovered nor should have discovered PPG's breach of the twenty-year warranty, I would affirm the court of appeals judgment in JMB's favor on this claim.

As to the five-year warranty, PPG contends that JMB's claims are barred by limitations. But JMB alleged the same injuries under the twenty-year warranty, and the jury awarded the same amount of damages for each breach that it found. Because the judgment can be sustained on the jury's findings regarding JMB's twenty-year warranty claim, I would not reach PPG's arguments challenging recovery under the five-year warranty.

### III. Conclusion

I would hold that JMB may not invoke the DTPA's consumer protections, and therefore concur in the Court's judgment to the extent it renders judgment against JMB on that claim. I also agree with the Court that limitations does not bar JMB's claims based on breach of the twenty-year seal warranty. I disagree, though, with the Court's sweeping conclusion that no DTPA claims are assignable and its conclusion that the trial court abused its discretion in the manner in which it submitted the breach-of-warranty claim to the jury. I would affirm the court of appeals' judgment on the breach-of-warranty claim. Because the Court remands that claim for a new trial, I respectfully dissent.

Tex.,2004.
PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. Partnership
146 S.W.3d 79, 54 UCC Rep.Serv.2d 166, 47 Tex. Sup. Ct. J. 822

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.